MICHAEL LAURENCE (State Bar No. 121854)
JEANNIE S. STERNBERG (State Bar No. 79353)
LORENA M. CHANDLER (State Bar 84314)
SUSAN GARVEY (State Bar No. 187572)
HABEAS CORPUS RESOURCE CENTER
303 Second Street, Suite 400 South
San Francisco, California 94107
Telephone: (415) 348-3800
Facsimile: (415) 348-3873
Mlaurence@hcrc.ca.gov
docketing@hcrc.ca.gov

Attorneys for Petitioner TROY A. ASHMUS

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

SAN FRANCISCO HEADQUARTERS

| | |
|---|---|
| TROY A. ASHMUS,<br><br>                 Petitioner,<br><br>        v.<br><br>ROBERT K. WONG, Acting Warden of<br>California State Prison at San Quentin,<br><br>                 Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case Number 3:93-cv-00594-TEH<br><br>DEATH PENALTY CASE<br><br>PETITIONER'S EVIDENTIARY HEARING<br>EXHIBITS |

**Exhibit # 216**

**Amended Declaration of David C. Baldus, September 15, 2010**

Case Name and Case No.: *Ashmus v. Wong*, Case No. 3:93-cv-00594-TEH

**Exhibit #      216**

**Date:        9/20/2010**

**Clerk's Signature:**

## AMENDED DECLARATION OF DAVID C. BALDUS

I, David C. Baldus, declare as follows:

1.     I am the Joseph B. Tye Professor at the University of Iowa College of Law.  A copy of my curriculum vita is attached to this declaration as Appendix A.

2.     I obtained a B.A. from Dartmouth College in 1957, a M.A. in Political Science from the University of Pittsburgh in 1962, and a L.L.B. and L.L.M. from Yale Law School in 1964 and 1969 respectively.

3.     Since 1969, I have been employed at the University of Iowa College of Law as an Associate Professor (1969-1971), Professor (1972-1983), and the Joseph B. Tye Professor (1983-present).  During my academic career, I have taught courses on criminal law, federal criminal law, capital punishment, and statistical methods for lawyers.

4.     From 1988 until 1991, I served as a Special Master to the New Jersey Supreme Court.  Pursuant to that appointment I developed a factually based system of proportionality review and prepared for the Court a proportionality review report for the Court.  *See* Death Penalty Proportionality Review Project Final Report to the New Jersey Supreme Court (September 24, 1991) Proportionality Review of Death Sentences: The View of the Special Master, 5 Chance 18-27 (Summer 1993) (with George Woodworth).

5.     I have studied and applied statistical methods to a variety of legal settings for more than thirty years.  I am the author of Statistical Proof of Discrimination (1980) (with James Cole) and Equal Justice and the Death Penalty: A Legal and Empirical Analysis (1990) (with George Woodworth and Charles A. Pulaski Jr.).  I have authored numerous research papers on death penalty sentencing, including Quantitative Methods for Judging the Comparative Excessiveness of Death Sentences in The Use/Nonuse/Misuses Of Applied Social Science Research In The Court: Conference Proceedings, 83-94 (Michael Saks and Charles Baron eds. 1980); Race Discrimination In America's Capital Punishment System Since *Furman v. Georgia* (1972): The Evidence Of Race Disparities And The Record Of Our Courts And Legislatures In Addressing The Issue, Report To American Bar Association, Section Of Individual Rights And Responsibilities (July 25, 1997) (with George Woodworth);  and Arbitrariness and

Discrimination in the Administration of the Death Penalty: A Legal and Empirical Analysis of the Nebraska Experience (1973-1999), 81 Neb. L. Rev. 486 (2002) (with George Woodworth, Catherine Grosso, and Aaron Christ).

6.     I have qualified as an expert witness and testified in state and federal court proceedings, including *McCleskey v. Kemp*, Case No. CIV C81-2434A (N.D. Ga.).

**INTRODUCTION**

7.     On November 1, 2009, December 1, 2009, and February 18, 2010, I executed declarations concerning the findings of an empirical study of 27,453 California homicide cases with a date of offense between January 1, 1978, and June 30, 2002, that resulted in a first- or second-degree murder or voluntary manslaughter conviction.  Since the filing of the previous declarations, I have reviewed and classified cases recently provided by the California Department of Corrections and Rehabilitation and cases in which subsequent information has been obtained to permit final decisions.  In addition, I have verified the accuracy of my findings with respect to the cases used for my opinions in the previous declarations.  This declaration thus reports additional and corrected findings of the study based on a stratified sample of 1,900 cases drawn from the 27,453 case universe.

8.     The purpose of the study is two-fold.  The first purpose is to evaluate the scope of death eligibility under California law following the decision in *Furman v. Georgia*, 408 U.S. 238 (1972).  The second purpose is to evaluate capital charging and sentencing practices in post-*Furman* California death-eligible cases.

9.     With regard to death eligibility in post-*Furman* California, my colleague Professor George Woodworth and I documented the rates of death eligibility under post-*Furman* California law among several categories of legally relevant homicide cases.  This study also evaluated the death eligibility of each case in the sample under pre-*Furman* Georgia law.  This information enabled us to document the extent to which post-*Furman* California law has narrowed the rate of death eligibility in homicide cases from the rate of death eligibility that existed under pre-*Furman* Georgia law.  We also compared post-*Furman* California death-eligibility rates with post-*Furman* death-eligibility rates in other states.  Finally, we compared

1    the narrowing produced by post-*Furman* California law with the narrowing of death eligibility
2    produced by post-*Furman* statutes in other states.

3           10.    With regard to the second purpose, Professor Woodworth and I examined the
4    rates at which death-eligible post-*Furman* California cases are capitally charged and result in a
5    death sentence.  In that analysis, we compared post-*Furman* California death sentencing rates to
6    the death sentencing rates in pre-*Furman* Georgia death-eligible cases.  In addition, we compared
7    post-*Furman* California capital charging and sentencing rates with comparable rates in other
8    American death sentencing jurisdictions for which comparable data are available.

9    <strong>METHODOLOGY</strong>

10   **The Research Team And Responsibilities**

11          11.    The research design and sample for this study were produced by Professor
12   Woodworth, Richard Newell, and me.  Richard Newell is an experienced data management
13   specialist with many years of experience managing comparable databases.  Professor Woodworth
14   produced the statistical procedures used to estimate death-eligibility narrowing rates and the
15   charging and sentencing outcomes in the universe of cases in this study.  Robin Glenn, an
16   experienced lawyer with substantial experience as a supervisor in comparable empirical studies
17   of death penalty systems, and I oversaw the data coding and cleaning process.  The coding of the
18   data collection instrument for the cases in the sample was conducted by thirteen University of
19   Iowa law students and eight recent University of Iowa law graduates.[1]  Professor Woodworth
20   and I produced the substantive statistical findings reported herein.  The curriculum vitae of
21   Professor Woodworth, Richard Newell, and Robin Glenn are attached to this declaration as
22   Appendices B-D.

23   **The Universe And Sample**

24          12.    Because we seek to assess the narrowing effect of California's post-*Furman* law

---

26   [1]    The Iowa law students are Sadad Ali, Peter D'Angelo, John Magana, Jacob Natwick,
27   Fangzhou Ping, Thomas Farrens, Folke Simons, Erin Snider, Jason Stoddard, James Vaglio, Porntiwa Wijitgomen, Fei Yu, and Weiyan Zhang.  The recent law graduates are Rebecca Bowman, Edward Broders, Theresa Dvorak, David Franker, Luke Hannan, Beth Moffett,
28   Amanda Stahle, and Kristen Stoll.

among all willful homicide cases and relevant subgroups of those cases, we define our universe as all defendants convicted of first-degree murder (M1), second-degree murder (M2), and voluntary manslaughter (VM).  The basis for defining this universe empirically was a machine readable database maintained by the California Department of Corrections and Rehabilitation (CDCR).  This database includes information on 27,453 cases with a date of offense between January 1, 1978, and June 30, 2002, classified by crime of conviction as follows: 32% M1, 29% M2, and 39% VM.  For each case, the CDCR database includes information on the date of offense, crime of conviction, county of prosecution, county court case number, CDCR case number, date of conviction, and the gender and age of the defendant.

13.    Our 6.9% (1,900/27,453) sample was determined by available time and resources and considerations of statistical validity.  Using the CDCR database, we stratified the sample on three dimensions in order to produce a more representative sample of the cases than would have been produced by a random sampling method.  The first dimension, the crime of conviction, provides proportionate representation for the M1, M2, and VM conviction cases (three levels).  The second dimension is the population density per square mile of the county of prosecution.[2] We designed this dimension with four levels to obtain a representative sample of smaller and more rural counties.  Our goal was 25% of the sample from Los Angeles (which accounts for 42% of the cases in the universe), and 25% of the sample from each of the three other groups of counties ranked in terms of population density.[3]  Third, we stratified the sample on the basis of

---

[2]    The data source was County Population Per Square Mile: 2000 - Department of Finance, California Statistical Abstract, Sec. A, Table A-1 (county land square miles), Sec. B, Table B-3 (county population) (2001).

[3]    The counties in the four population density levels from low (1) to high (4) density are as follows.  Level 1 has 41 counties with a population density per square mile of fewer than 200 people (Alpine, Amador, Butte, Calaveras, Colusa, Del Norte, El Dorado, Fresno, Glenn, Humboldt, Imperial, Inyo, Kern, Kings, Lake, Lassen, Madera, Mariposa, Mendocino, Merced, Modoc, Mono, Monterey, Napa, Nevada, Placer, Plumas, San Benito, San Bernardino, San Luis Obispo, Santa Barbara, Shasta, Sierra, Siskiyou, Sutter, Tehama, Trinity, Tulare, Tuolumne, Yolo, and Yuba).  Level 2 has nine counties with a population per square mile larger than 200 and smaller than 700 (Marin, Riverside, San Diego, San Joaquin, Santa Cruz, Solano, Sonoma, Stanislaus, and Ventura).  Level 3 has seven counties with a population per square mile between 700 and 3400 people (Alameda, Contra Costa, Orange, Sacramento, San Francisco, San Mateo, and Santa Clara).  Level 4 is Los Angeles.

1   four time periods that would enable us to over-represent in the sample cases from the *Carlos*

2   Window,[4] during which time Jerry Frye and Troy Ashmus were sentenced to death (four levels).[5]

3   Our goal was a sample with 57% of the cases from this time period.

4       14.     Based on the information we gathered for each case in the universe, we developed

5   a stratified random sample of cases consisting of 48 strata.[6]  Within each stratum, we identified

6   the sequence in which we would request case information from the state.[7]  For each stratum, we

7   weighted the cases in the sample on the basis of the ratio of the number of cases in the universe

8   and the sample.  For example, if a stratum contained 100 cases in the universe and 20 cases in

9   the sample, the weight for each case in the sample from that stratum would be 5.0 (100/20).

**Sources Of Data For The Individual Homicide Cases In The Sample**

11      15.     Our primary source of information on each case was the probation report prepared

12  by the county probation officer with jurisdiction over the case.  California law calls for the

13  preparation of a probation report in each homicide regardless of the crime of conviction and

14  sentence.  The purpose of the report is to justify the probation officer's recommendation on the

15  appropriateness of probation as a sentencing alternative in the case.

16      16.     One limitation of the probation reports is that they are often prepared pre-trial so

17  that the ultimate crime of conviction may not be noted in the report.  When that occurred, we

---

[4]     The *Carlos* Window refers to the time period that was governed by the California Supreme Court's decision in *Carlos v. Superior Court*, 35 Cal. 3d 131 (1983).  In *Carlos*, decided on December 12, 1983, the California Supreme Court held that the robbery felony-murder special circumstance (Cal. Penal Code. § 190.2(a)(17)(i)) required the state to prove that the defendant had the intent to kill or to aid in a killing.  In *People v. Anderson*, 43 Cal. 3d 1104 (1987), decided on October 13, 1987, the California Supreme Court overruled *Carlos*, holding that intent to kill is not required to find a felony-murder special circumstance for a person who is the actual killer.  Thus, "*Carlos* applies only to murder committed between December 12, 1983, the date on which *Carlos* was decided, and October 13, 1987, the date on which it was overruled."  *People v. Musselwhite*, 17 Cal. 4th 1216, 1265 (1998) (citations omitted).

[5]     The four time periods are: a. (01/01/78 – 12/11/83), b. (12/12/83 – 10/13/87) (the *Carlos* Window), c. (10/14/87 – 12/31/92), and d. (01/01/93 – 6/30/02).

[6]     The stratum count is the product of 3 (offense categories) x 4 (county population density categories) x 4 (time periods) = 48 strata.

[7]     The state was directed by the federal district courts in Mr. Frye's and Mr. Ashmus's habeas corpus proceedings to produce (1) the database used to construct the stratified random sample, and (2) probation reports for the cases that we identified as part of the sample.

consulted the crime of conviction reported in the CDCR database.  On other occasions, the probation report contained insufficient "procedural" information because it failed to report the crime charged and/or the basis of the conviction (by guilt trial verdict or guilty plea), information that may be essential to assess the death eligibility of a case.[8]  A number of probation reports also included insufficient "substantive" information about the facts of the crime to support a valid assessment of its death eligibility.  Missing procedural or substantive information occurred in 16% of the cases for which we received a probation report from the state.

17.    When either of these information insufficiency situations occurred, we provisionally removed the case from the sample and sought a cure for the insufficiency by requesting counsel from the California Habeas Corpus Resource Center (HCRC) to consult the trial and appellate court records in the case and report the missing information if it was available.[9]  When the HCRC was able to provide us with documents containing the information needed about a case, it was coded accordingly and the case was returned to the active sample of cases.

18.    As noted above, the state's obligation to provide probation reports was defined by court orders.[10]  There were substantial delays in the state's production of these reports, which has delayed our review and coding of the homicide cases.  On October 9, 2009, counsel for Mr. Frye requested from the state replacement probation reports for the information insufficient cases that the HCRC staff had been unable to cure as of that time.  As of the submission of this amended

---

[8]    For example, when a defendant is charged with California Penal Code section 187 murder generally and is convicted of M2, a coder needs to know if the basis of the decision was a guilt trial conviction or a guilty plea in order to apply our controlling fact finding rule of interpretation (CFF).  If it were a guilt trial decision the CFF rule would authoritatively classify the case as factually M2 and not death eligible.  However, if the conviction was based on a guilty plea, the prosecutor's decision to accept that plea would not foreclose a coder's classification of factual M1 liability and the factual presence of a special circumstance because a prosecutor's decision to accept a plea bargain is not a controlling finding of fact.  *See infra* para. 25-26 for a discussion of the controlling fact finding rule and the role that procedural information plays in its application.

[9]    The HCRC cured the insufficiency in 106 cases, thus reducing the percentage of cases with missing information to 11%.

[10]    Note 7, *supra*, describes the basis of the state's obligation to provide us with probation reports for use in the conduct of this study.

declaration, we have received some of the requested probation reports.

19.     The probation reports are also limited in the information they can provide because some of the requested reports were not produced by the state or contained no usable information. The specific reasons for these shortfalls are listed in the note below.[11]   When we encountered these situations, we requested a probation report for a substitute case that was selected in random order from the sampling lists.[12]

**The Coding Process For Individual Cases**

   **The data collection instrument**

20.     Each case was coded into the data collection instrument (DCI) attached to this declaration as Appendix E.  A "thumbnail" sketch of each case was created during the coding process, which enhanced the process of reviewing the original coding decisions.  The coders and data cleaners also had the probation reports available.  The information in the probation reports provided the basis for all of the final coding decisions in this project unless an information insufficiency was present and we obtained additional information from the HCRC.  We also consulted appellate judicial opinions when applicable.

21.     The DCI consists of four substantive sections following a three-part introduction. Part IV documents charging and sentencing decisions in the case under the post-*Furman* law applicable on the date of the offense.  If the case was capitally charged, this part of the DCI documents any special circumstances alleged, found, or rejected.  It also documents sentencing outcomes reported in the probation report.

---

[11]     1. The probation report produced by the state was not a homicide conviction.  2.  The probation report produced by the state reported the facts of a conviction for involuntary manslaughter or less.  3.  The probation report relates to the defendant named in the sample but the crime of the defendant reported in the report is not in the sample.  4.  The requested probation report was not produced by the state or it is unusable because it was substantially incomplete.  5. The probation report produced by the state was illegible or unusable because of incomplete or missing pages.

[12]     The information insufficiency problem in these situations differs from the shortfall of procedural and substantive information discussed in para. 16, *supra*, in that we either had no probation report at all for the case in the sample or the severity of the missing information problem (e.g., illegible) was beyond the capacity of the HCRC to cure with its supplemental information sources.

22.     The balance of the DCI focuses on assessments of the death eligibility of the case under (a) pre-*Furman* Georgia law, and (b) post-*Furman Carlos* Window California law and 2008 California law.[13]

23.     **The coding protocol.**   The HCRC provided a detailed summary of the law concerning the elements of murder liability under pre-*Furman* Georgia law and M1 liability and special circumstances under post-*Furman* California law.   When legal issues arose under the terms of the coding protocol, Ms. Glenn and I certified legal questions to HCRC counsel to which they would reply in writing.   These memoranda were then added to the coding protocol.

24.     **The standards used to identify factual M1 status in the cases and the factual presence of special circumstances in the cases.**   We applied two core principles of interpretation in this research to assess the factual death eligibility of each case.

25.     **The controlling fact finding rule.**   The first principle is the "controlling fact finding" rule (CFF).   Its purpose is to narrowly limit the coders' discretion to override authoritative fact findings of juries and judges in particular cases.[14]   The rule holds first that if an authoritative fact finder (judge or jury) with responsibility for finding a defendant liable for M1 convicts the defendant of less than M1 (i.e., M2 or VM), that finding is considered to be a CFF and the coder will code the case at the reduced level of homicidal liability in the absence of overwhelming evidence of jury nullification.   The rule also holds that an authoritative fact finding of M1 liability or a M1 guilty plea is a CFF, and the case will be coded at that level of liability.   The same rule applies with respect to allegations and findings of the presence or absence of special circumstances in the case and defendant admissions of their presence.

---

[13]     Part V of the DCI focuses on the factual presence of special circumstances in M1 conviction cases that were not capitally charged.   Part VI of the DCI focuses on the factual presence of M1 liability and special circumstances in the case in the absence of a fact finder's M2 or VM decision that would foreclose a determination that the case is factually M1 under the controlling fact finding rule described in paragraph 25 below.   Part VII summarizes the coder's judgments of the death eligibility of the case under each of the three legal regimes.

[14]     David Baldus, George Woodworth, David Zuckerman, Neil Alan Weiner & Catherine M. Grosso, Empirical Studies of Race and Geographic Discrimination in the Administration of the Death Penalty: A Primer on the Key Methodological Issues in The Future of America's Death Penalty An Agenda For the Next Generation of Capital Punishment Research 153, 164-65 (C. Lanier, W. Bowers, and J. Acker eds., 2009) (explaining the rationale of the CFF rule).

26.     In this research, prosecutors are not viewed as controlling fact finders in the same way as jurors and judges in guilt trials.   For this reason, the CFF does not apply when a defendant is charged with less than M1 or when a M1 charge is reduced by the prosecutor to a lesser charge.   The CFF rule also does not apply when the prosecutor does not allege a special circumstance that is factually present in the case or when a special circumstance is alleged but withdrawn by the prosecutor before trial.   When any of these situations occurs, a prosecutorial decision not to charge M1 or a special circumstance or a prosecutorial decision to withdraw a M1 charge or a special circumstance allegation does not limit a coder's discretion to find factual M1 liability or a special circumstance if either or both is factually present in the case.   The same rule applies when a prosecutor reduces the charge or withdraws a special circumstance.

27.     **The legal sufficiency rule.**   The second core principle of interpretation applies when the factual M1 status of a case or the presence or absence of a special circumstance in the case is not determined by a CFF.   In these situations, the issue is not what the coder believes would be the "correct" factual determination given the conflicting evidence in the case.   Nor is the test a coder's assessment of how a reasonable juror would decide the factual issues in the case.

28.     Rather the test, known as the "legal sufficiency" standard, is whether a California appellate court would affirm a jury M1 conviction in the case or a jury's finding of the presence of a special circumstance in the case if a jury had made either of those findings and the finding was challenged on appeal for a lack of sufficient evidence.   In our application of this principle, exculpatory evidence offered by the defendant (as reported in the probation report) is given no weight, but incriminating evidence offered by the defendant is credited.

29.     In their application of the legal sufficiency test, coders relied on three forms of authority to support their judgments that the facts in a case did or did not satisfy the "legal sufficiency" test.   The strongest level of authority was a factually comparable case in which a jury or trial court's M1 or special circumstance finding of fact was sustained or reversed by a California appellate court when challenged with a claim of evidentiary insufficiency.   The second level of authority was a factually comparable case in this study in which a fact finder

returned a finding of fact on M1 liability or the presence of a special circumstance that was not disturbed on appeal. The third level of authority was the coding protocol described in paragraph 23 above.

30. **Exceptions to the CFF rule**. A CFF may not apply when the relevant law to be applied to a case was different under *Carlos* Window California law than it was under 2008 California law or vice versa. For example, assume that in a case involving a drive-by shooting, which implicates the special circumstance contained in California Penal Code section 190.2(a)(21),[15] a jury applying 2008 law found the special circumstance present. This CFF decision would control the coder's discretion in her coding of the case under 2008 law. However, because that special circumstance was not extant during the *Carlos* Window, the jury's section 190.2(a)(21) decision under 2008 law would not control the coder's classification under *Carlos* Window law. Similarly, if under *Carlos* Window law, a jury rejected a robbery special circumstance (section 190.2(a)(17)(A)) for lack of proof of intent to kill, which was required under *Carlos* Window law for all defendants, that decision would not affect the coder's classification of the robbery special circumstance case under 2008 law, which does not require proof of intent to kill to establish it as to actual killers.[16]

31. A "jury nullification" exception to the controlling fact finding rule arises when a general California Penal Code section 187 or M1 charge results in a M2 or VM jury or bench conviction and the evidence of M1 liability is "overwhelming."[17] The same rule applies to a special circumstance rejected by a fact finder[18] in the face of overwhelming evidence that the

---

[15]    Unless otherwise identified, all further statutory references are to the California Penal Code.

[16]    A related issue arises when there are no relevant fact findings in the case and the applicable law differs between *Carlos* Window law and 2008 law. Consider, for example, a drive-by shooting case prosecuted under 2008 law in which the special circumstance contained in section 190.2(a)(21) was not alleged and the prosecutor accepted a M2 guilty plea. In that situation, the coder could find both M1 liability and the drive-by shooting special circumstance factually present under 2008 law but not under *Carlos* Window law because the SC21 special circumstance was not extant under *Carlos* Window law.

[17]    The DCI code for this situation is Question (Q) 62 = 2.

[18]    In addition, when all of the special circumstances alleged in a M1 liability case are rejected by a fact finder, the case may be classified as factually death eligible if another special

1   special circumstance is present in the case.

2        32.    **Measuring death eligibility in individual cases**.  We measured the death

3   eligibility of each case under three legal regimes – pre-*Furman* Georgia law, *Carlos* Window

4   California law, and 2008 California law.  Each of these bottom-line variables is coded "1" for

5   clearly present, "0" for clearly not present, and "2" for a close call.  Close call classifications

6   arise when a M1 liability or special circumstance classification is not determined by a controlling

7   finding of fact and the circumstances of the offense are sufficiently well understood to support

8   coding.  A close call relates to the legal issue of whether the facts in the cases satisfy the legal

9   sufficiency test.[19]  As noted above,[20] that test poses the question of whether, on the facts of the

10  case, an appellate court would sustain a jury verdict finding M1 liability and a special

11  circumstance present in the case.  As noted above, there are three forms of authority on this

12  issue.[21]  When we were uncertain how an appellate court would rule on a finding of the presence

13  of M1 liability or a special circumstance in the case, we coded it a close call.

14       33.    These distinctions produced two measures of death eligibility – a conservative

15  measure that limited death eligibility to "clearly present" classifications and a liberal measure

16  that classified a case as death eligible if that status was clearly present or a close call.  In the

17  presentation of our findings, we note these distinctions and report both the conservative and

18  liberal estimates.

19       34.    **Measuring the comparative expansion and narrowing of death-eligibility**

20  **rates between different legal regimes**.  An important purpose of this project involves

21  comparisons of death-eligibility rates among different jurisdictions and within individual

22  jurisdictions under different legal regimes.  We made the following comparisons of death-

23  eligibility rates:

24         a. within California (a) Pre-*Furman* versus *Carlos* Window and 2008

25

26  circumstance not alleged by the state is factually present in the case.

[19]    *See supra* para. 27-29.

27  [20]    *See supra* para. 28.

28  [21]    *See supra* para. 29.

Amended Declaration of David C. Baldus    11

rates, and (b) *Carlos* Window versus 2008 rates, and

b. among states, e.g., California *Carlos* Window and 2008 rates versus the rates in all other death penalty states.

35.     In these analyses we focus on the comparative "expansion" and "narrowing" of death-eligibility rates between and within these jurisdictions.   For this purpose, we measure expansion and narrowing effects in two ways.  The first is the arithmetic difference between two death-eligibility rates, e.g., a 20% rate of death-eligibility pre-*Furman* versus a 10% post-*Furman* rate represents a 10-percentage point "absolute" disparity in the two rates.  The second measure is the "percentage" of expansion or narrowing of death eligibility between the two groups, which we characterize as expansion and narrowing rates.   For example, if within a jurisdiction, the pre-*Furman* death-eligibility rate was 30% compared to a 20% rate in the post-*Furman* period, the absolute difference in the two rates would be 10 percentage points (30%-20%).  The proportionate narrowing rate, would be 33% (10%/30%) – the 10-percentage point absolute disparity in the two rates divided by the pre-*Furman* rate of 30%.  Similarly if the death-eligibility rate expanded under two different legal regimes, say from 20% to 30%, the rate of expansion would be 50% (the 10-percentage point difference between the two legal regimes divided by the 20% rate for the first legal regime).   If the rate rose from 20% to 50% the expansion rate would be 150% (the 30-percentage point disparity divided by the 20% rate for the first legal regime).

36.     The precision of our estimates of rates and the expansion and narrowing of those rates is expressed in terms of a "95% confidence interval" around the estimated death-eligibility rate or the estimated expansion or narrowing rate, as the case may be.  For example, for the 33% percent narrowing rate noted above, the 95% confidence interval will depend on the size of the sample of cases on which the estimate is based.  A 95% confidence interval of 30% to 36% for a 33% narrowing rate provides us a 95% level of confidence that the narrowing rate in the universe of cases implicated in the analysis is between 30% and 36%.

## DEATH-ELIGIBILITY RATES IN CALIFORNIA AND OTHER STATES

### California Death-Eligibility Rates Under *Carlos* Window And 2008 California Law

37.     This section presents rates of death eligibility in post-*Furman* California cases

under *Carlos* Window and 2008 California law.  Table 1 presents death-eligibility rates for all cases and broken down by the crime of conviction.  Part I, Column B, Row 4 indicates that the rate of death eligibility for all cases under *Carlos* Window law was 55%, while the comparable rate under 2008 law in Column D is 59%, which represents a 7% (4/55) rate of expansion.[22]  This expansion under 2008 law is principally explained by the large number of cases in the system that implicate the drive-by shooting (section 190.2(a)(21)) and street gang murder (section 190.2(a)(22)) special circumstances, which were adopted after the *Carlos* Window.[23]

38.     Part I of Table 1 also breaks down the death-eligibility rates by the crime of conviction in Rows 1-3.  Row 1 documents for the M1 conviction cases a 91% rate under *Carlos* Window law in Column B and a 95% rate under 2008 law in Column D, which represents a 4% (4/91) expansion of death eligibility.  The death-eligibility rates reported in Rows 2 and 3 are lower for M2 and VM conviction cases.  For the M2 cases, the documented rates in Row 2 of Part I are 33% under *Carlos* Window law and 38% under 2008 law, which represents a 15% (5/33) death-eligibility expansion under 2008 law.   For the VM cases the respective rates documented in Row 3 are 41% under *Carlos* Window law and 46% under 2008 law, which represents a 12% (5/41) expansion.

39.     Of particular interest are death-eligibility rates among cases that are factually M1, as distinguished from the smaller number of cases that resulted in M1 convictions.[24]  Part II of Table 1 documents those results.  It reports an 80% rate for cases that are factually M1 under *Carlos* Window law (Row 1) and an 86% rate for cases that are factually M1 under 2008 law (Row 2), which represents a 7.5% (6/80) expansion of the rate under 2008 law.

**Comparisons of Death Eligibility Rates Under Post-*Furman* California Law and Pre-*Furman* Georgia Law**

40.     In this section and in Table 2 we compare the rate of death eligibility of the post-

---

[22]     These rates are based on our conservative death-eligibility estimates.  The rates based on the liberal estimates are reported in a footnote in Table 1.

[23]     March 27, 1996, and March 8, 2000, respectively.

[24]     Part I, Column B, Row 1 documents the death-eligibility rate in 8,711 M1 convictions while Part II, Rows 1 and 2 document death-eligibility rates among almost 19,000 factual M1 cases.

TABLE 1

DEATH-ELIGIBILITY RATES BY CRIME OF CONVICTION (PART I) AND AMONG ALL FACTUAL FIRST-DEGREE MURDERS (PART II) UNDER CALIFORNIA CARLOS WINDOW AND 2008 LAW: 1978-2002

Part I: Death-Eligibility Rates by Crime of Conviction[1]

| A<br>Crime of Conviction | B<br>Carlos Window Law | C<br>95% Confidence Interval for Col. B Estimate | D<br>2008 Law | E<br>95% Confidence Interval for Col. D Estimate |
|---|---|---|---|---|
| 1. First-Degree Murder (M1) | 91% (7,918/8,711) | 88%, 94% | 95% (8,238/8,711) | 92%, 97% |
| 2. Second- Degree Murder (M2) | 33% (2,642/7,900) | 27%, 40% | 38% (3,022/7,900) | 32%, 45% |
| 3. Voluntary Manslaughter (VM) | 41% (4,453/10,842) | 35%, 47% | 46% (5,038/10,842) | 41%, 52% |
| 4. All Cases | 55% (15,013/27,453) | 52%, 58% | 59% (16,298/27,453) | 56%, 62% |

Part II. Death-Eligibility Rates Among Factual M1 Cases[2]

| A | B<br>Death-Eligibility Rate | C<br>95% Confidence Interval for Col. B Estimate |
|---|---|---|
| 1. Percentage of factual M1 cases under Carlos Window law that are death eligible under Carlos Window law | 80% (15,013/18,737) | 77%, 83% |
| 2. Percentage of factual M1 cases under 2008 law that are death eligible under 2008 law | 86% (16,298/18,982) | 83%, 89% |

[1]When death-eligibility rates are estimated with our liberal measure of death eligibility, the Column B and D rates for Rows 1 - 4 are: Row 1 – 91% and 95%; Row 2 –34% and 38%; Row 3 – 42% and 47%, and Row 4 – 55% and 60%.
[2]When the death-eligibility rates are estimated with our liberal measure of death eligibility, the Column B estimates are 81% for Row 1 and 86% for Row 2.

*Furman* California cases under post-*Furman* California law with their rate of death eligibility under pre-*Furman* Georgia law.  Part I of Table 2 presents the narrowing rates under *Carlos Window* California law, first for all cases and then broken down by the crime of conviction.  Part I, Column A, Row 4 presents the results for all cases in the sample, while Rows 1-3 report separate results for M1, M2, and VM convictions.

41.     Part I, Column E, Row 4 of Table 2 reports a 40% narrowing rate under *Carlos Window* California law for all cases.  When the focus shifts to the three different crimes of conviction, Column E reports respective narrowing rates of 9% for the M1 cases, 67% for the M2 cases, and 47% for the VM cases.[25]

42.     Part II reports similar findings under 2008 law.  Column E reports narrowing rates of 5% for the M1 cases and 62% and 40% respectively, for the M2 and VM cases.  The overall narrowing rate reported in Row 4 for all cases under 2008 law in Column E is 35%.[26]

**Post-*Furman* Death Eligibility and Death-Eligibility Narrowing Rates in Other States**

43.     Rates of death eligibility under the capital punishment laws in other states reported in Table 3 shed important light on the breadth of California's post-*Furman* statute.  Part I of the Table first presents death-eligibility rates in two states, New Jersey and Maryland, where death eligibility is principally defined by the Model Penal Code's aggravating circumstances that have been commonly used in American death sentencing jurisdictions.  For both New Jersey and Maryland, we have empirical assessments of death-eligibility rates for first- and second-degree murder convictions.  The methodology used to make those assessments in New Jersey[27] and

---

[25]     Column E of Parts I and II of Table 2 report the narrowing rates estimated with our conservative death-eligibility measure.  Note 1 of Table 2 reports that the narrowing rates based on our liberal death-eligibility measure for Part I, Column E are as follows: Row 1 – 9%; Row 2 – 66%; Row 3 – 46%; and Row 4 – 40%.

[26]     Note 2 of Table 2 reports that the death-eligibility  narrowing rates based on our liberal death-eligibility measure for Part II of Table 2 Column E are as follows:  Row 1 – 5%; Row 2 – 62%; Row 3 – 39%; and Row 4 – 35%.

[27]     When I was the New Jersey Supreme Court's Special Master for Proportionality Review (1988-1991), Professor Woodworth and I with substantial assistance from the staff of the New Jersey Supreme Court conducted an empirical study of the operation of the New Jersey death penalty system from 1983 through 1991 based on the methodology of our Georgia research.

The staff of the court screened probation reports for death eligibility under my

TABLE 2

FACTUAL DEATH-ELIGIBILITY NARROWING AMONG CALIFORNIA POST-*FURMAN* M1, M2, AND VM CONVICTION CASES UNDER POST-*FURMAN* CALIFORNIA LAW COMPARED TO PRE-*FURMAN* GEORGIA LAW, BROKEN DOWN BY CRIME OF CONVICTION: 1978 – 2002

Part I: *CARLOS* WINDOW (CW) LAW[1]

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| **Crime of Conviction** | **Pre-*Furman* (PF) Death-Eligibility Rate** | ***Carlos* Window (CW) Death-Eligibility Rate** | **Absolute Disparity (Col. B – Col. C)** | **Narrowing Rate (Col. D/Col. B)** | **95% Confidence Interval for Col E. Estimate** |
| 1. First-Degree Murder (M1) (n = 8,711) | 100% | 91% | 9 pts. | 9% | 6%, 12% |
| 2. Second-Degree Murder (M2) (n = 7,900) | 99% | 33% | 66 pts. | 67% | 60%, 73% |
| 3. Voluntary Manslaughter (VM) (n = 10,842) | 77% | 41% | 36 pts. | 47% | 40%, 53% |
| 4. All Cases (n = 27,453) | 91% | 55% | 36 pts. | 40% | 36%, 43% |

Part II: CALIFORNIA LAW -- JANUARY 1, 2008[2]

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| **Crime of Conviction** | **Pre-*Furman* (PF) Death-Eligibility Rate** | **2008 Law Death-Eligibility Rate** | **Absolute Disparity (Col. B -- Col. C)** | **Narrowing Rate (Col. D/Col. B)** | **95% Confidence Interval for Col E. Estimate** |
| 1. First-Degree Murder (M1) (n = 8,711) | 100% | 95% | 5 pts. | 5% | 3%, 8% |
| 2. Second-Degree Murder (M2) (n = 7,900 ) | 99% | 38% | 61 pts. | 62% | 55%, 68% |
| 3. Voluntary Manslaughter (VM) (n = 10,842) | 77% | 46% | 31 pts. | 40% | 33%, 46% |
| 4. All Cases (n = 27,453) | 91% | 59% | 32 pts. | 35% | 31%, 38% |

[1]When the narrowing rates are based on our liberal measure of death eligibility, the narrowing rates in Column E are as follows:  Row 1 – 9%; Row 2 – 66%; Row 3 – 46%, and Row 4 – 40%.

[2]When the narrowing rates are based on our liberal measure of death eligibility, the narrowing rates in Column E are as follows:  Row 1 – 5%; Row 2 –62%; Row 3 – 39% and Row 4 – 35%.

16

1    Maryland[28] is similar to the methodology that we used for the California project.

2         44.    Column A, Part I of Table 3 identifies the three comparison states while Column

3    B lists the death-eligibility rates for each.  Rows 1 and 2 of Column B indicate that the post-

4    *Furman* death-eligibility rates for New Jersey and Maryland are identical at 21%.  In contrast,

5    Row 3a of Column B reports California death-eligibility rates of 64% under *Carlos* Window

6    California law, which is 3.0 (64%/21%) times higher than the New Jersey and Maryland rates,

7

8    _____

9    supervision.  My final report to the court, <u>Death Penalty Proportionality Review Project: Final Report To The New Jersey Supreme Court</u> 3-10 (September 24, 1991) [N.J. Rpt.] explains that the screening occurred in two steps.  The first threshold screen excluded as clearly not death

10   eligible juveniles, death by auto, acquittal in a murder trial and also non-penalty trial homicides that resulted in indictments for less than some form of murder or a conviction less serious than

11   aggravated manslaughter. *Id.* at 2-4.  Cases that resulted in simple manslaughter convictions (called passion-provocation or reckless manslaughter in New Jersey and voluntary or involuntary

12   manslaughter elsewhere) were also excluded.  The 1496 cases that survived this initial screen were "(a) pleas to murder [M1 or M2] felony murder, or aggravated manslaughter when the

13   original charge was a form of murder, (b) jury convictions for murder and for felony murder when the indictment was for felony murder, and (c) capital murder convictions."  This

14   population of New Jersey cases is directly comparable to the M1 and M2 California conviction cases screened for death eligibility in our California research.  With an enhanced database, the

15   New Jersey proportionality review project subjected these cases to further analysis to assess their death eligibility.   The test for "clear" death eligibility was whether the evidence was

16   "overwhelming or strong." *Id.* at 8.  The analysis determined that 16% (246/1496) of the cases screened were "clearly death eligible." *Id.* at 10.

17
     I was succeeded by two special masters until New Jersey repealed capital punishment in
18   2007.  The last special master, Judge David Baime, reported in 1999 that the court staff continued to follow the screening process established in 1988.  David Baime, <u>Report of the</u>

19   <u>Special Master to the New Jersey Supreme Court</u> 28 (April 28, 1999).  He reports that as of early 1999, of "the 2104 cases that have been screened since the beginning of the proportionality

20   review process, only 433 homicides have been classified as clearly death-eligible, approximately twenty-one percent."  This represents a post-*Furman* death-eligibility rate among M1 and M2

21   convictions of 21% (433/2104) over 15 years.  *See also Proportionality Review Project* 735 A.2d 528, 536 (N.J. 1999) (explaining and quoting from Judge Baime's 1999 report).   In our

22   discussion of death-eligibility rates in this report, we use the 21% rate for New Jersey between 1983 and 1999 reported by Judge Baime in 1999 because it is based on a larger sample than the

23   16% estimate reported by me for the 1983-1991 period.

24   [28]     Professor Raymond Paternoster conducted a *McCleskey*-style study of death sentencing in Maryland between 1978 and 1999.  Raymond Paternoster, Robert Brame, Sarah Bacon &

25   Andrew Ditchfield, <u>Justice by Geography and Race: The Administration of the Death Penalty in</u> <u>Maryland,1978-1999,</u> 4 MARGINS: Maryland's L. J. On Race, Religion, Gender, and Class 1

26   (2004) [Maryland].  To obtain a data base of "death eligible" cases his research assistants screened "approximately 6000" first- and second-degree homicide convictions based on a

27   substantial file of information maintained for each prisoner in the department of corrections. *Id.* at 15.  Professor Paternoster provided me with the more precise number of cases screened that is

28   reported in Table 2.  They used the same screening procedures that we used in New Jersey and California.

Amended Declaration of David C. Baldus      15                              **17**

TABLE 3

POST-*FURMAN* DEATH-ELIGIBILITY RATES IN OTHER STATES COMPARED TO DEATH-ELIGIBILITY
RATES IN POST-*FURMAN* CALIFORNIA: 1978-2002

Part I:  Death-Eligibility Rates in Maryland, New Jersey, and California among M1 and M2
Conviction Cases

| A<br>State | B<br>Death-Eligibility Rate[3] | C<br>95% Confidence Interval<br>for Death-Eligibility Rate<br>in Col. B. |
|---|---|---|
| 1.  New Jersey (1982-1999)[1] | 21% (433/2,104) | NA[4] |
| 2.  Maryland (1978-1999)[2] | 21% (1,311/6,150) | NA[4] |
| 3.  California (1978-2002)<br>    a.  *Carlos* Window Law<br>    b.  2008 Law | <br>64% (10,560/16,611)<br>68% (11,260/16,611) | <br>60%, 67%<br>64%, 71% |

[1]David Baime,  Report of the the New Jersey Supreme Court Proportionality Review Project 28 (April 28, 1999).
[2]Raymond Paternoster et al., Justice by Geography and Race:  The Administration of the Death Penalty in Maryland,
1978-1999, 4 U. of Md. L.J. Race, Religion, Gender & Class (MARGINS) 1, 18 (2004).
[3]When the death-eligibility rates reported in Row 3 are estimated with our liberal measures of death eligibility, the rate in
Column B, Row 3.a is 63% and the rate in 3.b is 68%.
[4]Not applicable (NA) because the rate reported in Column B is based on the universe of M1 or M2 convictions in the
state.

Part II:  Death-Eligibility Rates in Nebraska and California among M1, M2, and VM Conviction
Cases

| A<br>State | B<br>Death-Eligibility Rate[2] | C<br>95% Confidence Interval<br>for Death-Eligibility Rate<br>in Col. B. |
|---|---|---|
| 1.  Nebraska (1973-1999)[1] | 25% (175/689) | NA[3] |
| 2.  California (1978-2002)<br>    a. *Carlos* Window Law<br>    b. 2008 Law | <br>55% (15,013/27,453)<br>59% (16,298/27,453) | <br>(52%, 58%)<br>(56%, 62%) |

[1]David C. Baldus, George Woodworth, Catherine M. Grosso, & Aaron M. Christ, Arbitrariness and Discrimination in the
Administration of the Death Penalty:  A Legal and Empirical Analysis of the Nebraska Experience (1973-1999), 81 Neb.
L. Rev. 486, 542 (2002).
[2]When the death-eligibility rates reported in Row 2 are estimated with our liberal measure of death eligibility, the rate in
Column B, Row 2.a is 55% and the rate in 2.b. is 60%.
[3]Not applicable (NA) because the rate reported in Column B is based on the universe of M1, M2, and VM convictions in
the state.

Part III:  Death-Eligibility Rates for California, Nationwide, New Jersey, Maryland, and Nebraska
Based on the Percent of Death-Eligible Homicides Among All Homicides Reported in the
FBI Supplemental Homicide Reports (SHR) (1978-2003)[1]

| A<br>State | B<br>Death-Eligibility Rate | C<br>95% Confidence Interval for Death Eligibility Rate in Col. B. |
|---|---|---|
| 1.   California | 37.8% | (36%, 40%) |
| 2.   Nationwide[2] | 23.8% | (23.0%, 24.6%) |
| 3.   New Jersey | 25.5% | (24%, 27%) |
| 4.   Maryland | 21.9% | (20%, 23%) |
| 5.   Nebraska | 28.9% | (25%, 32%) |

[1] Jeffrey Fagan, Franklin E. Zimring & Amanda Geller, Capital Punishment and Capital Murder:  Market Share and the Deterrent Effects of the Death Penalty, 84 Tex. L. Rev. 1803, 1819 (2006).  These findings are based on FBI, Supplemental Homicide Report (SHR) data, which documents all murder and non-negligent manslaughter  reported to the FBI by state law enforcement officials.  Professor Fagan and his colleagues generously shared their unpublished state by state findings for use in this declaration.
[2] Id. at 1819.  The nationwide rates range from 37.8% (California) to 13.1% (Alabama). See infra Table 4, Part II.

19

1    and 68% under 2008 California law, which is 3.2 (68%/21%) times higher than the New Jersey

2    and Maryland rates.  Expressed in terms of expansion rates, the *Carlos* Window California law

3    rate represents a 205% (43/21) expansion over the New Jersey and Maryland rates, while the

4    68% death-eligibility rate under 2008 California law represents a 224% (47/21) expansion over

5    the New Jersey and Maryland rates.

6          45.     The New Jersey and Maryland post-*Furman* death-eligibility rates can also be

7    usefully compared with California in terms of their rates of death eligibility under pre-*Furman*

8    law.   Under New Jersey and Maryland pre-*Furman* law, all first-degree murder was death

9    eligible.[29]   The breadth of death eligibility in these states was greatly narrowed with post-

10   *Furman* legislative requirements of one or more aggravating circumstances in M1 cases and the

11   additional New Jersey legislative requirement limiting death eligibility to actual killers.[30]

12   However, we cannot empirically quantify the rate of death eligibility of New Jersey's and

13   Maryland's post-*Furman* cases under its pre-*Furman* statutes.

14         46.     What we can determine with considerable certainty, however, is the rate of death

15   eligibility of Maryland's and New Jersey's first and second degree post-*Furman* murder cases

16   under pre-*Furman* Georgia law.   That law classified common law murder as death-eligible

17   murder, a classification that, with rare exceptions, would have embraced all M1 and M2

18   convictions under post-*Furman* Maryland and New Jersey law.  It is fair to say that close to

19   100% of Maryland and New Jersey's post-*Furman* M1 and M2 conviction cases would have

20   been death eligible under pre-*Furman* Georgia law.[31]

21         47.     A conservative estimate, therefore, would put the rate of death eligibility of the

---

[29]    *See* Edward Devine, Marc Feldman, Lisa Giles-Klein, Cheryl A. Ingram, & Robert F. Williams, Special Project: The Constitutionality of the Death Penalty in New Jersey, 15 Rutgers L. J. 261, 270, 274 (1984); Roann Nichols, *Tichnell v. State* – Maryland's Death Penalty: The Need For Reform, 42 Md. L. Rev. 875 (1983).

[30]    *State v. Bobby Lee Brown*, 138 N.J. 481, 509 (1994) (examining the history of New Jersey's "own conduct" requirement).

[31]    This is exactly what we see in California. Table 2, Parts I and II, Column B document pre-*Furman* death-eligibility rates of 100% for M1 and 99% for M2 California convictions in our sample.

1  post-*Furman* Maryland and New Jersey cases under pre-*Furman* Georgia law at 95%.  The 21%

2  rate of post-*Furman* death eligibility in these two states suggests conservatively a 78% (74/95)

3  narrowing of death eligibility compared to their death-eligibility status under pre-*Furman*

4  Georgia law.  The comparable California narrowing rate among M1 and M2 cases as a group is

5  36% under *Carlos* Window law and 32% under 2008 law,[32] which are respectively 54% (42/78)

6  and 59% (46/78) lower narrowing rates than the New Jersey and Maryland rates.

7       48.    Part II of Table 3 explores a post-*Furman* comparison between Nebraska (1973 -

8  1999) and California (1978 - 2002).  Both of the death-eligibility rates reported in Column B are

9  based on a screen for death eligibility of M1, M2, and VM cases in Nebraska that employed the

10  same methodology that we used to screen California M1, M2, and VM cases for this project.[33]

11  The reported death-eligibility rates are 25% for Nebraska compared to 55% for California during

12  the *Carlos* Window and 59% under 2008 law.[34]  Those two California rates are respectively 2.2

13  (55%/25%) and 2.4 (59%/25%) times higher than the Nebraska rate.  Moreover, the California

14  rates represent a 120% (30/25) expansion over the Nebraska rate under *Carlos* Window

15  California law and a 136% (34/25) expansion under 2008 California law.

16       49.    Part III of Table 3 reports death-eligibility rates nationwide and for the four states

17  whose rates are reported in Parts I and II of Table 3.  The research methodology used to produce

18  the Column B estimates in Part III is different than the methodology used to produce the

19  estimates reported in Parts I and II.  Specifically, the Part III estimates were produced in an

20  analysis of death eligibility in each state among all murder and non-negligent manslaughter cases

21  reported to the FBI in Supplemental Homicide Reports (SHR) by state law enforcement

---

[32]    We estimated these narrowing rates in a replication of the analysis that produced the results reported in Table 2, Column E with all of the M1 and M2 cases combined for the procedure.

[33]    The death-eligibility screen of the Nebraska cases was conducted under my supervision in connection with the identification of death eligible cases as the foundation for a study that Professor Woodworth and I conducted of the Nebraska death penalty system.  David C. Baldus, George Woodworth, Catherine M. Grosso, and Aaron M. Christ, <u>Arbitrariness and Discrimination in the Administration of the Death Penalty: A Legal and Empirical Analysis of the Nebraska Experience (1973-1999)</u>, 81 U. of Neb. L. Rev. 486, 542 tbl. 2 (2002).

[34]    *See supra* Table 1, Part I, Row 4, Columns B and D.

1   authorities.[35]

2       50.    Of particular note is the comparability of the results reported for New Jersey,

3   Maryland, and Nebraska in Part III of Table 3, based on the SHR methodology, and the results

4   reported for those states in Parts I and II, which are based on a screening of all M1, M2, and VM

5   convictions, as the case may be.  The estimated death-eligibility rates based on the two different

6   methodologies (case screening method versus SHR method) are: New Jersey, 21% versus 25.5%;

7   Maryland, 21% versus 21.9%; and Nebraska, 25% versus 28.9%.  The comparability of these

8   estimates enhances our confidence in the validity of both estimates for each state in Part III of

9   Table 3.  Their comparability also enhances our confidence in the validity of the SHR based

10  death-eligibility estimates reported in Table 4 below for each American death penalty state.

11      51.    Part I of Table 4 reports the estimated state death-eligibility rate for each death

12  penalty state classified by region and state, while Part II of the table rank orders those states by

13  their estimated death-eligibility rates.  In Part I of Table 4 California is in Region 9 – Pacific

14  States – where its rate of 37.8% is 35% (9.8/28) higher than its two neighbors Oregon and

15  Washington, each at 28%.  Part II of Table 4, which rank orders the states from low to high in

16  terms of their estimated death-eligibility rates, places California at the top of the list with a

17  death-eligibility rate of 37.8%.

18      52.    In assessing the death-eligibility rates reported in Part III of Table 3 and in Table

19

20  _____

21  [35]    Jeffrey Fagan, Franklin E. Zimring, & Amanda Geller, Capital Punishment and Capital
    Murder: Market Share and the Deterrent Effects of the Death Penalty, 84 Tex. L. Rev. 1803,
22  1816-17 (2006) describe their methodology as follows. "The SHR has the unique advantage of
    providing detailed, case-level information about the context and circumstances of each homicide
23  event known to the police. This allows us to identify the presence of factors that map onto the
    statutory framework of the Texas murder statutes and more broadly onto the Model Penal Code
24  aggravating factors."   To generate a death-eligibility estimate for each state, the authors
    classified a murder or non-negligent homicide as death eligible if it included any of "the
25  following elements that are part of the recurrent language of capital-eligible homicides across the
    states: (a) killings during the commission of robbery, burglary, rape or sexual assault, arson, and
26  kidnapping; (b) killing of children below age six: (c) multiple-victim killings; (d) 'gangland'
    killing involving organized crime of street gangs; (e) institution killings where the offender was
27  confined in a correctional or other governmental institution; (f) sniper killings… (g) killings in
    the course of drug business."  They also defined a law enforcement officer victim as a qualifying
28  aggravating factor.   When the defendant's age was known cases were classified as not death
    eligible if the defendant was under 16 years of age at the time of the offense.

TABLE 4

Part I:  Nationwide and State Death-Eligibility Rates Based on the Percentage of Death-Eligible Murders Among All Intentional Homicides (Murder and Non-Negligent Manslaughter) Broken Down by Region and State (1978-2003)[1]

| | A<br>Region/State | B<br>Percentage of Homicides that are Death Eligible[1] | C<br>95% Confidence Interval for Estimate in Column B |
|---|---|---|---|
| 1 | National Average | 23.8% | 23.0%, 24.6% |
| 2 | Northeast | | |
| | Connecticut | 23.2 | 21%, 25% |
| | New Hampshire | 31.9 | 26%, 38% |
| | New Jersey | 25.5 | 24%, 27% |
| | New York | 20.4 | 18%, 22% |
| | Pennsylvania | 25.0 | 24%, 26% |
| 3 | East North Central | | |
| | Illinois | 28.9 | 27%, 31% |
| | Indiana | 24.0 | 22%. 25% |
| | Ohio | 22.0 | 21%, 23% |
| 4 | West North Central | | |
| | Kansas | 23.9 | 20%, 28% |
| | Missouri | 22.4 | 21%, 24% |
| | Nebraska | 28.9 | 25%, 32% |
| | South Dakota | 27.4 | 21%, 34% |
| 5 | South Atlantic | | |
| | Delaware | 18.4 | 14%, 23% |
| | Florida | 18.2 | 17%, 20% |
| | Georgia | 20.3 | 18%, 22% |
| | Maryland | 21.9 | 20%, 23% |
| | North Carolina | 16.8 | 16%, 18% |
| | South Carolina | 22.5 | 21%, 24% |
| | Virginia | 20.6 | 20%, 22% |
| 6 | East South Central | | |
| | Alabama | 13.1 | 12%, 15% |
| | Kentucky | 18.2 | 16%, 20% |
| | Mississippi | 19.7 | 18%, 22% |
| | Tennessee | 18.7 | 17%, 20% |
| 7 | West South Central | | |
| | Arkansas | 23.0 | 21%, 25% |
| | Louisiana | 18.3 | 17%, 19% |
| | Oklahoma | 28.3 | 25%, 32% |
| | Texas | 21.7 | 20%, 23% |
| 8 | Mountain | | |
| | Arizona | 23.8 | 22%, 25% |
| | Colorado | 26.1 | 24%, 28% |
| | Idaho | 29.7 | 25%, 34% |
| | Montana | 26.5 | 20%, 33% |
| | Nevada | 22.7 | 21%, 24% |
| | New Mexico | 22.9 | 21%, 25% |
| | Utah | 30.0 | 27%, 33% |
| | Wyoming | 26.9 | 22%, 32% |
| 9 | Pacific | | |
| | California | 37.8 | 36%, 40% |
| | Oregon | 28.0 | 25%, 30% |
| | Washington | 28.0 | 26%, 30% |

[1]The estimates in Parts I and II of this table are based on the number of death-eligible homicides reported to the FBI using the Fagan-Geller-Zimring estimation procedure described *supra* note 35.

Part II: State Death-Eligibility Rates Rank Ordered From Low (Alabama) to High
(California) (1978-2003)

| A<br>State | B<br>Percent of Homicides that<br>are Death Eligible | C<br>95% Confidence Interval for<br>Estimate in Column B |
|---|---|---|
| Alabama | 13.1 | 12%, 15% |
| North Carolina | 16.8 | 16%, 18% |
| Florida | 18.2 | 17%, 20% |
| Kentucky | 18.2 | 16%, 20% |
| **Louisiana** | **18.3** | 17%, 19% |
| Delaware | 18.4 | 14%, 23% |
| Tennessee | 18.7 | 17%, 20% |
| Mississippi | 19.7 | 18%, 22% |
| Georgia | 20.3 | 18%, 22% |
| New York | 20.4 | 18%, 22% |
| Virginia | 20.6 | 20%, 22% |
| Texas | 21.7 | 20%, 23% |
| Maryland | 21.9 | 20%, 23% |
| Ohio | 22.0 | 21%, 23% |
| **Missouri** | **22.4** | 21%, 24% |
| South Carolina | 22.5 | 21%, 24% |
| Nevada | 22.7 | 21%, 24% |
| New Mexico | 22.9 | 21%, 25% |
| Arkansas | 23.0 | 21%, 25% |
| Connecticut | 23.2 | 21%, 25% |
| Arizona | 23.8 | 22%, 25% |
| Kansas | 23.9 | 20%, 28% |
| Indiana | 24.0 | 22%, 25% |
| Pennsylvania | 25.0 | 24%, 26% |
| **New Jersey** | **25.5** | 24%, 27% |
| Colorado | 26.1 | 24%, 28% |
| Montana | 26.5 | 20%, 33% |
| Wyoming | 26.9 | 22%, 32% |
| South Dakota | 27.4 | 21%, 34% |
| Oregon | 28.0 | 25%. 30% |
| Washington | 28.0 | 26%, 30% |
| Oklahoma | 28.3 | 25%, 32% |
| **Nebraska** | **28.9** | 25%, 32% |
| Illinois | 28.9 | 27%, 31% |
| Idaho | 29.7 | 25%, 34% |
| Utah | 30.0 | 27%, 33% |
| New Hampshire | 31.9 | 26%, 38% |
| California | 37.8 | 36%, 40% |

24

4, it should be noted that the reported California estimate of a 37.8% death-eligibility rate underestimates the actual rate. The reason is that the SHR-based methodology on which the Table 3, Part III and Table 4 estimates are based reflects only a minor "lying in wait" type aggravating circumstance – "sniper killings," the only species of "lying in wait" that is included in the FBI's SHR database. The broad scope of California's lying-in-wait special circumstance (section 190.2(a) (15)) is simply not reflected in the SHR-based estimates of death eligibility. Professor Woodworth's declaration filed in this case documents in paragraph 9 on page 2 that after adjustment for the scope of California's lying in wait and criminal street gang special circumstances, a valid estimate of California's rate of death eligibility under the SHR data is 50.2% rather than the 37.8 rate reported in Part II of Table 4.

53.   Against this background it is useful to consider California's death-eligibility rate vis-a-vis SHR based death-eligibility rates for the states identified in Part III of Table 3. Compared to the states listed in Rows 2-5, the California rate of death eligibility is 59% (14/23.8) higher than the nation as a whole, 48% (12.3/25.5) higher than New Jersey, 73% (15.9/21.9) higher than Maryland, and 31% (8.9/28.9) higher than Nebraska.

54.   The data in Table 4 and Figure 1 document California's outlier status in four ways.[36] First, Part II of Table 4 demonstrates that compared to the states with the second and third highest death-eligibility rates, California's death-eligibility rate of 37.8% is 18% (5.9/31.9) higher than New Hampshire's and 26% (7.8/30) higher than Utah's. Second, all of the major death penalty states have substantially lower death-eligibility rates than California. In this regard, it is useful to compare California's rate with representative states listed in bold font in the four quartiles of states in Part II of Table 4. Compared to Louisiana, the median state in the first quartile of states with a death-eligibility rate of 18.3%, California's rate is 107% (19.5/18.3) higher and compared to Missouri, the median state in the second quartile of states with a death-eligibility rate of 22.4%, California's rate is 69% (15.4/22.4) higher. Compared to New Jersey,

---

[36]   An outlier is defined as "an observation that lies outside the overall pattern of a distribution." Moore, D.S. and McCabe, G.P. Introduction to the Practice of Statistics (1999), http://mathworld.wolfram.com/Outlie.html.

FIGURE 1

THE DEATH-ELIGIBILITY RATES IN TABLE 4, PART B DISPLAYED IN A HISTOGRAM FROM ALABAMA
WITH RATE 13 TO CALIFORNIA WITH RATE 38

(The height of each bar indicates the number of states sharing that death-eligibility rate)



the median state in the third quartile of states with a death-eligibility rate of 25.5%, California's rate is 48% (12.3/25.5) higher and compared to Nebraska the median state in the fourth quartile of states with a death-eligibility rate of 28.9%, California's rate is 31% (8.9/28.9) higher.  Third, the data in Part II of Table 4 and Figure 1 indicate that the 5.9-percentage-point gap in death-eligibility rates between California and New Hampshire, California's closest near neighbor is 5 to 6 times larger than the gaps in rates between all of the other states in the second, third, and fourth quartiles of the distribution.  Finally, the formal definition of "outlier" calls for a score of 38.5 to qualify as an outlier in the distribution presented in Figure 1.[37]  Based on the data in Part II of Table 4, California's rate of 37.8 falls 0.7 of a percentage point short of that qualifying number, even without considering the effects of the limited lying-in-wait data in the SHR database.

## CAPITAL CHARGING AND SENTENCING OUTCOMES AMONG FACTUALLY DEATH-ELIGIBLE POST-*FURMAN* CALIFORNIA MURDER CASES

55.    Figure 2 and Table 5 document capital charging and sentencing outcomes among all factually death-eligible post-*Furman* cases.  A factually death-eligible case involves the factual presence of first-degree murder (M1) liability and the factual presence of one or more California special circumstances under *Carlos* Window or 2008 California law as the case may be.[38]  If the facts presented in the probation report for a case satisfy this test, the crime of conviction does not determine the factual death eligibility of the case.[39]

56.    Figure 2 documents the flow of death-eligible cases through four decision points in the process.  At stage 1, the prosecutor determines whether to charge the case capitally by

---

[37]    In statistical parlance, the first quartile is the 25th percentile and the third quartile is the 75th percentile; they are, respectively, the median of the lower 50% and the upper 50% of the data.  A convenient definition of an outlier is a point which falls more than 1.5 times the interquartile range above the third quartile or that far below the first quartile as the case may be. *Id.*  In this case the interquartile range is 7 -- the difference between the 25th percentile of the death-eligibility rates, New York (20.4), and the 75th percentile of the death-eligibility rates, South Dakota (27.4).

[38]    *See supra* para. 24-29 for a discussion of the methodology we used to classify cases as factually M1 and death eligible.

[39]    *Id.*

CAPITAL CHARGING AND SENTENCING OUTCOMES AMONG CASES THAT WERE DEATH-ELIGIBLE
UNDER *CARLOS* WINDOW LAW OR 2008 LAW:  CALIFORNIA, 1978-2002



**Stage 1**

| 1 | Did the Prosecutor Allege One or More Special Circumstances (S.C.)? |
|---|---|
| 1A Yes: 29% (4,585/16,007) | 1B No: 71% (11,422/16,007) |

**Stage 2**

| 2 Did the Prosecutor Delete All S.C. Allegations Unilaterally or in a Plea Bargain? |
|---|
| 2A No: 80% (3,680/4,585) | 2B Yes: 20% (905/4,585) |

**Stages 3[1]**

| 3 Were the S.C. Circumstances Dismissed by the Court or Rejected by a Fact Finder? |
|---|
| 3A No: A S.C. Was Found by a Fact Finder or Admitted by the Defendant | 3B Yes: |
| 83% (3,067/3,680) | 17% (613/3,680) |

**Stage 4[2]**

| 4 Was a Death or LWOP Sentence Imposed? |
|---|
| 4A Death 23% (705/3,067) | 4B LWOP 77% (2,362/3,067) |

| 5 Death and LWOP Sentencing Rates Among All Death Eligible Cases |
|---|
| 5A Death 4.4% (705/16,007) | 5B LWOP 14.8% (2,362/16,007) |

---

[1]At stage 3, special circumstances were found in a guilt trial or admitted by the defendant.

[2]At stage 4, a death or LWOP sentence was imposed after a penalty trial unless the prosecutor agreed to or the court imposed a term of years.  The data suggest that approximately 9% of the cases with a special circumstance found or admitted by the defendant resulted in a term of years.

TABLE 5

CAPITAL CHARGING AND SENTENCING OUTCOMES IN DEATH-ELIGIBLE CASES 1978-2002 (COLUMNS B AND C), FROM 1/1/78 THROUGH THE CARLOS WINDOW (COLUMNS D AND E), AND FROM THE END OF THE CARLOS WINDOW THROUGH 6/6/02 (COLUMNS F AND G)[1]

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| Charging and Sentencing Outcome | 1978-2002 Outcome Rate[2] | 95% Confidence Interval for Col. B Estimate | Outcome Rate Under Carlos Window Law From 1/1/78 Through the Carlos Window (10/13/87) | 95% Confidence Interval for Col. D Estimate | Outcome Rate Under 2008 Law From the End of the Carlos Window (10/14/87) Through 6/6/02 | 95% Confidence Interval for Col. F Estimate |
| 1. One or More Special Circumstances Alleged | 29% (4,585/16,007) | 25%, 32% | 24% (1,480/6,181) | 19%, 28% | 32% (3,105/9,826) | 26%, 37% |
| 2. One or More Special Circumstances Found Among Those Alleged | 67% (3,067/4,585) | 59%, 74% | 69% (1,027/1,480) | 59%, 79% | 66% (2,327/3,105) | 56%, 76% |
| 3. A LWOP Sentence Imposed | 14.8% (2,362/16,007) | 12%, 18% | 9.9% (614/6,181) | 7%, 13% | 17.7% (1,748/9,826) | 14%, 22% |
| 4. A Death Sentence Imposed | 4.4% (705/16,007) | 3%, 6% | 6.7% (412/6,181) | 4%, 10% | 3.0% (293/9,826) | 0.92%, 5% |

[1] The Carlos Window was (12/12/83 – 10/13/87) supra note 4.  The time periods before and after the Carlos Window embraced in this table were (01/01/78 – 12/11/83) and (10/14/87– 6/30/02), respectively.

[2] The cases in this analysis include those reported in Column D, which were death eligible under Carlos Window law, and the cases reported in Column F, which were death eligible under 2008 law.

1 | alleging one or more special circumstances, which occurred approximately 29% of the time. At
2 | stage 2, the prosecutor may delete the special circumstances unilaterally or as part of a plea
3 | bargain with the defendant, which occurs in approximately 20% of the cases in which special
4 | circumstances had been alleged. At stage 3, the court may dismiss the special circumstance
5 | allegations or the fact finder may reject them as not proved. These outcomes occurred in a
6 | relatively small percentage of the cases that advanced this far in the process. For cases in which
7 | a special circumstance is found present or admitted by the defendant, the prosecutor determines
8 | whether to advance the case to a penalty trial or to waive the death penalty in which event the
9 | court will impose a life-without-the-possibility-of-parole (LWOP) sentence or a term of years.
10 | While the number of penalty trials is unknown, the data document at stage 4 a distribution of
11 | sentencing outcomes with 23% (705/3,067) death sentences and 77% (2,362/3,067) LWOP
12 | sentences.[40] Box 5A at the foot of Figure 2 reports a 4.4% death sentencing rate among all death
13 | eligible cases and Box 5B reports a 14.8% LWOP sentencing rate among those cases.

14 |      57.    Table 5 presents similar findings with contrasts between the early years of the
15 | post-*Furman* system (1/1/1978 through 10/12/1987) and more recent years (10/13/1987 through
16 | 6/30/2002). Column A of Table 5 identifies the charging and sentencing outcomes of interest
17 | and Column B reports the outcomes for the entire period of the study. Column D presents the
18 | rates through the *Carlos* Window, while Column F reports the results from the later post-*Carlos*
19 | Window period. Row 1, Column B, documents that between 1978 and 2002, special
20 | circumstances were alleged in 29% of the cases that were death eligible under the *Carlos*
21 | Window or 2008 California law. Columns D and F report that the rates were 24% and 32%
22 | respectively during the earlier and later periods. We also have collateral evidence on this

25 | [40]    The data also suggest that approximately 9% of the cases with a special circumstance
found or admitted by the defendant resulted in a term of years, which may be imposed when it is
26 | agreed to by the prosecutor or imposed by the court. Although we were able to identify all cases
in our sample in which the defendant was sentenced to death, we have less confidence in our
27 | ability to identify all cases in which the defendant was sentenced to LWOP because some
probation reports omit this information and we did not have access to alternate sources
28 | identifying all defendants who have or could have been sentenced to LWOP.

Amended Declaration of David C. Baldus    21

outcome.  A recent study[41] documents that between August 1977 and December 31, 1986, prosecutors sought death sentences in 58% (11/19) of the felony-murder cases prosecuted in San Joaquin County.  This finding is comparable to the special circumstance filing rates documented in our statewide data for robbery felony-murder cases, with an average rate of 50% (2,598/5,227).[42]

58.    Row 2, Column B of Table 5 documents that during 1978-2002 special circumstances were found to be present by the judge or jury or admitted by the defendant in 67% of the death-eligible cases in which they were alleged, while Columns D and F report that those rates were 69% and 66% respectively during the earlier and later periods.

59.    The data indicate that the death penalty is waived in a large number of cases unilaterally or in plea bargains, in which event the case does not advance to a penalty trial. Unfortunately, our data do not squarely focus on the rate that death-eligible cases advance to a penalty trial.[43]  However, we have a useful proxy measure for that outcome – the rate that one or more special circumstances were found by a jury or judge or admitted by the defendant in death-eligible cases.  Our data document that a special circumstance was found by a jury or court or admitted by the defendant in 21% (3,354/16,007) of the cases in which a special circumstance could have been alleged and prosecuted.  This measure overstates the rate that cases advance to a penalty trial because prosecutors often do not seek a death sentence after a special circumstance has been found true in the guilt trial and proceed solely to a LWOP or term-of-years sentence. (Our data suggest that approximately 9% of the cases with a special circumstance found or admitted by the defendant resulted in a term of years, rather than a death or a life-without-the-possibility of-parole sentence.)  The measure does provide an upper limit of that rate, and our data suggest that many fewer than 21% of the death-eligible cases actually advanced to a penalty

---

[41]    Catherine Lee, Hispanics and the Death Penalty: Discriminatory Charging Practices in San Joaquin County, California, 35 J. of Crim. Just. 17, 21, tbl. 2 (2007).

[42]    The rate of filing a special circumstance allegation in such cases was 40% (870/2,185) during and before the Carlos Window, and 56% (1,708/3,042) after the Carlos Window.

[43]    Many of the probation reports used in this study were prepared before the guilt trial was conducted and, at best, the story typically ends with the guilt trial verdict.

1 | trial. This rate is substantially lower than the rates at which prosecutors in other jurisdictions
2 | have traditionally advanced cases to a penalty trial,[44] although those rates appear to have
3 | declined within the last two decades.[45]

4 |      60.    Row 3, Column B of Table 5 reports a 14.8% LWOP sentencing rate for the entire
5 | 1978-2002 period. Columns D and F indicate that the rate increased from 10% during the earlier
6 | period to 17.7% during the later period, a 77% (7.7/10) increase.

7 |      61.    Row 4, Column B of Table 5 reports a death sentencing rate of 4.4% among all
8 | death-eligible cases in the universe. Columns D and E report rates of 6.7% for the earlier period
9 | and 3.0% for the later period, a difference that represents a 55% (3.7/6.7) decline in the death
10 | sentencing rate in the later period. When we limit the documentation of death sentencing rates to
11 | death sentences that were affirmed on appeals, the overall rate declines to 3.6%.[46]

12 |      62.    Also of note is the death-sentencing rate among a subset of cases that is not

14 | [44]    David C. Baldus, George Woodworth, & Charles A. Pulaski, Jr. Equal Justice And The Death Penalty: A Legal And Empirical Analysis 327, tbl. 56 (1990) [EJDP] (the rate in Georgia 1973-1980 was 32% (228/707)); David C. Baldus, George Woodworth, David Zuckerman, Neil Alan Weiner, & Barbara Broffitt, Racial Discrimination and the Death Penalty in the Post-Furman Era: An Empirical and Legal Overview, With Recent Findings From Philadelphia, 83 Cornell L. Rev. 1638, 1677, tbl.1 (1998) [Philadelphia] (the rate in Philadelphia County 1983-93 was 54% (384/707)); David C. Baldus, George Woodworth, Catherine M. Grosso, & Aaron M. Christ, Arbitrariness and Discrimination in the Administration of the Death Penalty: A Legal and Empirical Analysis of the Nebraska Experience (1973-1999), 81 U. of Neb. L. Rev. 486, 547 (2002) [Nebraska] (the rate in Nebraska 1973-99 was 48% (89/185)); Maryland, supra note 28 at 52, Fig.1 (the rate in Maryland 1978-99 was 14% (180/1311); N.J Rpt. supra note 27, Appendices and Tables, at tbl. 3 (the rate in New Jersey 1983-1991 was 54% (132/246).

[45]    David C. Baldus, George Woodworth, & Catherine M. Grosso, Race and Proportionality Since McCleskey v. Kemp (1987): Different Actors with Mixed Strategies of Denial and Avoidance, 39 Col. H. Rights L. Rev.143, 168 (2007) (the rate at which New Jersey prosecutors advanced cases to a penalty trial declined "from a rate of 52% in the 1980s to a rate of 10% in the period from 1999-2004").

[46]    This outcome measure distinguishes between death sentence cases in which the sentence was affirmed on appeal and cases in which the sentence or murder conviction was vacated because of trial court error that drew into question the legitimacy of the conviction or sentence. Examples include ineffective assistance of counsel and the vacation of special circumstance findings for want of evidentiary sufficiency. Of the 61 death sentenced cases in our sample, the death sentences of the following eight defendants were so classified: Sixto, Felipe Evanjelista, 48 Cal. 3d 1247, 1252 (1989); Hunter, Michael Wayne, 2005 WL 1377738; Turner, Thaddaeus Louis, 2009 WL 2394152; Marshall, Ryan Michael, 566 F. Supp. 2d 1053 (2008); Lucas, Larry Douglas, 33 Cal. 4th 682, 737 (2004); Duncan, Henry Earl, 528 F.3d 1222 (2008); Heard, James, Matthew, 31 Cal. 4th 946, 982 (2003), and Mayfield, Demetrie, 270 F. 3d 915 (2001).

1   identified in Table 5 – death-eligible cases that resulted in a M1 conviction at trial or by a guilty

2   plea.  The death-sentencing rate for death-eligible M1 conviction cases was 8.7% (705/8,111)

3   with a (5%, 12%) 95% confidence interval.  The death-sentencing rate for death-eligible M1

4   conviction cases in the *Carlos* Window is 9.4% (119/1,269) with a (6.5%, 12.2%) 95%

5   confidence interval.

6       63.    As noted above,[47] our data do not squarely focus on the advancement of cases to a

7   penalty trial.  As a result, we can only approximate the penalty trial death sentencing rate, with a

8   proxy measure that computes the death sentencing rate among all cases in which jurors and

9   judges found or the defendant admitted to one or more special circumstances being present in the

10   case.  The statewide rate for this measure is 21% (705/3,354).  This figure clearly underestimates

11   the actual penalty trial death-sentencing rate because it overstates the number of cases that

12   advanced to a penalty trial.  However, it does suggest a lower limit of that rate.  In addition,

13   estimates of this measure over time are of interest.  During the early period from 1978 through

14   the *Carlos* Window, the rate was 40% (412/1,035) while during the post-*Carlos* Window period

15   the rate was 13% (293/2,319), which represents a 67% (27/40) decline in this rate between the

16   two periods.[48]

---

[47]    *See supra* para. 59.

[48]    These findings are consistent with three empirical studies of California penalty trials of
which we are aware.  The first is a pre-*Furman* study, which examined the outcomes of 238
unitary penalty trials between 1958 and 1966, documented a 43% (103/238) death sentencing
rate.  Special Issue, A Study of the California Penalty Trial in First-Degree-Murder Cases, 21
Stan. L. Rev. 1297, 1299 (1969).  The second is a post-*Furman* study that documents between
1977 and 1984 a statewide penalty trial death sentencing rate of 29% (144/496).  Stephen P.
Klein & John E. Rolph, Relationship of Offender and Victim Race to Death Penalty Sentences in
California, 32 Jurimetrics J. 33, 38, tbl. 1 (1991).  The third study is a survey by the California
State Public Defender's Office which reviewed capital charging and sentencing outcomes for a
five year period from August 1977 to July 1983.  It documents a 48% (148/309) penalty trial
death sentencing rate.  William J. Kopeny, Capital Punishment—Who Should Choose, 2 W. State
U. Law Rev. 383, 388, n. 33 (1985).

The death sentencing rate estimated in our California data and the rates in these three
studies are within the range of penalty trial death sentencing rates observed in many states.
EJDP, *supra* note 44 at 327, tbl. 50 (the rate in Georgia 1973-1980 was 55% (140/253); David
Baldus, When Symbols Clash: Reflection on The Future of The Comparative Proportionality
Review of Death Sentences, 26 Seton Hall L. Rev. 1582, 1600, tbl. 4 (the rate in New Jersey
1983-95 was 29% (48/168); Philadelphia, *supra* note 44 at 1702 (the rate in Philadelphia County
1983-93 was 29% (110/384); Nebraska, *supra* note 44 at 545, fig. 2 (the rate in Nebraska 1978-
99 was 15% (29/185)); Maryland, *supra* note 28 at 545, fig.1 (the rate in Maryland 1978-99 was

---

64.    Of particular note is the death sentencing rate among death-eligible cases in which the prosecutor actively sought a death sentence by filing an allegation of one or more special circumstances.  For the entire 1978-2002 period, that rate was 15% (705/4,585).

65.    California's very low death sentencing rate among death-eligible cases is the product of decisions at the four stages in its capital charging and sentencing process outlined in Figure 2, which we can illustrate with a hypothetical that assumes a population of 100 death-eligible cases.  First, prosecutors seek death sentences in only 29 of those cases (Stage 1), and dismiss those allegations before trial (Stage 2) in about 6 of those cases (20% of 29) .  For 77 of the hypothetical defendants, therefore, the risk of a death sentence is completely off the table before trial.  For the remaining 23 defendants facing special circumstance allegations, 19 (81% of 23) may advance to a penalty trial after a fact finder finds one or more special circumstances present in the case or the defendant admits to a special circumstance (Stage 3).  For these defendants, the penalty trial results in 4 (21% of 19) defendants being sentenced to death who contribute to the overall 4.4% risk of a death sentence being imposed among all death-eligible offenders that is documented in Row 4, Column B of Table 5 and at the foot of Figure 2 in Box 5A.

66.    For this last point of decision we highlight again the trend of LWOP and death sentencing decision making.  Table 5, Row 3, Columns D and F, document a 77% (7.7/10) increase in the LWOP sentencing rate between the early and later years.  After the *Carlos* Window, the ratio of LWOP to death sentences increased to 5.9 to 1 (17.7%/3.0%) from the 1.5 to 1 (10%/6.7%) ratio that existed during the *Carlos* Window and before.

67.    The low California death sentencing rates documented in this study are consistent with the results of comparative studies which place California at the low end among death penalty states in terms of their death sentencing frequencies.[49]  It is also useful to compare the

---

6% (76/1311)).

[49]    For example, in an extensive study of death sentences imposed per 1,000 homicides (1973-1995) only Maryland with a rate of 5 is lower than California with a rate of 8.  The median rate is 18.  John Blume, Theodor Eisenberg, and Martin T. Wells, Explaining Death Row's Population and Racial Composition, 1 J. of Empirical Legal Studies 165, 172, tbl. 1 (2004).  In

average post-*Furman* California death sentencing rate of 4.4% with pre-*Furman* Georgia's 15% death sentencing rate among all death-eligible murder trial conviction cases. The results of the comparison can be expressed in two ways. First, the pre-*Furman* rate[50] of 15% exceeds the post-*Furman* California rate by a factor of 3.4 (15/4.4). Second, California's post-*Furman* death sentencing rate among all death-eligible cases is 71% (10.6/15) lower than the death sentencing rate in pre-*Furman* Georgia murder trial conviction cases.

## CONCLUSIONS

68.     This declaration reports the findings of an empirical study of 27,453 post-*Furman* California convictions for M1, M2, and VM cases with a date of offense between January 1978 and June 2002. The results are based on an analysis of a stratified random sample of 1,900 cases from the 27,453 case universe.

69.     Our findings support three principal conclusions. First, the rate of death eligibility among California homicide cases is the highest in the nation by every measure. This result is a product of the number and breadth of special circumstances under California law. A major contribution to this over breadth is California's lying in wait (LIW) special circumstance. Under *Carlos* Window law (1978-2002), it was factually present in 29% (7,915/27,453) of California's M1, M2, and VM cases and it was the sole special circumstance present in 21% (5,843/27,453) of them.[51]

70.     Second, the post-*Furman* narrowing rate of death eligibility in California

---

another study of death sentencing rates per murder committed in each state from 1977 through 1999, California was ranked in the fourth quartile with a rate of 0.013 death sentences per murder, with the highest rate of 0.060 in Nevada and the lowest rate of 0.004 in Colorado. James S. Liebman, Jeffrey Fagan and Valerie West. 2000. A Broken System: Error Rates in Capital Cases, 1973-1995, New York: Columbia University, 87, fig. 17 http://www2.law.columbia.edu/instructionalservices/ liebman /liebman_final.pdf .

[50]     *See* EJDP, *supra* note 44, at 85, tbl. 5 (reporting a 15% (44/293) rate among death eligible murder trial convictions in a study we conducted in 1982.)

[51]     Under 2008 law, the lying-in-wait special circumstance was factually present in 29% (7,996/27,453) of all cases and it was the sole special circumstance present in 15% (4,239/27,453) of those cases. Under *Carlos* Window law, the lying-in-wait special circumstance was factually present in 23% (714/3,069) of all cases in which a special circumstance was found. The comparable number for the robbery felony-murder special circumstance was 55% (1,702/3,069).

compared to the rate of death eligibility under pre-*Furman* Georgia law is substantially lower than it has been in the vast majority of American death penalty states.

71.    Third, in post-*Furman* California, prosecutors seek a death sentence and juries impose death sentences in only a small fraction of the death-eligible cases in which death sentences are authorized under post-*Furman* law.  As a result, the post-*Furman* California death sentencing rate of 4.4% among all death-eligible cases is among the lowest in the nation and over two-thirds lower than the death sentencing rate in pre-*Furman* Georgia.

The foregoing is true and correct and executed under penalty of perjury under the laws of the United States and the State of California on September 15, 2010.

_____
DAVID C. BALDUS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

APPENDIX A

## DAVID C. BALDUS

*Joseph B. Tye Professor, University of Iowa College of Law • Iowa City, Iowa 52242-1113*
*Ph: 319/335-9012 - Fax: 319/335-9098 - Internet: david-baldus@uiowa.edu*

### ACADEMIC/PROFESSIONAL EMPLOYMENT

UNIVERSITY OF IOWA COLLEGE OF LAW, IOWA CITY, IOWA
*Joseph B. Tye Professor, 1983 - Present*
*Professor, 1972-83*
*Associate Professor, 1969-71*
Subjects: Criminal Law, Anti-discrimination Law, and Capital Punishment\

SYRACUSE UNIVERSITY COLLEGE OF LAW
Center for Interdisciplinary Legal Studies
*Professor and Director, 1981-82*

NATIONAL SCIENCE FOUNDATION
*Director, Law and Social Sciences Program, 1975-76*

NEW JERSEY SUPREME COURT
*Special Master for the Proportionality Review of Death Sentences, 1988-91*

### PRE-ACADEMIC EMPLOYMENT

PENNSYLVANIA CONSTITUTIONAL CONVENTION
*Delegate, 1967-68*

GENERAL PRACTICE OF LAW, Pittsburgh, Pennsylvania
*1964-68*

U.S. ARMY/ARMY SECURITY AGENCY (ASA)
*Lieutenant, 1958-59*

### EDUCATION

YALE LAW SCHOOL
*LL.M., 1969 - LL.B., 1964*

UNIVERSITY OF PITTSBURGH
*M.A., 1962 (Political Science)*

DARTMOUTH COLLEGE
*A.B., 1957 (Government Major)*

### BOOKS AND MONOGRAPHS

Statistical Proof of Discrimination, 386 pages, Shepards-McGraw Hill (1980) (with James W. Cole).

**38**

Annual Supplement, Statistical Proof of Discrimination (1981), (1982), (1983), (1984), (1985), (1986), and (1987) (with James W. Cole).

Equal Justice and the Death Penalty:  A Legal and Empirical Analysis, 698 pages, Northeastern University Press (1990) (with G. Woodworth & C. Pulaski).

## ARTICLES, BOOK CHAPTERS & REPORTS

"State Competence to Terminate Concession Agreements with Aliens," 53 Kentucky L.J. 56-97 (1964).

"Pennsylvania's Proposed Film Censorship Law - House Bill 1098," 4 Duquesne L. Rev. 429-40 (1966).

"Welfare As A Loan:  An Empirical Study of the Recovery of Public Assistance Payments in the United States," 25 Stan. L. Rev. 123-250 (1973).

"A Model  Statute for the Regulation of Abandoned Railroad Rights of Way" in Re-Use Planning for Abandoned Transportation Properties, Final Report to DOT.  109-25 (K. Deuker and R. Zimmerman eds. 1975) (with S. Grow).

"A Comparison of the Work of Thorsten Sellin and Isaac Ehrlich on the Deterrent Effect of Capital Punishment," 85 Yale. L. J. 170-86 (1976) (with J. Cole).

"Quantitative Proof of Intentional Discrimination," 1 Evaluation Quarterly 53-85 (1977) (with J. Cole).

"Statistical Modeling to Support a Claim of Intentional Discrimination," Am. Statistical Assn., Proceedings of the Soc. Stat. Sec. Part I pp. 465-70 (1977) (junior author with J. Cole).

"Quantitative Methods for Judging the Comparative Excessiveness of Death Sentences" in The Use/Nonuse/Misues of Applied Social Research in the Court: Conference Proceedings, 83-94 (M. Saks & C. Baron eds. 1980).

"Identifying Comparatively Excessive Sentences of Death," 33 Stan. L. Rev. 601-77 (1980) (with C. Pulaski, G. Woodworth, and F. Kyle).

"Comparative Review of Death Sentences:  An Empirical Study of the Georgia Experience," 74 J. Crim. L. & Criminology 661-753 (1983) (with C. Pulaski & G. Woodworth).

"Monitoring and Evaluating Contemporary Death Sentencing Systems:  Lessons From Georgia," 18 U.C. Davis L. Rev.1375-1407 (1985) (with C. Pulaski & G. Woodworth).

"Arbitrariness and Discrimination in the Administration of the Death Penalty:  A Challenge to State Supreme Courts," 15 Stetson L. Rev. 133-261 (1986) (with C. Pulaski and G. Woodworth).

"Law and Statistics in Conflict:  Reflections on McCleskey v. Kemp," in Handbook on Psychology and Law 251-73 (D. Kagehiro & W. Laufer eds. 1991) (with G. Woodworth & C. Pulaski).

"Race Discrimination and the Death Penalty," in Oxford Companion to the Supreme Court of the United States 705-07 (K. Hall ed. 1991) (with C. Pulaski and G. Woodworth).

2

<u>Death Penalty Proportionality Review Project:  Final Report to The New Jersey Supreme Court,</u> 120 pages plus 200+ pages of tables and appendices, (September 24, 1991).

<u>State v. Robert Marshall: Report to the New Jersey Supreme Court,</u> 80 pages (September 24, 1991).

"Proportionality Review of Death Sentences:  The View of the Special Master," 6 <u>Chance</u> 18-27 (Summer 1993) (with G. Woodworth).

"Reflections on the 'Inevitability' of Racial Discrimination in Capital Sentencing and the 'Impossibility' of its Prevention, Detection, and Correction," 51 <u>Wash & Lee L. Rev.</u> 419-79 (1994) (with G. Woodworth and C. Pulaski).

"Improving Judicial Oversight of Jury Damage Assessments:  A Proposal for the Comparative Additur/Remittitur Review of Awards for Nonpecuniary Harms and Punitive Damages," 80 <u>Iowa L. Rev.</u> 1109-1267 (1995) (with J. MacQueen & G. Woodworth).

Keynote Address:  "The Death Penalty Dialogue Between Law and Social Science."  70 <u>Ind. U. L. Rev.</u> 1033- 41 (1995).

"Additur/Remittitur Review: An Empirically Based Methodology for the Comparative Review of General Damages Awards for Pain, Suffering, and Loss of Enjoyment of Life," (with G. Woodworth and J. MacQueen) in <u>Reforming the Civil Justice System,</u> 386-415 (Likamer, ed. 1996).

"When Symbols Clash: Reflections on the Future of the Comparative Proportionality Review of Death Sentences," 26 <u>Seton Hall L. Rev.</u> 1582-1606 (1996).

"Race Discrimination in America's Capital Punishment System Since *Furman v. Georgia* (1972):  the evidence of race disparities and the record of our courts and legislature in addressing the issue," <u>Report to A.B.A. Section of Individual Rights and Responsibilities</u> (7/25/97) (19 pages) (with G. Woodworth).

"Pediatric Traumatic Brain Injury and Burn Patients in the Civil Justice System:  The Prevalence and Impact of Psychiatric Symptomatology," 26  <u>J .Am. Acad. Psychiatry L.</u> 247-58 (1998) (junior author with J. Max et al.).

"Race Discrimination and the Death Penalty: An Empirical and Legal Overview" (with G. Woodworth) in <u>America's Experiment with Capital Punishment)</u> 385-416 (J. Acker et al, eds. 1st ed.1998); pp. 501-52 in (J. Acker et al. eds. 2nd ed. 2003).

"Race Discrimination and the Death Penalty in the Post *Furman* Era:  An Empirical and Legal Overview, With Recent Findings From Philadelphia," 83 <u>Cornell L. Rev.</u> 1638-1770 (1998) (with G. Woodworth et al.).

"The Use of Peremptory Challenges in Capital Murder Trials:  A Legal and Empirical Analysis," 3 <u>U. Penn. J. of Constitutional Law</u>  3-170 (2000) (with G. Woodworth et al.).

<u>Disposition Of Nebraska Capital and Non-Capital Homicide Cases (1973-1999): A Legal and Empirical Analysis: Report to the Nebraska Commission on Criminal Justice and Law Enforcement,</u> (October 10, 2001), 120 pages (with G. Woodworth et al.).

"Death Penalty Symposium:  A Call to Action:  A Moratorium on Executions Presented by the ABA," (October 12, 2000 at the Carter Center, Atlanta, Ga.), 4 <u>New York City L. Rev.</u> 113, 152-155 (2002) (DB remarks).

3

**40**

Evidence of Race and Gender Discrimination in the Prosecutorial Use of Peremptory Strikes in Philadelphia Capital Trials: The Case of *Commonwealth v. Harold Wilson* (1989) (March 16, 2001) (with G. Woodworth et al.), a 30 page report with approximately 40 pages of tables figures and an Appendix submitted in post conviction proceeding in Philadelphia state court.

Race-of-Victim and Race of Defendant Disparities in the Administration of Marylsnd's Capital Charging and Sentencing System (2001) (with G. Woodworth), a 25 page report.

Evidence of Race and Gender Discrimination in the Prosecutorial Use of Peremptory Strikes in Philadelphia Capital Trials: The Case of *Commonwealth v. Robert Cook* (1988) (March 16, 2001) (with G. Woodworth et al.), a 30 page report with approximately 40 pages of tables figures and an Appendix submitted in post conviction proceeding in Philadelphia state court.

Evidence of a Pattern and Practice of Purposeful Race Discrimination in the Administration of the Death Penalty in Philadelphia County, 1978-2000: The Case of *Commonwealth v. Lance Arrington* (May 29, 2002) (with G. Woodworth et al.), a two volume report of over 90 pages submitted in state post-trial proceedings in which Professor Woodworth and I testified December 13, 2005 in Philadelphia.

"Arbitrariness and Discrimination in the Administration of the Death Penalty: A Legal and Empirical Analysis of the Nebraska Experience (1973-1999)," 81 Neb. L. Rev. 486-754 (2002) (with G. Woodworth et al.).

Evidence of Race and Gender Discrimination in Prosecutor Jack McMahon's Use of Peremptory Strikes (September 4, 2003) (with G. Woodworth), a 47 page report with approximately 40 pages of tables figures and an Appendix submitted in *Commonwealth v. Luis Montilla* in post conviction proceeding in Philadelphia state court.

"Race Discrimination in the Administration Of The Death Penalty: An Overview Of The Empirical Evidence With Special Emphasis On The Post-1990 Research," 39 Crim. L. Bulletin 194-226 (2003) (with G. Woodworth).

"Race Discrimination and the Legitimacy of Capital Punishment: Reflections on the Interaction of Fact and Perception," 53 De Paul L. Rev. 1411-95 (2004) (with G. Woodworth).

Evidence of Race and Gender Discrimination in the Commonwealth's Use of Peremptory Strikes in Capital Cases: *Commonwealth v. Jesse Bond* (1993) (November 15, 2005), (with G. Woodworth), a 13 page report with approximately 40 pages of tables figures and an Appendix submitted in habeas corpus proceeding in federal court.

Evidence of Race and Gender Discrimination in the Commonwealth's Use of Peremptory Strikes in Capital Cases: *Commonwealth v. Lee Baker* (1984) (February 2, 2006) (with G. Woodworth), a 23 page report with approximately 40 pages of tables figures and an Appendix submitted in habeas corpus proceeding in federal court.

Evidence of Race and Gender Discrimination in the Commonwealth's Use of Peremptory Strikes in Capital Cases: *Commonwealth v. Robert Lark* (1985) (September 9, 2006), (with G. Woodworth), a 23 page report with 40 pages of tables figures and an Appendix submitted in habeas corpus proceeding in federal court.

"Race and Proportionality Since McCleskey v. Kemp (1987): Different Actors with Mixed Strategies of Denial and Avoidance," 39 Col. Human Rights L.Rev. 143-77 (2007) (with G. Woodworth and Catherine M. Grosso).

4

**41**

Evidence of Racial Discrimination in the Administration of the Death Penalty: Arkansas Judicial Circuits 8 & 8S, 1990-2005 (July 3, 2008) (a 13 page report with tables and figures filed in *Arkansas v. Frank William Jr.* a clemency proceeding (2008)) (with N Weiner, G. Woodworth and J. Brain)

Evidence of the Inevitability and Ineradicability of Arbitrariness and Discrimination in the Administration of Capital Punishment in Maryland – Past, Present and Future (September 5, 2008) (a 32 page report with tables, figures and an Appendix submitted to the Maryland Capital Punishment Commission that is based on my testimony before the Commission July 30, 2008 (with G. Woodworth).

"Perspectives, Approaches, and Future Directions in Death Penalty Proportionality Studies"in The Future Of America's Death Penalty 135-52 (C. Lanier et al. eds. 2009) (with G. Woodworth et al.)

"Empirical Studies of Race and Geographic Discrimination in the Administration of the Death Penalty: A Primer on the Key Methodological Issues" (with G. Woodworth et al.) in The Future Of America's Death Penalty 153-98 (C. Lanier et al. eds. 2009) (with G. Woodworth et al.)

"McCleskey v. Kemp (1987): Denial, Avoidance, and the Legitimization of Racial Discrimination in the Administration of the Death Penalty," (with G. Woodworth, John C. Boger, and Charles A. Pulaski, Jr.), in Capital Punishment Stories 229-77 (J. Steiker and J. Blume eds. 2009)

Work in Progress

"Racial Discrimination in the Administration of the Death Penalty:  the experience of the United States Armed Forces (1984-2005)" (with G. Woodworth et al.) (approximately 50 law review pages).

BOOK REVIEWS

"D. Chambers, Making Fathers Pay," 78 Mich. L. Rev. 750 (1980).

M. O. Finkelstein, Quantitative Methods in Law & W. Fairley & F. Mosteller, Statistics and Public Policy, 1980 Am. Bar. Found. R. J. 409.

"W. White, The Death Penalty in the Eighties" & "H. Bedau, Death is Different," 1 Crim. L. Forum 185 (1989) (with G. Woodworth & C. Pulaski).

PAPERS PRESENTED SINCE 1985

"Arbitrariness and Discrimination in Capital Sentencing:  A Challenge For Presented State Supreme Courts," Stetson Law School, March 1985.

"Arbitrariness and Discrimination in Capital Sentencing: The Georgia Experience," Fortunoff Criminal Justice Colloquium, N.Y.U. Law School, May 1985.

 "Statistical Proof in Employment Discrimination Litigation: An Overview", State of Washington Judicial Conference, Tacoma, Washington, August, 1985.

"Arbitrariness and Discrimination in Capital Sentencing" Symposium on Capital Punishment, Columbia Law School, December 1985.

5

**42**

"Capital Punishment -- A Tragic Choice?" Mount Mercy College, Cedar Rapids, Iowa, April 1986.

"Consistency and Evenhandedness in Federal Death Sentencing Under Proposed Legislation," testimony before House Criminal Justice Subcommittee, Washington, D.C., May 1986.

"The Impact of Prosecutorial Discretion on Arbitrariness and Discrimination," American Criminology Society, Atlanta, GA, November 1986.

"Death Penalty Cases:  The Role of Empirical Data," National Judicial College of San Diego, February 10, 1987.

"Individual Rights and the Constitution:  Issues and Trends in the Death Penalty," Controversy & The Constitution Conference, Ames, Iowa, February 12, 1987.

"Equal Justice in Proposed Federal Death-Sentencing Legislation: lessons from the states," Testimony before the United States Sentencing Commission, Hearing on the Commission's responsibility regarding promulgation of sentencing guidelines for federal capital offenses, Washington, D.C., February 17, 1987.

"Usable Knowledge from the Social Sciences:  A Lawyer's Perspective," University of Nebraska College of Law, April 10, 1987.

"Equal Justice and the Death Penalty:  Some Empirical Evidence," University of Nebraska College of Law, April 10, 1987.

"McCleskey v. Kemp: A methodological critique," Law and Society Association, Washington, D.C., June 12, 1987.

"Law and Statistics in Conflict: Reflections on McCleskey v. Kemp," University of Bristol (March 4, 1988), University of Durham (March 16, 1988), Hebrew University (April 17, 1988), University of Reading (May 6, 1988), University of Oxford (May 27, 1988).

"Arbitrariness and Discrimination in the Imposition of the Death Penalty," Testimony before Senate Judiciary Committee, Washington, D.C., October 2, 1989.

"Arbitrariness and Racial Discrimination in Post-Furman Death Sentencing:  Implications for the Racial Justice Act and Proposed Federal Death-Penalty Legislation," Testimony before the Constitutional and Civil Rights Subcommittee, House Judiciary Committee, Washington, D.C., May 3, 1990.

"The Proportionality Review of Death Sentence: New Jersey's Options," New Jersey Bar Assembly, Headquarters, New Brunswick, New Jersey, April 23, 1992.

"Proportionality Review of Death Sentences:  New Jersey's Options," Law and Society Association, Philadelphia, May 24, 1992.

"Regulating the Quantum of Damages for Personal Injuries through Enhanced Additur-Remittitur Review," Law and Society Association, Philadelphia, May 28, 1992.

"Proportionality Review of Death Sentences" & "Race Discrimination in the Use of the Death Penalty," University of Michigan Law School, January 1993.

6

"Reflections on the Reinstatement of the Death Penalty in Iowa," Public Lecture, Coe College, April 1993.

"Discretion and Disparity in the Administration of the Death Penalty" & "Racial and Ethnic Bias in the Criminal Law: Some Trends and Prospects," AALS Workshop on Criminal Law, Washington, D.C., October 29 & 30, 1993.

"Improving Judicial Oversight of Jury Damages Assessments: A Proposal for the Comparative Additur/Remittitur Review of Awards for non-pecuniary harms and punitive damages," Conference of Chief Justices, Williamsburg, Virginia, January 1993; Department of Pediatrics, University of Iowa Medical School, February, 1993; Conference on Civil Justice Reform, NYU Law School, October 1993.

"Racial Discrimination in Capital Sentencing:  Reflections on its Inevitability and the Impossibility of its Prevention and Cure," Symposium on Racism in the Criminal Law, Washington and Lee Law School, March 11, 1994.

"Racial Discrimination in Mortgage Lending," Department of Housing and Urban Development, January 19, 1994.

"The Death Penalty Dialogue Between Law and Social Science," Keynote Address, Symposium, Capital Jury Project, Indiana Law School, February 24, 1995.

"Reflections on the Failure to Reinstate the Death Penalty in Iowa" & "Claims of Arbitrariness and Discrimination Under State Law; recent trends."  Legal Defense Fund Annual Conference on the Death Penalty, Airlie House, Virginia, July 28 & 29, 1995.

"Statistical Approaches to Title VII Discrimination Claims" Defense Lawyers Association, Des Moines, September 1995.

"The Marshall Hypothesis Revisited," University of Pittsburgh Law School, October 1995.

"When Symbols Clash, Reflections of Proportionality Review, Death Sentences," Luncheon speaker, Death Penalty Conference, Seton Hall Law School, Nov. 2, 1995.

"Law As Symbol: explaining the uses of the death penalty in America," DePaul Law School, Chicago, January 1996; Northwestern Law School, March 1996.

"Post-McCleskey Discrimination Claims: Law, Proof and Possibilities," Plenary Session, Legal Defense Fund Annual Conference on the Death Penalty, Georgetown University, July 26, 1996.

"Preliminary Finding from the Pennsylvania Capital Charging and Sentencing Study" and "Law As Symbol," American Criminology Society, November 1996.

"The Death Penalty and How It Might Affect the Iowa Practitioner," Iowa Bar Association Criminal Law Seminar, Des Moines, March 21, 1997.

"Race Discrimination and the Death Penalty:  Recent Findings from Philadelphia" Plenary Session, Legal Defense Fund Annual Conference on the Death Penalty, Airlie House, Virginia, July 1997; Death Penalty Symposium; Cornell Law School  March 1998; American Society of Criminology, Washington D.C. November 1998.

"The Death Penalty for Iowa:  What Would It Bring," testimony before the Iowa House Judiciary Committee, March 1998.

"Race Discrimination and the Proportionality Review of Death Sentences," Yale Law School, March 1998; St. John's Law School, March 1999.

"The Use of Peremptory Challenges in Capital Murder Trials: A Legal and Empirical Analysis," Research Club, University of Iowa, December 17, 1999; Center for Socio-Legal Studies, University of Iowa, January 21, 2000; "Race, Crime, and the Constitution Symposium," University of Pennsylvania Law School, January 29, 2000; Law Dept., Erlangen University, Erlangen, Germany, July 18, 2000.

"Race Discrimination in the Administration of the Death Penalty," Senate Judiciary Committee, Pennsylvania Legislature, Harrisburg, Pa., January 22, 2000; The Governor's Race and the Death Penalty Task Force, Tallahassee, Florida, March 30, 2000.

"Reflections on the Use of Capital Punishment in Europe and the United States," Political Science Dept., Erlangen University, Erlangen, Germany, July 17, 2000.

"Race Discrimination in the Administration of the Death Penalty: Current Concerns and Possible Strategies for Addressing the Issue During a Moratorium on Executions," ABA's Call to Action: A Moratorium on Executions, ABA Conference, Carter Center, Atlanta, Georgia, October 12, 2001.

"Race and Gender Disparities in the Administration of the Death Penalty: Recent Finding From Philadelphia and Legislative and Judicial Strategies to Reduce Race and Gender Effects," Pennsylvania Supreme Court Committee on Racial and Gender Bias in the Justice System, Philadelphia, Pa. December 6, 2000.

"Race Discrimination in the Administration of the Death Penalty," Death Penalty Symposium, NYU Law School, March 29, 2001.

"Reflections on the Use of the Death Penalty in Europe and the United States," Capital Punishment Symposium, Ohio State Law School, March 31, 2001.

"Arbitrariness and Discrimination in the Administration of the Death Penalty: the Nebraska Experience," Judiciary Committee, Nebraska Legislature, October 18, 2001; University of Nebraska Law School, February 22, 2002.

"Reflections on Comparative Proportionality Review" and "Race Discrimination and the Death Penalty: the post-1990 research," John Jay School of Criminal Justice, New York City, November 11, 2002.

"Proving Systemic Systemic Disparate Treatment in Capital Charging and Sentencing and in the Use of Peremptory Challenge" and "Understanding Equal Justice and the Death Penalty: the Role of Social Science," Yale Law School, New Haven, Conn., April 24, 2003.

"Race Discrimination and the Legitimacy of Capital Punishment: Reflections on the Interaction of Fact and Perception," DePaul Law Review Capital Punishment Symposium, Chicago Ill, Oct. 23, 2003.

"Excessiveness and Race Discrimination in the Military Death Penalty: Lessons from Civilian Courts Since *Furman v. Georgia* (1972)," Judicial Conference of the Court of Appeals For The Armed Forces, Columbus School of Law, Washington, D.C. May 19, 2004.

"Questions and Answers Concerning Evidence of Racial Disparities in the Administration of the Death Penalty," CLE Panel, NAACP Convention, Milwaukee, WI, July 11, 2005.

8

**45**

"Race Discrimination and the Administration of the Death Penalty: the experience of the United States Armed Forces: preliminary findings" University of Illinois Law School Seminar, April 15, 2006 and Harvard Law School conference on Race and the Death Penalty, May 5, 2006.

"Racial Discrimination in the Administration of the Death Penalty: the Maryland experience (1978-2000),"Maryland Summit on the Abolition of Capital Punishment, Baltimore Md., January 2007.

"Race and Proportionality since *McCleskey v. Kemp* (1987): different actors with mixed strategies of denial and avoidance," Columbia Law School and NAACP Symposium "Pursing Racial Fairness in the Administration of Justice: Twenty Years After *Mc McCleskey v. Kemp,* March 3, 2007; University of Miami Law School, Seminar, March 19, 2007; Georgia State University Law School, Atlanta, Conference on Race Discrimination and the Administration of the Criminal Justice System, October 4, 2007.

"The Story of *McCleskey v. Kemp*: Capital Punishment and the Legitimization of Racial Discrimination," University of Texas Law School, Symposium on Capital Punishment Stories, Foundation Press (2009), November 4, 2007.

"Evidence of the Inevitability and Ineradicability of Arbitrariness and Discrimination in the Administration of Capital Punishment in Maryland – Past, Present and Future," Testimony before the Maryland Capital Punishment Commission, Annapolis, Maryland, July 30, 2008.

## Miscellaneous

Member:   American Bar Association; American Law Institute; American Society of Criminology; Law and Society Association.

Board of Editors:  Evaluation Quarterly (1976-79); Law & Policy Quarterly (1978-79); Law and Human Behavior (1984-  ); Psychology, Public Policy and Law (1994-  ).

Board of Trustees, Law and Society Association (1992-94).

Grant Recipient, N.S.F. Law and Social Science Program
1974-75--"Quantitative Proof of Discrimination."

Invited Participant, N.S.F. Sponsored Conference on the Use of Scientific Evidence in Judicial Proceedings, November 1977.

Invited Participant, ABA--AAAS Conference on Cross Education of Lawyers and Scientists, Airlie House, Virginia, May 1978.

Reporter, Roscoe Pound Am. Tr. Lawyers Foundation Conf. On Capital Punishment, Harvard University, June 1980.

Grant Recipient, National Institute of Justice, 1980-81, "The Impact of Procedural Reform on Capital Sentencing:  the Georgia Experience."

Consultant, Delaware Supreme Court, April 1981 and South Dakota Supreme Court, November 1981, on the proportionality review of death sentences.

Member, Special Committee of the Association of the Bar of New York on Empirical Data in Legal Decision Making and the Judicial Management of Large Data Sets (1980-82).

Grant Recipient, NSF Law & Social Science Program. "A Longitudinal Study of Homicide Case Processing" (1983).

Consultant, National Center for State Courts project on the proportionality review of death sentences (1982-84).

Expert witness in McCleskey v. Kemp, 105 S.Ct. 1756 (1987), a capital case challenging the constitutionality of Georgia's capital sentence process.

Recipient, Law and Society Association's Harry Kalven Prize for Distinguished Scholarship in Law and Society (with G. Woodworth & C. Pulaski) for our capital punishment research ( June 11, 1987).

Grant recipient, State Justice Institute, 1988-1992, "Judicial Management of Judicial Awards for Noneconomic and Punitive Damages" (with Dr. J. MacQueen & J. Gittler).

Special Master for Proportionality Review of Death Sentences for the New Jersey Supreme Court: 1988-91.

Member, AALS Committee on Curriculum and Research (1994-97).

Recipient, "Michael J. Brody Award for Faculty Excellence in Service to the University of Iowa", October 1996.

Recipient, "Award For Faculty Excellence," Board of Regents, State of Iowa, October 18, 2000.

Grant recipient, Nebraska Crime Commission, "The Disposition of Nebraska Homicide Cases (1973-1999)" (2000).

Grant recipient, JEHT Foundation, support for study of racial discrimination in the death penalty: the experience of the United States Armed Forces: 1984-2005 (October 2005).

Recipient, Harold Hughes Award, Iowans Against the Death Penalty (October 27, 2007) for advocacy and research used in opposition to the reintroduction of the death penalty in Iowa.

Member, AAUP, Iowa Chapter (1969-___), Member, Executive Board (1992- ___), Member Committee A (1985-__)

1
2
3
4
5
6
7
8
9
10
11
12
13
14                                APPENDIX B
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## GEORGE WOODWORTH
## CURRICULUM VITAE
### February 25, 2009

**Address:**

George Woodworth
Department of Statistics
  and Actuarial Science
241 SH
University of Iowa
Iowa City, IA 52242

FAX:        319-335-3017
Voice:      319-335-0816
Home:       319-337-2000
Internet:   George-Woodworth@uiowa.edu

**Personal Data:**

Born:  May 29, 1940, Oklahoma City, Oklahoma
Marital Status:  Married with two children

**Education:**

B.A.  Carleton College, Northfield, Minnesota, 1962
Ph.D. University of Minnesota, 1966

**Employment:**

Instructor, Department of Statistics, University of Minnesota, 1965-66.

Assistant Professor, Department of Statistics, Stanford University, 1966-71.

*Assistent* (Visiting Assistant Professor), Department of Mathematical Statistics, Lund Institute of
  Technology, Lund, Sweden, 1970-71 (on leave from Stanford).

Associate Professor, Department of Statistics, The University of Iowa, Iowa City, Iowa, 1971-
  1996.

Associate Director, Director (1973-1980), Acting Director (1982-3), Adviser (1984-present):
  University of Iowa Statistical Consulting Center.

Associate Professor, Department of Preventive Medicine, Division of Biostatistics, University of
  Iowa, 1990-1996.

Professor, Department of Statistics and Actuarial Science, University of Iowa, 1996-.

Professor, Department of Preventive Medicine, Division of Biostatistics, University of Iowa
  1996- .

**Research Interests:**

Bayesian Inference and Pedagogy
Smooth Bayesian Inference
Bayesian Experimental Design
Applications of Statistics in Biomedical Science, Behavioral Science, and Law and Justice
Multivariate Analysis and Discrete Multivariate Analysis

**Dissertations Supervised:**

**Stanford University Ph.D.:**

1. Reading, James (1970). "A Multiple Comparison Procedure for Classifying All Pairs out of k Means as Close or Distant".

2. Withers, Christopher Stroude (1971).  "Power and Efficiency of a Class of Goodness of Fit Tests."

3. Rogers, Warren (1971). "Exact Null Distributions and Asymptotic Expansions for Rank Test Statistics."

**University of Iowa, Ph.D.:**

4. Huang, Yih-Min (1974).  "Statistical Methods for Analyzing the Effect of Work-Group Size Upon Performance."

5. Scott, Robert C. (1975).  "Smear and Sweep: a Method of Forming Indices for Use in Testing in Non-Linear Systems."

6. Hoffman, Lorrie Lawrence (1981). "Missing Data in Growth Curves."

7. Patterson, David Austin (1984).  "Three-Population Partial Discrimination."

8. Mori, Motomi (1989).  "Analysis of Incomplete Longitudinal Data in the Presence of Informative Right Censoring."  (Biostatistics, joint with Robert Woolson)

9. Galbiati-Riesco, Jorge Mauricio (1990).  "Estimation of Choice Models Under Endogenous/Exogenous Stratification."

10. Shin, Mi-Young (1993).  "Consistent Covariance Estimation for Stratified Prospective and Case-Control Logistic Regression."

11. Lian, Ie-Bin (1993).  "The Impact of Variable Selection Procedures on Inference for a Forced-in Variable in Linear and Logistic Regression."

12. Nunez Anton, Vicente A. (1993).  "Analysis of Longitudinal Data with Unequally Spaced Observations and Time Dependent Correlated Errors."

13. Bosch, Ronald J. (1993).  "Quantile Regression with Smoothing Splines."

14. Samawi, Hani Michel (1994).  "Power Estimation for Two-Sample Tests Using Importance and Antithetic Resampling." (Biostatistics, joint with Jon Lemke)

15. Chen, Hungta (1995).  "Analysis of Irregularly Spaced Longitudinal Data Using a Kernel Smoothing Approach." (Biostatistics)

16. Nichols, Sara (2000).  "Logistic Ridge Regression." (Biostatistics)

17. Dehkordi, Farideh Hosseini (2001).  "Smoothness Priors for Longitudinal Covariance Functions." (Biostatistics)

18. Meyers, Troy (2002)  "Frequentist properties of credible intervals."

19. Zhao, Lili, (2006)  "Bayesian decision-theoretic group sequential analysis with survival endpoints in Phase II clinical trials."

20. Chakravarty, Subhashish (2007)  "Bayesian surface smoothing under anisotropy."

2

**50**

**University of Iowa, MS:**

19. Juang , Chifei (1993). "A Comparison of Ordinary Least Squares and Missing Information Estimates for Incomplete Block Data."

20. Wu, Chia-Chen (1993). "Time Series Methods in the Analysis of Automatically Recorded Behavioral Data."

21. Peng, Ying (1995). "A Comparison of Chi-Square and Normal Confidence Intervals for Variance Components Estimated by Maximum Likelihood."

22. Wu, Li-Wei (1996). "CART Analysis of the Georgia Charging and Sentencing Study."

23. Meyers,Troy (2000) "Bias Correction for Single-Subject Information Transfer in Audiological Testing."

**Publications**

**Refereed Publications (Law review articles are reviewed and edited by law students):**

1. Savage, I.R., Sobel, M., Woodworth, G.G. (1966), "Fine Structure of the Ordering of Probabilities of Rank Orders in the Two Sample Case," *Annals of Mathematical Statistics,* 37, 98-112.

2. Basu, A.P., Woodworth, G.G. (1967), "A Note on Nonparametric Tests for Scale," *Annals of Mathematical Statistics,* 38, 274-277.

3. Rizvi, M.M., Sobel, M., Woodworth, G.G. (1968), "Non-parametric Ranking Procedures for Comparison with a Control," *Annals of Mathematical Statistics,* 39, 2075-2093.

4. Woodworth, G.G. (1970), "Large Deviations, Bahadur Efficiency of Linear Rank Statistics," *Annals of Mathematical Statistics,* 41, 251-183.

5. Rizvi, M.H., Woodworth, G.G. (1970), "On Selection Procedures Based on Ranks: Counterexamples Concerning Least Favorable Configurations," *Annals of Mathematical Statistics,* 41, 1942-1951.

6. Woodworth, G.G. (1976), "t for Two: Preposterior Analysis for Two Decision Makers: Interval Estimates for the Mean," *The American Statistician,* 30, 168-171.

7. Hay, J.G., Wilson, B.D., Dapena, J., Woodworth, G.G. (1977), "A Computational Technique to Determine the Angular Momentum of a Human Body," *J. Biomechanics,* 10, 269-277.

8. Woodworth, G.G. (1979), "Bayesian Full Rank MANOVA/MANCOVA: An Intermediate Exposition with Interactive Computer Examples," *Journal of Educational Statistics,* 4(4), 357-404.

9. Baldus, DC., Pulaski, C.A., Woodworth, G.G., Kyle, F. (1980), "Identifying Comparatively Excessive Sentences of Death: A Quantitative Approach," *Stanford Law Review,* 33(1),1-74.

10. Louviere, J.J., Henley, D.H., Woodworth, G.G., Meyer, J.R., Levin, I. P., Stoner, J.W., Curry, D., Anderson D.A. (1981), "Laboratory Simulation vs. Revealed Preference Methods for Estimating Travel Demand Models: An Empirical Comparison," *Transportation Research Record,* 797, 42-50.

11. Baldus, D.C., Pulaski, C.A., Woodworth, G.G. (1983), "Comparative Review of Death Sentences: An Empirical Study of the Georgia Experience," *The Journal of Criminal Law and Criminology,* 74(3), 661-753.

**51**

12. Louviere, J.J., Woodworth, G.G. (1983), "Design and Analysis of Simulated Consumer Choice of Allocation Experiments: An Approach Based on Aggregate Data," *Journal of Marketing Research*, XX, 350-367.

13. Baldus, D.C., Pulaski, C.A., Woodworth, G.G. (1986), "Monitoring and Evaluating Contemporary Death Sentencing Systems: Lessons from Georgia," *U.C. Davis Law Review*, 18(4), 1375-1407.

14. Baldus, D.C., Pulaski, C.A., Woodworth, G.G. (1986), "Arbitrariness and Discrimination in the Administration of the Death Penalty: A Challenge to State Supreme Courts," *Stetson Law Review*, XV(2), 133-261.

15. Bober, T., Putnam, C.A., Woodworth, G.G. (1987), "Factors Influencing the Angular Velocity of a Human Limb Segment," *Journal of Biomechanics*, 20(5), 511-521.

16. Gantz, B.J., Tyler, R.S., Knutson, J.F., Woodworth, G.G., Abbas, P., McCabe, B.F., Hinrichs, J., Tye-Murray, N., Lansing, C., Kuk, F., Brown, C. (1988), "Evaluation of Five Different Cochlear Implant Designs: Audiologic Assessment and Predictors of Performance," *Laryngoscope*, 98(10), 1100-6.

17. Tye-Murray, N., Woodworth, G.G. (1989), "The Influence of Final Syllable Position on the Vowel and Word Duration of Deaf Talkers," *Journal of the Acoustical Society of America*, 85, 313-321.

18. Baker, R.G., Van Nest, J., Woodworth, G.G. (1989), "Dissimilarity Coefficients for Fossil Pollen Spectra from Iowa and Western Illinois During the Last 30,000 Years," *Palynology*, 13, 63-77.

19. Shymansky, J.A., Hedges, L.V., Woodworth, G.G. (1990), "A Reassessment of the Effects of 60's Science Curricula on Student Performance," *Journal of Research in Science Teaching*, 27(2), 127-144.

20. Tye-Murray, N., Purdy, S., Woodworth, G.G., Tyler, R.S. (1990), "Effect of Repair Strategies on Visual Identification of Sentences," *Journal of Speech and Hearing Disorders*, 55, 621-627.

21. Cadoret, R.C., Troughton, E.P., Bagford, J.A., Woodworth, G.G. (1990), "Genetic and Environmental Factors in Adoptee Antisocial Personality," *European Archives of Psychiatry and Neurological Sciences*, 239(4), 231-240.

22. Chakraborty, G., Woodworth, G.G., Gaeth, G.J., Ettenson, R. (1991), "Screening for Interactions Between Design Factors and Demographics in Choice-Based Conjoint," *Journal of Business Research*, 23(3), 219-238.

23. Kochar, S.C., Woodworth, G.G. (1991). "Rank order Probabilities for the Dispersion Problem," *Statistics & Probability Letters*, 14(4), 203-208.

24. Knutson, J.F., Hinrichs, J.V., Tyler, R.S., Gantz, B.J., Schartz, H.A., Woodworth, G.G. (1991), "Psychological Predictors of Audiological Outcomes of Multichannel Cochlear Implants: Preliminary Findings," *Annals of Otology, Rhinology & Laryngology*, 100(10), 817-822.

25. Knutson, J.F., Schartz, H.A., Gantz, B.J., Tyler, R.S., Hinrichs, J.V., Woodworth, G.G. (1991), "Psychological Change Following 18 Months of Cochlear Implant Use," *Annals of Otology, Rhinology & Laryngology*, 100(11), 877-882.

26. Kirby, R.F., Woodworth, C.H., Woodworth G.G., Johnson, A.K. (1991), "Beta-2 Adrenoceptor Mediated Vasodilation: Role in Cardiovascular Responses to Acute Stressors in Spontaneously Hypertensive Rats," *Clin. and Exper. Hypertension.- Part A, Theory and Practice*, 13(5), 1059-1068.

27. Tye-Murray, N., Tyler, R.S., Woodworth, G.G., Gantz, B.J. (1992), "Performance over Time with a Nucleus or Ineraid Cochlear Implant," *Ear and Hearing,* 13, 200-209.

28. Tye-Murray, N., Purdy, S.C., Woodworth, G.G. (1992), "Reported Use of Communication Strategies by SHHH Members: Client, Talker, and Situational Variables," *Journal of Speech & Hearing Research,* 35(3), 708-717.

29. Mori, M., Woodworth, G.G., Woolson, R.F. (1992), "Application of Empirical Bayes Inference to Estimation of Rate of Change in the Presence of Informative Right Censoring," *Statistics in Medicine,* 11, 621-631.

30. Shymansky, J.A., Woodworth, G.G., Norman, O., Dunkhase, J., Matthews, C., Liu, C.T. (1993), "A Study of Changes in Middle School Teachers' Understanding of Selected Ideas in Science as a Function of an In-Service Program Focusing on Student Preconceptions," *J. Res. in Science Teaching,* 30, 737-755.

31. Wallace, R.B., Ross, J.E., Huston, J.C., Kundel, C., Woodworth, G.G. (1993), "Iowa FICSIT Trial: The Feasibility of Elderly Wearing a Hip Joint Protective Garment to Reduce Hip Fractures," *J. Am. Geriatr. Soc.,* 41(3), 338-340.

32. Gantz, B.J., Woodworth, G.G., Knutson, J. F., Abbas, P.J., Tyler, R.S. (1993), "Multivariate Predictors of Success with Cochlear Implants," *Advances in Oto-Rhino-Laryngology,* 48, 153-67.

33. Mori, M., Woolson, R.F., Woodworth, G.G. (1994), "Slope Estimation in the Presence of Informative Right Censoring: Modeling the Number of Observations as a Geometric Random Variable," *Biometrics,* 50(1), 39-50.

34. Nunez-Anton, V., Woodworth, G.G. (1994), "Analysis of Longitudinal Data with Unequally Spaced Observations and Time Dependent Correlated Errors," *Biometrics,* 50(2), 445-456.

35. Baldus, D.C., Woodworth, G.G., Pulaski, C.A. (1994), "Reflections on the Inevitability of Racial Discrimination in Capital Sentencing and the Impossibility of Its Prevention, Detection, and Correction," *Washington and Lee Law Review,* 51(2), 359-430.

36. Cutrona, C.E., Cadoret, R.J., Suhr, J.A., Richards, C.C., Troughton, E. Schutte, K., Woodworth, G. G. (1994), "Interpersonal Variables in the Prediction of Alcoholism Among Adoptees: Evidence for Gene-Environment Interactions," *Comprehensive Psychiatry,* 35(3), 171-9.

37. De Fillippo, C.L., Lansing, C.R., Elfenbein, J.L., Kallaus-Gay, A., Woodworth, G.G. (1994), "Adjusting Tracking Rates for Text Difficulty via the Cloze Technique," *Journal of the American Academy of Audiology,* 5(6), 366-78

38. Gantz, B.J., Tyler, R.S., Woodworth, G.G., Tye-Murray, N. Fryauf-Bertschy. H. (1994), "Results of Multichannel Cochlear Implants in Congenital and Acquired Prelingually Deafened Children: Five Year Follow-Up," *Am. J. Otol.,* 15 (Supplement 2), 1-7.

39. Cadoret, R.J., Troughton, E., Woodworth, G.G. (1994), "Evidence of Heterogeneity of Genetic Effect in Iowa Adoption Studies," *Annals of the New York Academy of Sciences,* 708, 59-71.

40. Bosch, R., Ye, Y., Woodworth, G.G. (1995), "An Interior Point Quadratic Programming Algorithm Useful for Quantile Regression with Smoothing Splines," *Computational Statistics and Data Analysis,* 19, 613-613.

41. Cadoret, R.J., Yates, W.R., Troughton, E., Woodworth, G.G., Stuart, M.A. (1995), "Adoption Study Demonstrating Two Genetic Pathways to Drug Abuse," *Archives of General Psychiatry,* 52(1), 42-52.

**53**

42. Tye-Murray, N., Spencer, L., Woodworth, G.G. (1995), "Acquisition of Speech by Children who have Prolonged Cochlear Implant Experience," *Journal of Speech & Hearing Research*, 38(2), 327-37.

43. Cadoret, R.J., Yates, W.R., Troughton, E., Woodworth, G.G., Stewart, M.A. (1995), "Genetic-Environmental Interaction in the Genesis of Aggressivity and Conduct Disorders," *Archives of General Psychiatry*, 52(11), 916-924.

44. Tyler, R.S., Lowder, M.W., Parkinson, A.J., Woodworth, G.G., Gantz, B.J. (1995), "Performance of Adult Ineraid and Nucleus Cochlear Implant Patients after 3.5 Years of Use," *Audiology*, 34(3), 135-144.

45. Baldus, D., MacQueen, JC, and Woodworth GG. (1995) "Improving Judicial Oversight of Jury Damages Assessments: A Proposal for the Comparative Additur/Remittitur Review of Awards for Nonpecuniary Harms and Punitive Damages," with John C. MacQueen and George Woodworth, 80 Iowa Law Review 1109 (1995), 159 pages.

46. Parkinson, A.J., Tyler, R.S., Woodworth, G.G., Lowder, M., Gantz, B.J., (1996) "A Within-Subject Comparison of Adult Patients Using the Nucleus F0F1F2 and F0F1F2B3B4B5 Speech Processing Strategies," *Journal of Speech & Hearing Research*, Volume 39, 261-277.

47. Baldus, D., MacQueen, J.C., Woodworth, G.G., (1996) "Improving Judicial Oversight of Jury Damages Assessments: A Proposal for the Comparative Additur/Remittitur Review of Awards for Nonpecuniary Harms and Punitive Damages," *Iowa Law Review*, (80) 1109-1267.

48. Cadoret, Remi J., Yates, William R., Troughton, E., Woodworth, G.G. (1996) "An Adoption Study of Drug Abuse/Dependency in Females," *Comprehensive Psychiatry,* Vol. 37, No. 2, 88-94.

49. Tripp-Reimer, T., Woodworth, G.G., McCloskey, J.C., Bulechek, G. (1996), "The Dimensional Structure of Nursing Intervention," *Nursing Research* 45(1) 10-17.

50. Tyler RS. Fryauf-Bertschy H. Gantz BJ. Kelsay DM. Woodworth GG. (1997) "Speech perception in prelingually implanted children after four years," *Advances in Oto-Rhino-Laryngology.* 52:187-92.

51. Tyler RS, Gantz BJ, Woodworth GG, Fryauf-Bertschy H, and Kelsay DM. (1997) "Performance of 2- and 3-year-old children and prediction of 4-year from 1-year performance. *American Journal of Otology.* 18(6 Suppl):S157-9, 1997.

52. Miller CA, Abbas PJ, Rubinstein JT, Robinson BK, Matsuoka AJ, and Woodworth G. (1998) "Electrically evoked compound action potentials of guinea pig and cat: responses to monopolar, monophasic stimulation." *Hearing Research.* 119(1-2):142-54, 1998 May.

53. Knutson JF, Murray KT, Husarek S, Westerhouse K, Woodworth G, Gantz BJ, and Tyler RS. (1998) "Psychological change over 54 months of cochlear implant use." *Ear & Hearing,* 19(3):191-201, 1998.

54. Gfeller K, Knutson JF, Woodworth G, Witt S, and DeBus B. (1998) "Timbral recognition and appraisal by adult cochlear implant users and normal-hearing adults." *Journal of the American Academy of Audiology,* 9(1):1-19, 1998.

55. Baldus D, Woodworth G, Zuckerman D, Weiner NA, Broffitt B. (1998) "Racial Discrimination and the Death Penalty in the Post-Furman Era: An Empirical and Legal Overview with Recent Findings from Philadelphia," Cornell Law Review, 88:6, 1998.

56. Green GE. Scott DA. McDonald JM. Woodworth GG. Sheffield VC. Smith RJ. Carrier rates in the midwestern United States for GJB2 mutations causing inherited deafness. JAMA. 281(23):2211-6, 1999 Jun 16.

6

57. Gantz BJ. Rubinstein JT. Gidley P. Woodworth GG. Surgical management of Bell's palsy. Laryngoscope. 109(8):1177-88, 1999 Aug

58. Featherstone KA. Bloomfield JR. Lang AJ. Miller-Meeks MJ. Woodworth G. Steinert RF. Driving simulation study: bilateral array multifocal versus bilateral AMO monofocal intraocular lenses. Journal of Cataract & Refractive Surgery. 25(9):1254-62, 1999 Sep.

59. Weiler JM. Bloomfield JR. Woodworth GG. Grant AR. Layton TA. Brown TL. McKenzie DR. Baker TW. Watson GS. Effects of fexofenadine, diphenhydramine, and alcohol on driving performance. A randomized, placebo-controlled trial in the Iowa driving simulator. *Annals of Internal Medicine. 132(5):354-63, 2000 Mar 7*

60. Tyler RS. Teagle HF. Kelsay DM. Gantz BJ. Woodworth GG. Parkinson AJ. Speech perception by prelingually deaf children after six years of Cochlear implant use: effects of age at implantation. *Annals of Otology, Rhinology, & Laryngology - Supplement. 185:82-4, 2000 Dec.*

61. Ballard KJ. Robin DA. Woodworth G. Zimba LD. Age-related changes in motor control during articulator visuomotor tracking. *Journal of Speech Language & Hearing Research. 44(4):763-77, 2001 Aug.*

62. Gfeller K. Witt S. Woodworth G. Mehr MA. Knutson J. Effects of frequency, instrumental family, and cochlear implant type on timbre recognition and appraisal. *Annals of Otology, Rhinology & Laryngology. 111(4):349-56, 2002 Apr.*

63. Green GE. Scott DA. McDonald JM. Teagle HF. Tomblin BJ. Spencer LJ. Woodworth GG. Knutson JF. Gantz BJ. Sheffield VC. Smith RJ. Performance of cochlear implant recipients with GJB2-related deafness. *American Journal of Medical Genetics. 109(3):167-70, 2002 May 1.*

64. Weiler JM. Quinn SA. Woodworth GG. Brown DD. Layton TA. Maves KK. Does heparin prophylaxis prevent exacerbations of hereditary angioedema?. *Journal of Allergy & Clinical Immunology. 109(6):995-1000, 2002 Jun.*

65. Berkowitz RB. Woodworth GG. Lutz C. Weiler K. Weiler J. Moss M. Meeves S. Onset of action, efficacy, and safety of fexofenadine 60 mg/pseudoephedrine 120 mg versus placebo in the Atlanta allergen exposure unit. *Annals of Allergy, Asthma, & Immunology. 89(1):38-45, 2002 Jul.*

66. Baldus, D, Woodworth GG, Grosso, C., Christ, M. (2002) "Arbitrariness and Discrimination in the Administration of the Death Penalty: A Legal and Empirical Analysis of the Nebraska Experience (1973-1999)," with George Woodworth, Catherine M. Grosso, and Aaron M. Christ, 81 *Nebraska Law Review* 486 (2002), 271 pages.

67. Baldus, D, and Woodworth GG. (2003) "Race Discrimination in the Administration of the Death Penalty: An Overview of the Empirical Evidence with Special Emphasis on the Post-1990 Research," with George Woodworth, 39 *Criminal Law Bulletin* 194 (2003), 33 pages.

68. Kadane, J. and Woodworth G.G. (2004) "Hierarchical Models for Employment Decisions," *Journal of Business and Economic Statistics*, 1 April 2004, vol. 22, no. 2, pp. 182-193(12).

69. Woodworth, G.G. and Kadane, J.B. (2004) "Expert testimony supporting post-sentence civil incarceration of violent sexual offenders." *Law Probablity and Risk*, 2004 3: 221-241.

70. Baldus, D. and Woodworth, G.G., "Race Discrimination and the Legitimacy of Capital Punishment: Reflections on the Interaction of Fact and Perception," 53 *DePaul Law Review* 1411 (2004).

71. Weiler K. Christ AM. Woodworth GG. Weiler RL. Weiler JM. "Quality of patient-reported outcome data captured using paper and interactive voice response diaries in an allergic

7

rhinitis study: is electronic data capture really better?. *Annals of Allergy, Asthma, & Immunology.* 92(3):335-9, 2004 Mar.

72. Robin DA, Jacks A, Hageman C, Clark HM, Woodworth G., "Visuomotor tracking abilities of speakers with apraxia of speech or conduction aphasia," Brain and Language, Aug;106(2):98-106. 2008.

73. Woodworth, G.G. and Kadane, J.  "Age and Time-Varying Proportional Hazards Model for Employment Discrimination," *Annals of Applied Statistics,*  2009 accepted pending revisions.

74. Zhao, L and Woodworth, G.G. "Bayesian decision sequential analysis with survival endpoint in phase II clinical trials," *Stat Med*, 2009, Feb 18.

**Books, Chapters:**

75. Bober, T., Hay, J.G., Woodworth, G.G.  (1979),  "Muscle Pre-Stretch and Performance," in *Science in Athletics*, eds. Juris Terauds and George G. Dales,  Del Mar CA: Academic Publishers, pp. 155-166.

76. Hay, J.G.,  Dapena, J., Wilson, B.D., Andrews, J.G., Woodworth, G.G.  (1979),  "An Analysis of Joint Contributions to the Performance of a Gross Motor Skill,"  in *International Series on Biomechanics, Vol. 2B, Biomechanics VI-B*, eds. Erling Asmussen and Kuert Jorgensen,  Baltimore: University Park Press,  pp. 64-70.

77. Hay, J.G., Vaughan, C.L., Woodworth, G.G. (1980).  "Technique and Performance: Identifying the Limiting Factors," in *Biomechanics VII-B*, eds.  Adam Morecki, Kazimerz Fidelus, Krzysztof Kedzior, Andrzej Wit, Baltimore: University Park Press,  pp. 511-520.

78. Woodworth, G.G. (1980).  "Numerical Evaluation of Preposterior Expectations in the Two-Parameter Normal Model, with an Application to Preposterior Consensus Analysis,"  in *Bayesian Analysis in Econometrics and Statistics*,  ed. Arnold Zellner, Amsterdam: North-Holland Publishing Co.,  pp. 133-140.

79. Hodges, L.V., Shymansky, J.A., Woodworth, G.G. (1989),  *Modern Methods of Meta-Analysis: an NSTA Handbook*,  Washington, D.C.: National Science Teachers Association.

80. Baldus, D.C., Woodworth, G.G., Pulaski, C.A.  (1990),  *Equal Justice and the Death Penalty:  A Legal and Empirical Analysis,*  Boston: Northeastern University Press.

81. Baldus, D., Pulaski, C., Woodworth GG (1992) "Law and Statutes in Conflict: Reflections on McCleskey v. Kemp," in Handbook of Psychology and Law, edited by Dorothy K. Kagehiro and William S. Laufer. New York: Springer-Verlag, 1992.

82. Baldus, D., Pulaski, C., Woodworth GG (1992) "Race Discrimination and the Death Penalty," with Charles J. Pulaski, Jr. and George Woodworth, in The Oxford Companion to the Supreme Court of the United States. New York: Oxford University Press, 1992, p 705-7.

83. Woodworth, G.G. (1994).  "Managing Meta-Analytic Databases,"  in *The Handbook of Research Synthesis*, eds. Harris Cooper and Larry V. Hedges,  New York: Russell Sage Foundation, pp. 177-189.

84. Lovelace, D. Cryer, J.,  Woodworth, G.G.  (1994),  *Minitab Handbook to Accompany Statistics for Business Data Analysis and Modelling, 2nd edition,*  Belmont, CA: Wadsworth Publishing Company.

85. Tye-Murray, N. Kirk, K.L., Woodworth, G.G. (1994).  "Speaking with the Cochlear Implant Turned On and Turned Off," in *Datenknovertierung, Reproduktion und Drick*, eds. I.J. Hochmair-Desoyer and E.S. Hochmair, Wien, Manz, pp. 552-556.

86. Baldus, D. MacQueen, JC, Woodworth GG. (1996) "Additur/Remittitur Review: An Empirically Based Methodology for the Comparative Review of General Damages Awards for Pain, Suffering, and Loss of Enjoyment of Life," with John C. MacQueen and George Woodworth, in Reforming the Civil Justice System, edited by Larry Kramer. New York: New York University Press, 1996, p 386, 30 pages.

87. Baldus, D, and Woodworth, GG. (1998) "Race Discrimination and the Death Penalty: An Empirical and Legal Overview," with George Woodworth, in America's Experiment with Capital Punishment, edited by James C. Acker, Robert M. Bohm, and Charles S. Lanier. Durham, NC: Carolina Academic Press, 1998, page 385, 32 pages.

88. Woodworth, George G. *Biostatistic: A Bayesian Introduction.* New York: John Wiley and Sons, September, 2004.

### Unrefereed Articles, Reviews.

89. Libby, D.L., Novick, M.R., Chen, J.A., Woodworth, G.G., Hamer, R.M. (1981), "The Computer-Assisted Data Analysis (CADA) Monitor," *The American Statistician*, 35(3), 165-166.

90. Woodworth, G.G. (1987), "STATMATE/PLUS, Version 1.2," *The American Statistician*, 41(3), 231-233.

91. Hoffmaster, D., Woodworth, G.G. (1987), "A FORTRAN Version of the Super Duper Pseudorandom Number Generator," *Science Software Quarterly*, 3(2), 100-102.

92. Baldus, D.C., Woodworth, G.G., Pulaski, C.A. (1987) "Death penalty in Georgia remains racially suspect," *Atlanta Journal and Constitution,* September 6, 1987.

93. Hawkins, D., Conaway, M., Hackl, P., Kovacevic, M., Sedransk, J., Woodworth, G.G., Bosch, R, Breen, C. (1989) "Report on Statistical Quality of Endocrine Society Journals," *Endocrinology,* 125(4), 1749-53.

94. Woodworth, G.G. (1989). "Statistics and the Death Penalty," *Stats. The Magazine for Students of Statistics,* 2, 9-12.

95. Baldus, D.C., Pulaski, C.A., Woodworth, G.G. (1989), "Reflections on 'Modern' Death Sentencing Systems," Book review, *Criminal Law Forum*, 1, 190-197.

96. Baldus, D., Woodworth, G.G. (1993). "Proportionality: The View of the Special Master," *Chance, New Directions for Statistics and Computers,* 6(3), 9-17.

97. "Race Discrimination in America's Capital Punishment System since Furman v. Georgia (1972): The Evidence of Race Disparities and the Record of Our Courts and Legislatures in Addressing the Issue," with George Woodworth, Report to the A.B.A. Section of Individual Rights and Responsibilities (1997), 19 pages.

98. Baldus, David C., George Woodworth, David Zuckerman, Neil Alan Weiner, and Barbara Broffitt (2001). "The Use of Peremptory Challenges in Capital Murder Trials: A legal and Empirical Analysis," *University of Pennsylvania Journal of Constitutional Law*, February, 2001.

99. "Complement to Chapter 6. The WinBUGS Program," in *Bayesian Statistics: Principles, Models, and Applications, Second Edition*, by S. James Press, John Wiley and Sons, Inc., New York, 2002.

**Convention Papers, other Oral Presentations:**

100. Woodworth, G.G. (1983), "Analysis of a Y-Stratified Sample: The Georgia Charging and Sentencing Study," in *Proceedings of the Second Workshop on Law and Justice Statistics*, ed. Alan E. Gelfand, U.S. Department of Justice, Bureau of Justice Statistics, pp. 18-22.

101. Woodworth, G.G., Louviere, J.J. (1985), "Simplified Estimation of the MNL Choice Model using IRLS," Contributed talk at TIMS/ORSA Marketing Science Conference at Vanderbilt University.

102. Woodworth, G.G. (1985), "Recent Studies of Race- and Victim Effects in Capital Sentencing," *Proceedings of the Third Workshop on Law and Justice Statistics*, ed. G.G. Woodworth, U.S. Department of Justice, Bureau of Justice Statistics, pp. 55-58.

103. Woodworth, G.G., Louviere, J.J. (1988), "Nested Multinomial Logistic Choice Models Under Exogenous and Mixed Endogenous-Exogenous Stratification," *ASA Proceedings of the Business and Economics Statistics Section*, American Statistical Association, pp. 121-129.

104. Woodworth, G.G. (1989), "Trials of an Expert Witness," *ASA Proceedings of the Social Science Section*, American Statistical Association, pp. 143-146.

105. Kirby, R.F., Woodworth, C.H., Woodworth, G.G., Johnson A.K., (1989), "Differential Cardiovascular Effects of Footshock and Airpuff Stressors in Wistar-Kyoto and Spontaneously Hypertensive Rats," *Society for sNeuroscience Abstracts*, 15, 274.

106. Woodworth, C.H., Kirby, R.F., Woodworth, G.G., Johnson, A.K. (1989), "Spontaneously Hypertensive and Wistar-Kyoto Rats Show Behavioral Differences but Cardiovascular Similarities in Tactile Startle," *Society for Neuroscience Abstracts*, 15, 274.

107. Woodworth, G.G., Mah, Jeng, Breiter, D. "Bayesian Experimental Design of Sequential and Nonsequential Medical Device Trials. Contributed Talk, Joint Statistical Meeting 2005, Minneapolis, MN

**Unpublished Reports:**

108. Baldus, D.C., Woodworth, G.G., Pulaski C.A. (1989). "Procedural Reform Study," *Inter-University Consortium for Political and Social Research: Criminal Justice Archive*.

109. Baldus, D.C., Woodworth, G.G., Pulaski C.A. (1989). "Charging and Sentencing Study," *Inter-University Consortium for Political and Social Research: Criminal Justice Archive*.

**Work in Process:**

110. Woodworth, G.G., *Statistical Issues in Recent Re-Analyusis of Capital Charging and Sentencing Data*, read at John Jay College, February 21, 2007.

111. Woodworth, G.G., "Bayesian Experimental Design of Sequential Clinical Trials." To be submitted to *Statistics in Medicine*, 2009.

112. Woodworth, G.G., *Biostatistics II: Intermediate Bayesian Analysis*, Proposal accepted by John Wiley, December 2006, completion date May 1, 2009.

**Professional Honors and Awards:**

1987  Harry Kalven prize of the Law and Society Association (with David Baldus and Charles Pulaski).

1987  Iowa Educational Research and Evaluation Association, annual award "For Excellence in the Field of Educational Research and Evaluation for Best Educational Evaluation Study," (with Larry Hedges and James Shymansky).

1991  Gustavus Myers Center for the Study of Human Rights in the United States, selection of *Equal Justice and the Death Penalty* as an outstanding book on the subject of human rights (with David Baldus and Charles Pulaski).

1996  Elected Fellow of the American Statistical Association


**Service Activities**

**Departmental Service:**

University of Iowa Statistical Consulting Center:
Founder, Associate Director, Director (1973-1980)
Acting Director (1982-3)
Member of Steering Committee and Adviser (1984-present).

**University Service:**

Outside member of over thirty Ph.D. dissertation committees, 1973-present.

Woodworth, G.G., Lenth, R.V.L. (1982)  "A Stratified Sampling Plan for Estimating Departmental and University-Wide Administration Effort."

University of Iowa, Basic Mathematics Committee, January 1983-84.

Statistics Advisor to the University of Iowa Journal of Corporation Law, 1984-85.

University of Iowa, Research Council, 1984-87, Chairman 1986-87.

University House Advisory Committee, 1986-87.

Chairman, Political Science Review Committee, 1988-89.

Interdisciplinary Ph.D. Program in Applied Mathematical Sciences, 1988-present.

University of Iowa, Judicial Commission, 1979-81, 1990-93.

University of Iowa, Liberal Arts Faculty Assembly, 1985-87, 1995-6.

**Professional Service:**

NAACP Legal Defense and Education Fund, 1980-3:  Statistical Analysis of the Georgia Charging and Sentencing Study,  Expert testimony in McCleskey vs. Zant (decided in the U.S. Supreme Court).

ASA Law and Justice Statistics Committee, 1982-1987:  Member of two methodological review panels in Washington, DC.  Organizer of two-day Workshop on Law and Justice Statistics, August 1985.

ASA Visiting Lecturer Program, 1984-1988.
1984  Invited talk at Culver-Stockton College
1986  Invited talk at Moorhead State University
1988  Invited talk at Grinnell College

Invited Participant, 1984, *Planning Session for Florida Capital Charging and Sentencing Study*, Florida Office of Public Defender, Richard H. Burr, Esq.

Editor, *Proceedings of the Third Workshop on Law and Justice Statistics*, American Statistical Association, 1985.

Invited Panelist, 1986 Law and Society Association Annual Meeting,  Panel discussion of current state of capital sentencing research.

Invited Speaker, 1987 *Seminar-Workshop on Meta-Analysis in Research,* University of Puerto Rico, San Juan, Faculty of Education, Department of Graduate Studies.

Associate Editor, *Evaluation Review*, 1983-1986.

Baldus, D., Woodworth, G.G., Pulaski, C.A.  (1989).  Oral Testimony before the U.S. Senate Judiciary Committee (presented by D. Baldus).

Invited Participant, ASA Media Experts Program  (1989).

Statistical Consultant to Special Master, David Baldus.  State of New Jersey, Administrative Office of Courts -- Proportionality Review System.  1989-present.

ASA Law and Justice Statistics Committee, second appointment, 1993-95.

Baldus, D., Woodworth, G.G.  (1993),  "An Iowa Death Penalty System in the 1990's and Beyond:  What Would it Bring?"  Report submitted to the Senate Judiciary Committee,  Iowa Legislature, February 24, 1993.

Baldus, D., MacQueen, J.C., Woodworth, G.G.  (1993),  "An Empirically-Based Methodology for Additur/Remittitur Review and Alternative Strategies for Rationalizing Jury Verdicts," Report prepared for the Research Conference on Civil Justice Reform in the 1990's.

Baldus, D.C., Woodworth G.G. (1995),  "Proportionality Review and Capital Charging and Sentencing: A Proposal for a Pilot Study,"  Commonwealth of Pennsylvania, Administrative Office of Courts.

Session Chair, Joint Statistical Meeting, Minneapolis, 2005.

Session Discussant, 2006 FDA/Industry Statistics Workshop, Washington, DC, September 2006

Invited Speaker at a one-day conference on Race and Death Penalty Research, at John Jay College of Criminal Justice, CUNY, February 21, 2007.

**Refereeing** *(since 1980)*:

| | |
|---|---|
| 1980: | Journal of the American Statistical Association |
| 1982: | Journal of Educational Statistics |
| 1983: | Journal of Statistical Computation and Simulation |
| | Annals of Mathematical Statistics |
| | Evaluation Review (associate editor) |
| 1984: | Transportation Research |
| | Law and Society Review |
| | American Journal of Mathematical and Management Sciences |
| | Journal of Educational Statistics |
| | Evaluation Review (associate editor) |
| 1985: | Edited Proceedings of 3rd Workshop on Law and Justice Statistics |
| | Evaluation Review (associate editor) |
| 1986: | Psychological Bulletin |
| | National Science Foundation |
| | Evaluation Review (associate editor) |
| 1987: | J. Amer. Statist. Assoc. |

1988:   Science *(ca. 1988)*
1990:   Annals of Otology, Rhinology & Laryngology
        American Speech-Language-Hearing Association
        Macmillan Publishing Company
        Survey Methodology Journal
1991:   International Journal of Methods in Psychiatric Research
1993:   Multivariate Behavioral Research
1994:   International Journal of Methods in Psychiatric Research
1995:   SIAM Review
        Duxbury Press
        Acta Applicandae Mathematicae
1996:   American Journal of Speech-Language Pathology
1998:   Duxbury Press
2001:   John Wiley and Sons, Inc.
2002:   Addison-Wesley
2004:   J. Amer. Statist. Assoc.
2005    J. Amer. Statist. Assoc.

**61**

**Extramural Consulting and Pro Bono Work:**

| | |
|---|---|
| American College Testing | Kaiser Aluminum |
| Allergan | Electric Power Research Institute |
| Beling Consultants, Moline IL | NAACP Legal Defense and Education Fund |
| Bettendorf Iowa AEA | National Research Council |
| Coerr Environmental, Chapel Hill | Supreme Court of Nebraska |
| Defender Association of Philadelphia | Pittsburgh Plate Glass |
| Death Penalty Information Center | Rhone-Poullenc |
| Florida State Public Defender's Office | Stanford Law School |
| Gas Research Institute. | StarForms |
| Hoechst Marion Roussel / Aventis | Supreme Court of New Jersey |
| Guidant Corporation | Vigertone Ag Products |
| HON Corporation | Westinghouse Learning Corporation |
| Legal Services Corporation of Iowa | WMT news department |
| Iowa State Attorney General's Office | |

**Intramural Consulting:**

I consult almost on a weekly basis with colleagues and students throughout the University, including at one time or another (but not limited to): Audiology, Biology, Exercise Physiology, Geology, Law, Marketing, Nursing, Otolaryngology, Physics, Psychology, Psychiatry, Science Education, the Iowa Driving Simulator, and the National Advanced Driving Simulator.

**Expert testimony / depositions:**

Robert R. Lang, Esq. (Legal Services Corporation of Iowa)
    1982   Ruby vs. Deere (gender discrimination)
Mark R. Schuling, Iowa Assistant Attorney General.
    1984   Burlington Northern Railroad Co. vs. Gerald D. Bair, Director (taxation)
Teresa Baustian (Iowa Asst. Atty. General - Civil Rights Division)
    1988   Howard vs. Van Diest Supply Co. (age discrimination)
Walter Braud, Esq.
    1988   Hollars et. al. vs. Deere & Co. et. al. (gender discrimination)
Mark W. Schwickerath, Esq.
    1988   Schwickerath vs. Dome Pipeline, Inc. (effects of chemical spill)
Richard Burr, Esq.
    1990   Selvage vs. State of Florida (capital sentencing)
Amanda Potterfield, Esq.
    1990   Reed vs. Fox Pool Corporation (product liability)
    1994   State of Iowa vs. Dalley (forensic identification via DNA)
Jerry Zimmerman, Esq.
    1991   George Volk Case (age discrimination)
    1993   Rasmussen vs. Rockwell (age discrimination)
    1994   Hans vs. Courtaulds (age discrimination)
Thomas Diehl, Esq.
    1992   State of Iowa vs. William Albert Harris (jury composition)
Diane Kutzko, Esq. (Iowa State Bar Association)
    1995   Consultation on the validity of the Iowa bar exam.
John Allen, Esq.
    1995   Buchholz vs. Rockwell (age discrimination)
Michael M. Lindeman, Esq.
    1995   Beck vs. Koehring (age discrimination)
Timothy C. Boller, Esq.

1995    Larh vs. Koehring (age discrimination,  see refereed publications, item 68)
Thomas C. Verhulst
1995    Carr vs. J.C. Penny (racial discrimination)
J. Nick Badgerow, Esq.
1995    Zapata et. al., vs. IBP, Inc. (racial/national origin discrimination)
David J. Goldstein, Esq., Faegre and Benson, Minneapolis
1999    Payless Cashways, Inc. Partners v. Payless Cashways (age discrimination)
Catherine Ankenbarndt, Deputy First Assistant Wisconsin State Public Defender
2001    Civil commitment hearing of Keith Rivas  (Prediction of Sexual Recidivism)
Michael B. McDonald, Assistant Florida Public Defender
2001    Frye hearing in re Actuarial Prediction of Sexual Recidivisim (see refereed
publications, item 69).
Greg Bal, Assistant Iowa Public Defender
2001    Civil commitment hearing of Lanny Taute (Prediction of Sexual Recidivism,
Harley C. Erbe, Esq.  Walker Law Firm, Des Moines
2002    Campbell et al. v. Amana Company (Age Discrimination)
Texas State Counsel for Offenders, Huntsville, TX
2002    Daubert hearing in re Actuarial Prediction of Sexual Recidivisim
Michael H. Bloom, Assistant Wisconsin Public Defender
2002    Detention of Morris F. Clement, Forest County Case No. 00 CI 01
(Prediction of Sexual Recidivism)
Federal Court Division, Defender Association of Philadelphia, Capital Habeas Corpus Unit
2002    Petitioner Reginald Lewis (racial discrimination)
2006    Commonwealth v. Baker (jury composition)
Stephen Snyder, Esq., Grey Plant Mooty Mooty and Bennett.
2006-7 (with Jay Kadane)

15

**63**

1
2
3
4
5
6
7
8
9
10
11
12
13
14                              APPENDIX C
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Resume of Richard G. Newell
Principal Consulting Analysis
TOSCA, Inc.

2175 Westminster Circle
Coralville, Iowa 52241
Phone (319) 339-1641
E-Mail: rnewell@q.com

| | |
|---|---|
| EXPERTISE | Accounting, Consulting, project supervision, research, systems analysis, design, programming, testing, implementation and customer support. |
| HARDWARE | IBM 1400 series, 360, 370, and later mainframes, RISC6000, System/3, System/32/34. Build and maintain IBM-compatible multi-media microcomputers. |
| SOFTWARE | CLIPPER, BLINKER, XBASE, COBOL, FORTRAN IV, PL/I, RPG-II, SAS, WYLBUR, TSO, RJE, HASP, MVS, JCL, AIX, ORACLE FORMS 7.0, OS/2, DOS 6.2, WIN 3.1, WIN95, WIN98, WINXP, FTP, TELNET, OFFICE/97 & 2000 |
| EDUCATION | University of Iowa: B.B.A. with a major in Marketing. Graduated in Feb. 1963. University of California at Berkeley: Graduate studies in Computer Science. |

RESEARCH and STATISTICS SUPPORT

From December of 2000 to the present time: Principal Research Consultant at Tosca, Inc. under contract with Professor David Baldus at the University of Iowa Law School. Provider of consulting, data collection design, data entry supervision and quality control, database design and maintenance, research, and programming using SAS in support of several studies at the University of Iowa, City of Philadelphia, State of Nebraska, United States Military and others.

PC PROPRIETARY SOFTWARE and HARDWARE SUPPORT

| | |
|---|---|
| 06/91-08/01 | Dr. Steven Price – Wrote and maintained Dental Billing System. |
| 08/93-07/01 | Dr. John Lennarson – Wrote and maintained Dental Billing System |
| 03/06-08/01 | Consulted and assisted in PC hardware purchase, installation & upgrades for several personal and professional clients. |

EMPLOYMENT EXPERIENCE

09/86-02/00    Promoted to Consulting Staff Analyst (S21). Internal consultant, project leader and programmer. Provided the majority of the analysis, design, programming and user support for the following:

- ACT-internal: Programming and support for Budget & Finance accounting applications which included the following: Accounts Payable, Billing, Payroll, Job-Costing, and Inventory.

- ACT-resident: Proficiency Exams Program, Educational Opportunity System, Student Aid Systems.

- ACT Software packages. Responsible for all design, programming, and customer support for ASSET, a dBASE system used by over 700 Community Colleges nation-wide from 1989 through the present.

09/85    Promoted to Director of Systems Support (S21). Additional duties: Introduction and support of IBM personal computers. Supervised a staff of 13 people.

09/83    Promoted to Assistant Director of Systems Development (S20). Additional duties: Hiring, training, staff development. Supervised a staff of six people.

Resume of Richard G. Newell
Principal Consulting Analysis
TOSCA, Inc.

2175 Westminster Circle
Coralville, Iowa 52241
Phone (319) 339-1641
E-Mail: rnewell@q.com

| | |
|---|---|
| 06/81 | Senior Systems Analyst (S19), American College Testing, 2255 North Dubuque Road, Iowa City, IA, 52243. Duties included consulting, analysis, design, programming & testing. |
| 12/69 - 05/81 | Self-employed. DBA Newell Computer Consulting, Inc. Consulting, design, analysis, programming, testing, hardware and software selection, for several clients in the San Francisco Bay area with an emphasis on accounting systems design, programming, and consulting. |
| 09/68 - 11/69 | Worked 20 hours per week as a Programmer/Analyst at U.C. Berkeley while attending graduate school. PL/1 & IBM OS |
| 01/64 - 09/68 | IBM Corp., Buffalo, New York. Systems Engineer and Marketing Representative. Attended more than 18 weeks of training in basic data processing design and computer programming. Assisted in the installation of punched card and computer systems at several customer sites. Transferred to IBM branch office in Oakland California in early 1968. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

APPENDIX D

# ROBERTA GLENN
78 Rick Drive
Florence, MA 01062
(413) 585 – 9439
rrglenn@earthlink.net

**EXPERIENCE**

**HABEAS CORPUS RESOURCE CENTER**, San Francisco
LEGAL RESEARCH CONSULTANT        2008 – present
Consulting on the design and methodology of an empirical study conducted in the State of California. Responsible for supervising researchers and coordinating overall document review, data collection and data cleaning.

**FEDERAL PUBLIC DEFENDER,** Middle District Of Pennsylvania
LEGAL RESEARCH CONSULTANT        2007 – present
Retained to conduct research on a variety of constitutional trial issues.

**NEW JERSEYANS FOR ALTERNATIVES TO THE DEATH PENALTY**, Trenton
LEGAL RESEARCH CONSULTANT        2006 – 2007
Conducted a review and analysis of New Jersey's 600 death eligible homicides using data collected by the New Jersey Administrative Office of the Courts. Drafted and presented a report to the New Jersey Death Penalty Study Commission on the question of whether a significant difference exists between the crimes of defendants selected for the punishment of death and those of defendants who receive life in prison.  Testified before the Commission on October 11, 2006.

**CAPITAL DEFENDER OFFICE**, New York
RESEARCH DESIGN AND METHODOLOGY     2003 – 2005
Consulted on the design and methodology of an empirical study conducted in New York State and involving thousands of capital homicides.   Coordinated the redesign of the data collection instrument.  Drafted comprehensive instructions, research protocols, and training materials for researchers.  Responsible for the design and conduct of training program for graduate students employed as researchers.  Screened thousands of cases for possible inclusion in the study and coded data for analysis.

**STATE OF CONNECTICUT**
**DIVISION OF PUBLIC DEFENDER SERVICES**
SPECIAL PUBLIC DEFENDER      2001 – 2002
Reviewed and analyzed legal files and trial evidence for research study of racial bias in the application of the state's death penalty statute.  Drafted case narratives and compiled reports. Contributed to the design of the data collection instrument, coding instructions and the analytical and research methodology.

New York State Bar:  2247229                        California State Bar:  196549

**68**

**GAP, INC.,** San Francisco
CONTRACT ATTORNEY    1998 – 2001
INTELLECTUAL PROPERTY DEPARTMENT
Negotiated and drafted agreements for personal services, marketing promotions, field advertising, product development, web services, on-line advertising, intellectual property buyouts, and licenses.  Coordinated outside counsel advising the company on complex issues of advertising law, tax matters and international law.

**FREELANCE JOURNALIST**                1997 – 2001
Reported and wrote financial and business stories for Plan Sponsor, Advisors Resource and Global Custodian, nationally and internationally distributed magazines for employers, human resource and benefits executives, institutional investors and financial planners.

**ACCENTURE,** New York
WRITER; MARKETING AND RESEARCH        1999 - 2001
Conducted interviews with consultants and executives worldwide and produced industry research studies.  Composed and edited marketing products and Internet articles for a multinational business consulting firm.

**CAROLCO PICTURES,** Los Angeles
MUSIC BUSINESS AFFAIRS        1991 - 1995
Negotiated and drafted composer, soundtrack distribution and licensing agreements. Managed music publishing catalog, collected revenue and negotiated co-publishing arrangements worldwide.  Responsible for all employment, union issues and special payments inquiries. Supervised all areas of music production for feature films.  Created and managed budgets in excess of $3 million. Produced scoring sessions and ensured timely delivery of required recordings.

**SCHULTE ROTH & ZABEL,** New York
TAX ASSOCIATE    1987 - 1990
Counseled major domestic and international corporations, partnerships and individuals in all aspects of tax planning.  Responsible for analyzing and structuring corporate acquisitions and reorganizations, both foreign and domestic.  Drafted tax disclosures in offering memoranda, tax opinions, indemnity agreements and letters to clients describing tax consequences of proposed transactions.  Represented individual clients in both state and federal tax audit matters.

**HONORABLE WILLIAM C. CONNER,** Southern District of New York
LAW CLERK        1986 - 1987

**EDUCATION**

**UNIVERSITY OF SAN FRANCISCO SCHOOL OF LAW**
J.D., cum laude, 1986
McAuliffe Honor Society
American Jurisprudence Awards: Civil Procedure, Evidence

**UNIVERSITY OF CALIFORNIA, BERKELEY**
A.B., Political Economy, 1979
Advisory Committee, University Art Museum

1
2
3
4
5
6
7
8
9
10
11
12
13
14                     APPENDIX E
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CALIFORNIA PROJECT NUMBER: \_\_\_\_\_|\_\_\_\_\_|\_\_\_\_\_|\_\_\_\_\_|\_\_\_\_\_

### CALIFORNIA HOMICIDE STUDY
### DATA COLLECTION INSTRUMENT (DCI)

**October 2, 2009**

Defendant's
Name: \_\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|
Last

\_\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|
First                                                                                                          MI

Coder Last
Name:         \_\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|\_\_\_\_|

### Table of Contents

Introduction..................................................................................................................... 2

Part I. Thumbnail Sketch and Narrative Comments on Issues of Information Sufficiency Fact,
and Law – a free standing document........................................................................ 4

Part IA.  CDCR Identifying Information. ...................................................................... 11

Part II. Sufficiency of the Available Information to Support Substantive Coding ................... 13

PART III.  Coder Entry of Identifying Information for the Instant Case ................................. 17

Part IV. Charges, Allegations, and Findings on Homicide Liability, Contemporaneous Offenses
and the Presence or Absence of Special Circumstances in the Instant Case.................... 20

Part V. Factual Death-Eligibility Status of Cases with a M1 Conviction.................................. 30

Part VI. Factual Death-eligibility Status of Cases with an M2 or VM Conviction. ................. 38

Part VII. Summary of Coder Classifications on Factual-Homicide Liability and Death-Eligibility in
Three Time Periods ....................................................................................... 51

Page  Numbers of Questions in Cross References.................................................................54

Figure 1 ...........................................................................................................................55

# Introduction

**Coder Note:**
(a) **This document has seven parts.  All of the defendants in this study were convicted between 11/08/1978 and 6/30/2002.  Pre-*Furman* law for this study is the Georgia law deemed unconstitutional by the United States Supreme Court law in *Furman v. Georgia* (1972).  "*Carlos Window*" law refers to California law in effect between 12/12/1983 and 10/12/1987.  "2008" law refers to California law in effect on January 1, 2008.**

(b) **If the instant/assigned case has a M1 conviction, code Sections I-V and VII.  If the instant case has a M2 or VM conviction, code sections I-IV and VI-VII.**

Part I includes a thumbnail sketch of the case with overview of Death-Eligibility Classifications and issues.

Part IA includes identifying information of the instant case from the CA Department of Corrections and Rehabilitation (DCR), which provides coders FYI information to compare for consistency with the information presented in the probation report for the case.

Part II addresses the sufficiency of the evidence in the instant case to support substantive coding of the death-eligibility of the case under three legal regimes.

Part III calls for coding of identifying information from the probation report in the instant case.

Part IV. This part describes charging and sentencing decision-making and outcomes in the instant case.

Part V assesses for cases <u>with a first-degree murder conviction (M1)</u> factual criminal liability and death-eligibility under: (1) pre-*Furman* law, (2) post-*Furman* law during the *Carlos* window (12/12/1983 – 10/13/1987),[1] and (3) January 1, 2008 law.  Under pre-*Furman* law, all factual <u>common law "murder"</u> (CLM) cases were death-eligible, while death-eligibility for the law in place during the *Carlos* window and the law in place on January 1, 2008 requires factual M1 liability and the presence of one or more statutorily defined special circumstances.

Part VI presents a comparable analysis for cases that resulted in a <u>second degree murder (M2) or voluntary manslaughter (VM) conviction.</u>

Part VII summarizes the death-eligibility classifications of the case under the three legal systems.

    With respect to homicide liability, the first question is whether the case is factually <u>murder under pre-Furman law, which defines "death eligibility" under the first system.</u>  For the other two legal systems you must determine whether the case is factually M1 <u>under CW and 2008 law</u>, and then you must determine whether one or more special circumstances is factually present in the case under *Carlos* window law and 2008 law.

**In Part IV, the focus is strictly on the charges, decisions, and outcomes on liability and special circumstances already determined in the instant case, without regard to the factual basis of the liability**

---

[1] The Carlos Window (CW) ended on October 13, 1987, when the California Supreme Court decided *People v. Anderson*, 43 Cal.3d 1104 (1987).

decision and special circumstances.  The approach is different in Parts V and VI where the focus is on factual **murder-** liability **(common law murder, pre-*Furman* and M1 in the CW and 2008)** and the factual presence of special circumstances regardless of the outcome of the case **under CW and 2008 law**.  The one large exception to this approach in Parts V and VI is the controlling fact finding rule, which with a jury nullification exception, controls regardless of the facts of the case.  Thus, to the extent that the homicide liability is not determined by a controlling fact finding, the test throughout this document is whether the facts are legally sufficient to support a factual finding of murder of M1 liability.[2]  The same "legal sufficiency" rule holds with respect to the presence of special circumstances under post-*Furman* law.

## PAGE NUMBERS OF QUESTIONS USED IN CROSS REFERENCES ARE ON PAGE 55.

Your judgments in Parts V and VI, therefore, will be informed by the controlling findings of fact of juries and judges and M1 guilty pleas of defendants reported in the probation report for the case.[3]  In the absence of controlling findings of fact on liability and special circumstances, the question is whether the evidence is legally sufficient to support a finding of murder or M1 liability and the presence of special circumstances without regard to the actual conviction or whether special circumstances were found to be true or not true in the case.

When a case presents issues of law or fact that limit your ability to make the required classifications with confidence, note those issues with specificity in Part I Q.85. Your thumbnail narrative description of the case in Part I of this document should also highlight any legal and factual issues that you note in Part VII below.

Question (Q.) numbers are on the left side of the page in bold font.  Your answers for each question should be entered by circling the appropriate answer on the right side of the page or by checking the appropriate answer when the questions and answers are presented in a table.  If you identify legal issues in the case on which you believe we need legal advice from CA counsel, note them in Part I Q.86.

---

[2] The issue of "legal sufficiency" applicable throughout this DCI is whether in the appeal from an M1 finding of fact by a jury or court, the evidence in the "whole record" would convince a California appellate court that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Sanchez*, 906 P.2d 1129, 1148 (Cal. Sup. Ct. 1996) (quoting *People v. Davis*, 41 Cal. Rptr.2d 826, 896 (Cal. Sup. Ct. 1995)).  The issue is not whether the coder is convinced beyond a reasonable doubt that the element at issue exists.

[3] When a judicial opinion for the case is available it will be included in the file.  Some cases also include trial court documents provided by counsel that fill in gaps on procedural aspects of the case that were not reported in the probation report for the case.

## Part I. Thumbnail Sketch and Narrative Comments on Issues of Information Sufficiency Fact, and Law – a free standing document.

### A.  Introduction

The most important single task in coding the DCI is the preparation of a thumbnail sketch for the case with, when applicable, narrative comments on issues of fact, law, and information insufficiency.  This is a free standing WORD document for each case that you will send separately or in groups via Hushmail to dicknewell@hush.com, with CC to davidbaldus@hushmail.com and lisaschomberg@hushmail.com or deliver to Lisa Lowenberg on a USB drive in a manila envelope according to the Narrative Protocol in the Coding Manual.  **Whenever you send a Hushmail message to participants in the project, also send a regular email advising the recipient that a Hushmail message has also been sent to them.**

THE FORMAT FOR YOUR ANSWERS TO THESE PART I QUESTIONS IS PRESENTED <u>IN THE LAST THREE PAGES</u> OF THIS PART.

The thumbnail provides an overview of the facts, procedure, and death-eligibility status of the case.  It is used by the investigators to identify coding errors and issues.  It also provides us with the capacity to develop legal and factual issues for which we can obtain advice from counsel and a special advisory panel in CA.  The thumbnails are our window on the world.  They may be the only raw material from this study that the court will see.  For all of these reasons, it is essential that coders bring utmost precision and consistency to their preparation of the thumbnails.

The thumbnails permit us to review quickly one another's coding.  In the substantive analysis, the thumbnails enable us to define factually or procedurally similar cases for qualitative analysis.  They also enable us to present qualitative analyses that are more accessible to judges and lawyers than the results of statistical analyses.

If the case does not qualify for substantive death-eligibility coding because of information insufficiency identified in Part II, indicate that fact at the outset of the thumbnail and further indicate in italics within the thumbnail what is missing and if the missing information is procedural indicate what is needed to support coding.  Also indicate the reason in detail in an **INFORMATION INSUFFICIENCY** note (Q.81A) following the thumbnail sketch in your answer to this Part I.

### B.  Elements of the Thumbnail

For cases in which there is sufficient information to code the full DCI, these are the elements of the thumbnail and the order in which they should be presented:

1.  Project number, e.g. 450;

2.  Defendant's last name, first name, and middle initial;

3.  Facts of the crime with the date, defendant's age, sex, and the acts bearing on homicide liability and the presence of special circumstances, e.g., "D, a 20-yr. old male, intentionally shot and killed the V in the course of an armed robbery."  If the facts that implicate murder and M1 liability and the presence of special circumstances are not readily apparent, as they are in the just stated example, add the factual detail that will support your "death eligibility" classifications in para. 6 below.  Include facts that cut in favor of <u>and</u> against a finding of the factual presence of murder and M1 liability and special circumstances.  Be inclined to include more rather than less factual information that bears on the murder and M1 and S.C. issues.  Do not

**I. DCR Identifying Information**

include the race or ethnicity of the defendant or victims in the thumbnail unless it implicates a M1 predicate of a special circumstance, which should also be put in context in the facts of the thumbnail. The abbreviations are listed in Section C below.

4. The charges and outcomes (trial or guilty plea) for the homicide and any contemporaneous offenses that implicate the M1 predicates and the presence of special circumstances, with CFF status on M1 and special circumstance findings indicated, e.g., "Charge: 187 murder, robbery (211), and SC 17A robbery; Bench [or Jury]: M1 (CFF), robbery (211); SC 17A robbery (CFF);" If reported in the probation report, indicate in parentheses the code section number of contemporaneous felony charges and convictions that implicate M1 liability. Include the abbreviated code section number of special circumstances charged with the factual basis of each SC indicated, e.g. SC 17A robbery. A common charge is murder generally under PC187. State that charge as "Charge: 187 murder."

5. Sentence, if known, e.g., "15 yrs.-life or LWOP"; Enter "Sent: Unk," if the sentence is unknown;

6. <u>Death-eligibility (DE) status for pre-*Furman*, CW, and 2008 law</u>. For each time period report the basis of your death eligibility classification.

   (a) <u>For the pre-*Furman* period</u> if there is a CFF on <u>murder</u> liability report "DE: PF- yes (<u>murder</u> -CFF)." If there is no CFF on <u>murder</u> liability, indicate the strength of the factual basis for M1 liability, e.g., "DE: PF-yes (clear <u>murder</u> status)," "DE: PF-close call (on <u>murder</u> status)," or "DE: PF-no (no <u>murder</u> status)" when M1 status is clearly not present factually. This would be the case when there is a VM CFF or there is no factual basis at all for a claim of <u>murder</u> factual status. If there is a close call on <u>murder</u> liability, explain the basis for the close call in Q. 85.

   (b) <u>Under CW and 2008 law</u>, use the approach to M1 liability illustrated below <u>with reference to "M1" instead of murder</u>. Also, apply the following approach to special circumstances (SC), which will report an abbreviated section number for the SC (the foil numbers following Q.53) and a brief factual description of relevant special circumstances. Identify all SC found or present in the case.

      (1) If there is an allegation of a SC and a finding or admission that it is present/true or not present/true, so indicate with a CFF designation, e.g. (SC17A-robbery-not present CFF), (SC17A-robbery-present CFF).
      (2) If there is no CFF on a SC, and no facts supporting the presence of a SC, report "(no SC present)." If the presence of the SC is a close call, report that fact, e.g., (close call SC15-lying in wait).
      (3) If the SC is clearly present, report e.g., (clear SC15-lying in wait). Explain all close calls in Q. 85.
      (4) <u>If SC are alleged and found present or not present, also report SC that were present but not alleged. Report those "omitted" SC in the allegations charge section of the thumbnail, e.g. (SC 17A – robbery – present but not alleged.)</u>

   (c) Here are some examples with both M1 liability and SC reported under CW and 2008 law:

      1. CW-yes: (clear M1 status) and (clear SC 17A-robbery);

      2. CW-no: (M1-CFF) and (SC 17A-robbery-not present CFF);

      3. CW-close call: (close call M1 status) and (clear SC 17A-robbery);

      4. 2008-no: (M1-CFF) and (no SC present);

5. 2008-no: (M1-CFF) and (SC 15-lying in wait-not present CFF);

6. 2008-yes: (M1-CFF) and (SC15-lying in wait-present CFF);

7. 2008-yes: (clear M1 status) and (clear SC17A-robbery);

8. CW-close call: (close call M1 status) and (clear SC17A-robbery);

9. CW-close call: (M1-CFF) and (close call SC17A-robbery);

(Note the colon following the CW and 2008 death eligibility classifications, which are followed by the two elements (M1 and SC) underlying those classifications)

(d)   Thus, the death eligibility classifications at the end of the thumbnail might read as follows:

; DE: PF-yes (clear _murder_ status); CW-yes: (clear M1 status) and (clear SC 17A- robbery); 2008-yes: (clear M1 status) and (clear SC 17A-robbery)

; DE: PF-no (no _murder_ status); CW-no: (no M1 status) and (no SC present); 2008-no: (no M1 status) and (clear SC 17A-robbery)

(Note the semicolon between the death eligibility classifications for each time period.)

7.   Coder last name: "Coder-Jones."

**Please note that each major section (1-7 above) is followed by a semicolon and sub-categories are separated with colons and others with a small dash).**

## C.  Abbreviations Used in the Thumbnail

Use in the thumbnail the abbreviations listed below.  Omit periods unless specifically indicated.

CFF: controlling fact finding
Co-perp: co-perpetrator
Ct.: count (w/a period)
CW: _Carlos_ Window
D: defendant
DE: death-eligible
FF: fact finder
M1: first degree murder
M2: second degree murder
NDV: Non-deceased victim
PF: pre-_Furman_
PR: Probation Report
Sent: sentence
Unk: unknown
V: victim
V1: the first victim

I. DCR Identifying Information

V2: the second victim
V3: the third victim
VM: voluntary manslaughter
Yr.: year (w/a period)

**D. Thumbnail Examples**
   **(Check each thumbnail you do against these models)**

1.  Here are thumbnail examples when the coder believes there is enough information in the file to support full coding.

    9737; Greenwood, George Gabriel; On 7/4/81, D, an 18-yr. old male, killed the V with a blow to the head with his fist and removed the V's wallet; Charge: 187 murder, robbery (211), and SC 17A robbery; Bench: M1 (CFF), robbery (211), and SC 17A robbery present (CFF); Sent: Unk; DE: PF-yes (murder-CFF), CW-yes: (M1-CFF) and (17A-robbery-present CFF); 2008-yes: (M1-CFF) and (17A-robbery-present CFF); Coder- Ali

    618; Alvarez, Ramon Blancas; On 11/11/84, D, a 22-yr. old male, shot V 4 times and killed the V for unknown reasons; Charge: 187 murder; Plea: VM (No CFF); Sent: Unk; DE: PF-no (no murder status); CW-no: (no M1 status) and (no SC present); 2008-no: (no M1 status) and (no SC present): Coder-Magana

    402; Alexander, Shelby Darlene; On 11/14/80, D, an 18-yr. old female, caused the death of her 19-month old child by physical abuse and maltreatment; Charge: 187 murder; Plea: VM (no CFF); Sent: Unk; DE: PF-no (no murder status); CW-no: (no M1 status) and (no SC present); 2008: (no M1 status) and (no SC present); Coder-Ping.

2.  For cases with insufficient procedural information to support coding of the case (Q.30 = 0, Q.32 = 0, or Q.33 = 0), indicate with underline at the outset whether procedural or substantive information is missing, state as much as is known in the thumbnail but also indicate in Q81A exactly what is missing that impedes full coding, e.g., insufficient information to apply the CFF rule or to code the substance of the offense. If the case involves missing procedural information, indicate the county of prosecution and the local court case number to assist counsel in locating the missing procedural information. The following are examples illustrating insufficiency of procedural and substantive information:

    a.  Insufficient procedural information; 9737; Greenwood, George Gabriel; On 7/4/81, D, an 18-year old male, killed the V with a blow to the head with his fist and removed the V's wallet; Charge: 187 murder, robbery (211) and SC 190.2 (a) (17A) (robbery); M2 conviction but the CFF is Unk. To apply the CFF, *coding requires information on whether the M2 conviction is based on a guilty plea or a trial court conviction*; Los Angeles County, Docket # 23-4587.

    b.  Insufficient substantive information; 9738; Brown, Peter; On 7/4/81, D, an 18-yr. old male, killed the V; Charge: 187 murder; Plea: M2 *the probation report lacks sufficient information on the facts of the crime* to support substantive coding of the death-eligibility of the case, Los Angeles County, Docket #33-5481.

I. DCR Identifying Information

### E. Instructions on Writing the Thumbnail

1. Indicate the penal code number of contemporaneous felonies if they are reported in the probation report or they are well known and involve no ambiguities, e.g., robbery (211). However, leave out the word "PC," which means penal code.

2. Indicate the abbreviated penal code number of SCs in both charge and conviction sections of the thumbnail with the factual basis of the SC in parentheses in the charging section, e.g., SC 17A robbery present (CFF). If the SC section number is not reported in the probation report, but if it is clear what SC applies, look it up and include the code foil number in the thumbnail. If there is any ambiguity about which SC applies, report only what is stated in the probation report.

3. A defendant cannot be convicted of 187 PC murder. However, it is often the charge. Murder convictions are for M1 or M2. The defendant may also be convicted of VM. Reporting a conviction as "187 murder" is not authorized.

4. Use the abbreviations, e.g. M1, M2, VM, etc that are included in the Section C above.

5. If a SC is factually <u>clearly</u> present (but not charged, found or stipulated to), include <u>the facts of the SC in the factual section of the narrative summary. Also include in the allegation section the abbreviated section number and the factual basis of the SC and "but not alleged:, e.g. "SC17A Robbery present but not alleged." [This is a new Coding Rule.].</u>

6. Put down sex of the victim in the thumbnail if it is known and not otherwise indicated. For example, "D killed his girlfriend" is enough to indicate the victim's sex.

7. Under pre-*Furman* law, <u>murder</u> liability establishes death-eligibility. Under CW and 2008 law, death-eligibility requires M1 liability and the factual presence of one or more special circumstances.

8. If a SC charge was dismissed, indicate how it was dismissed and by whom. For example, the "SC was dismissed as part of a plea bargain" or the "SC was dismissed by the court."

9. If the exact date of the offense is unknown, use "on or about" to indicate approximate date or "in March" if only the month is known, e.g. "On or about 8/10/85" or "In August 1985."

10. Do not use the term "co-defendant," instead use "co-perpetrator," the abbreviation of which is "Co-perp."

11. The term "victim" is only for deceased victims. Otherwise, use the term "non-deceased victims" (NDV). For example, "D beat V1 and V2 to death and <u>wounded three NDV</u>."

12. The CFF rule only applies to the grade of homicidal liability and SCs. It does not apply to other felonies and special allegations.

13. For all homicide and SC outcomes indicate the CFF status, e.g. M1 (CFF); M2 (no CFF); M2 (CFF/Unk), 190.2(a)(17A) (CFF). All findings that a SC is present or not present by a jury or judge are a CFF. A dismissal of a SC by a court for evidence insufficiency is also a CFF. However, a dismissal of a SC by a prosecutor as part of a plea bargain is not a CFF.

**I. DCR Identifying Information**

**Template form for your answers to Part I.**  You should have a copy of this template with the file name PPPP_THUMBNAIL_AND_NARRATIVE_RESPONSE.DOC." Open template file with Microsoft WORD and type in the information requested below.  (See below for an example of the final product and a template you can adapt for your use.)

**1. Type The Thumbnail here:**

**2.  If after typing the Thumbnail you believe there is insufficient evidence to support reliable coding advance to Part II (Information insufficiency) code Q.29 through Q.35, as applicable.  At that point cease coding the DCI and under Q.81A identify with specificity the nature of the income insufficiency problem and what if anything can be done to cure it, e.g., obtain information on the decision maker in the case – jury, prosecutor, or judge.  Where applicable, explain the problem in terms of the categories defined in Q.29, Q.31, Q.32, Q.34 and Q.35 in Part II.  Also, note at the beginning of the thumbnail "Insufficient Procedural Information" or "Insufficient Substantive Information," as the case may be, as is illustrated in para. 2.a. and 2.b.**

Save the DOC file by substituting the Project # for PPPP in the file name "PPPP_THUMBNAIL_AND_NARRATIVE_RESPONSE.DOC".

**3. If you believe there is sufficient evidence to support reliable coding, CONTINUE entering information on this DCI form by answering questions, beginning with Q.16, as applicable. When you have completed Q.16 - Q.81 on the DCI form, resume answering the following questions in the template file, starting with question number 81A.**

Page numbers for Q.75 – Q.88 are found in the 'Cross-reference of Questions and/or reference and Page numbers' at the end of the DCI.

Q.81A.  Information insufficiency

Q.82.  Murder and M1 liability differences under pre-*Furman*, CW, and 2008 law, i.e., if the answers to Q. 75[4], Q. 76[5], or Q. 79[6] differ, state the reason(s) for the coding differences.

Q.83.  Special circumstances differences under CW and 2008 law, i.e., if the answers to Q. 77[7] and Q. 80[8] differ, state the reason(s) for the coding differences.

Q.84.  Death-eligibility differences – If the answers to Q. 75[9], Q. 78[10] or Q. 81[11] differ, state the reason(s) for the coding differences.

Q.85.  Ambiguities and close calls.  Summarize and explain factual and legal ambiguities and issues and "close calls" that complicated and/or impeded coding and/or required "close call" classifications.

Q.86.  Legal Issues.  State legal issues on which you believe we need advice from CA counsel.

---

[4] Factual murder liability under pre-*Furman* law
[5] Factual M1 liability under CW law
[6] Factual M1 liability under 2008 law
[7] SC under CW law
[8] SC under 2008 law
[9] Pre-*Furman* death eligibility
[10] CW law death eligibility
[11] 2008 law death eligibility

### I. DCR Identifying Information

Q.87  Special Circumstances not coded in the DCI.  Use this section to list special circumstances that are factually present in VM or M2 cases in which the VM or M2 conviction is based on a CFF.  Identify them in abbreviated form as noted in paragraph 6 above, e.g. (SC17A – Robbery present).

Q.88.  Other  Detail other facts or questions you believe require further consideration by the research director.

Q. 89  Date coding completed:  00/00/0000.  See below for an example of a thumbnail sketch template.

**4. When you  have completed this Template save it by substituting the Project # for PPPP in the file name "PPPP_THUMBNAIL_AND_NARRITIVE_RESPONSE.DOC" and Hushmail it to dicknewell@hush.com, with CC to davidbaldus@hushmail.com and lisaschomberg@hushmail.com.  The subject for your message should be CA Part I.**

Coder's Name
Date

### CA Homicide Study – U. of Iowa College of Law
### "0252_THUMBNAIL_AND_NARRATIVE_RESPONSES.DOC"

**1. Type The Thumbnail here:**[12]

0252; Guy, Bad; On 8/8/12, D, a 27-yr. male killed V by dropping a giant anvil on his head from a high window. There was evidence that he had ordered the anvil from Acme Services, specializing in selling murder weapons. Many prior threats passed between the D and V, who had been feuding a long time. A small child in the apartment witnessed D practicing his aim with the anvil and muttering dark opinions of V; Charge: 187 murder; Plea: VM (no CFF); Sent: Unk; DE: PF-yes (clear murder status); CW-yes: (clear M1 status) and (clear SC-15 lying in wait); 2008-yes: (clear M1 status) and (clear SC-15 lying in wait); Coder-Glenn.

**2.  If after typing the Thumbnail you believe there is insufficient evidence to support reliable coding, follow the instructions in Part I of the DCI.**

For Questions Q.81 through Q.86 below omit the question if the answer is "NONE".

Q.81A.  Information insufficiency

Q.82.  Murder and M1 Liability. Explain any differences in your coding of factual murder and M1 liability under pre-*Furmam* (Q.75), CW (Q.76), and 2008 (Q.79) law.

Q.83.  Special Circumstances. Explain any differences in your coding of the factual presence of special circumstances under CW (Q.77) and 2008 (Q. 80) law.

Q.84.  Death Eligibility. Explain any differences in your coding of the factual death eligibility of the case under pre-*Furman* (Q.75), CW (Q.78), and 2008 (Q.81) law.

Q.85. Ambiguities & Close Calls.  Summarize and explain any factual and/or legal ambiguities and issues that complicated or impeded your coding and/or required "close call" classifications.

Q.86.  Legal Issues. State any legal issues on which you believe we need advice from CA counsel.

**There could be a question about whether an anvil is a deadly weapon, even though purchased at a purveyor of murder weapons.**

---

[12] For the thumbnail's format, content, and abbreviations, consult the Coding Protocol, Part II, Section E, pp. 9-12.

Q. 87. Special Circumstances not coded in the DCI. Use this section to list special circumstances that are factually present in VM or M2 cases in which the VM or M2 conviction is based on a CFF. Identify them in abbreviated form as noted in paragraph 6 above, e.g. (SC17A – Robbery present).

Q. 88. Other. Detail other facts or questions you believe require further consideration by the research director.

*NOTICE THAT THE INSTRUCTIONS YOU DON'T NEED HAVE BEEN DELETED, LEAVING ONLY THE MATERIAL THE RESEARCHERS NEED.*

***Bold your notes under Q.81A – Q.88.*** *ALSO, THE CASE NUMBER SHOULD <u>ALWAYS</u> HAVE 4 DIGITS!*

## Part IA.  <u>CDCR Identifying Information</u>.

**Case Identifying Information and Status in the Study Obtained From the CA Department of Corrections and Rehabilitation (CDCR).** <u>This section requires no coding by the coder</u>. Specifically a "cover sheet" for Q.1 through Q.15 and Q.21 through Q.28 will be printed for each case assigned to you. You should compare the data on this sheet to the CDCR identifying information and the identifying information reported for the case in the probation report. **If you find data that is different and inconsistent please write a comment on the cover sheet describing the difference and alert your coding supervisor.**

    **4.  CASE** – County court case number

    **6.  CDC** – California Department of Corrections and Rehabilitation case number

    **7.  OFF_YR** – Year of offense

    **8.  OFNS_DT** – Date of the offense

    **9.  SEN_DT** – Date of sentence in the case

    **10.  TIME_4CW** – The applicable law at the date of the offense
        1 = Pre-*Carlos* window – 01/01/1978 – 12/11/1983
        2 = *Carlos* window – 12/12/1983 – 10/12/1987
        3 = Post-*Carlos* window (A) – 10/13/1987 – 12/31/1992
        4 = Post-*Carlos* window (B) – 01/01/1993 – 06/30/2002

    **11.  COUNTY_NAME** – County of conviction (Abbreviation)

    **12.  COUNTY_NUM** – County of conviction (Number)

    **13.  SEX** – Defendant's gender
        1 = Male
        2 = Female

    **14.  D_AGE** – Defendant's age at time of the offense

    **15.  CONVICT** – Crime of conviction reported by the Department of Corrections and Rehabilitation
        1 = M1
        2 = M2
        3 = VM
        4 = Murder, but degree unspecified (e.g. PC 187)
        9 = Unknown

**I. Sample Information & Data Sources**

21. Stratum location/number of the case in the final sample

22. The number of cases in the defendant's stratum in the final sample

23. Is the case in the pilot study sample randomly selected from the 27,928 case universe?
    1 = Yes, in the original 119 case pilot sample, not replaced, and included in the 1820 case final sample
    2 = Yes, although not included in the original sample it was added later to replace a deleted case
    3 = No, not selected originally and not used as a replacement case in the pilot sample
    4 = No, although originally selected for the pilot it was deleted from the pilot sample b/c of missing information
    9 = Unknown

24. Is the case in the 1820 case final sample randomly selected from the 5,300 case candidate sample?
    1= Yes, in the original 1820 case final sample and not replaced by a case from the pilot sample
    2 = Yes originally but it was replaced by a case from the pilot sample
    3 = Yes, although not included in the original final sample it was added later to replace a deleted case
    4 = No, not selected originally and not used as a replacement case in the final sample
    5 = No, although originally selected it was deleted from the final sample b/c of missing information
    9 = Unknown

25. Was the case in the 5300 case candidate sample randomly selected from the 27,928 case universe?
    1 = Yes, it is in both the 5300 candidate sample and the 1820 original final sample.
    2 = Yes, it is in the 5300 case candidate sample but was not included in the original 1820 case final sample and was not used as a replacement in the final sample and/or the pilot sample.
    3 = Yes, it was in the original 5300 case candidate sample but not in the original 1820 case final sample, and was used as a replacement in the final sample and/or the pilot sample.
    4 = No, not originally selected for the candidate sample.
    9 = Unknown

26. Probation Report Status
    1 = Requested from the State
    2 = Received in IA
    3 = Not found by the State and the case was deleted from the sample and the case for want of a probation report or equivalent information such as a judicial opinion
    4 = Not found by State and a substitute was produced by the State and received in IA
    5 = Case was deleted from the study
    9 = Status unknown

27. California Judicial Opinion (s)
    1 = Search requested
    2 = Search and none located
    3 = Opinion located and added to the file
    9 = Status unknown

### 28. COUNSEL_SUPP
    1 = Procedural information requested of counsel
    2 = Procedural information provided by counsel
    3 = Request not fulfilled
    8 = No missing information or request of counsel
    9 = Unknown

# Part II. Sufficiency of the Available Information to Support Substantive Coding

## A. Introduction

1. <u>Factual determinations based on controlling findings of fact.</u>

The first question is whether there is sufficient procedural information in the file[13] to determine whether homicide liability and/or special circumstances in the <u>instant</u> case were determined by a controlling finding of fact.

<u>A key distinction is the form of murder liability that is required to support death eligibility during the three periods of the study. Pre-*Furman* Georgia law deemed common law murder the sole basis for death eligibility, while CW and 2008 law required M1 liability and the presence of a special circumstance.</u>

With one major exception, a M1 conviction in <u>the instant</u> case (by a guilty plea admission of the defendant or a M1 conviction in a bench or jury trial) is considered to have been determined by a controlling fact finding that is applied across all three legal regimes. However, this rule is valid only when the M1 predicate in the instant case was applicable <u>to support murder pre-Furman and M1 for CW and 2008 law.</u> For example, the assumption of relevance across all three legal regimes does not apply when the M1 conviction in the instant case is based on an M1 predicate that was not applicable under CW or pre-*Furman* law. Such an M1 conviction would be a CFF only under 2008 law and it would not be a CFF under pre-*Furman* or CW law. Moreover, if such an M1 predicate was not in effect <u>for murder pre-*Furman*</u> or <u>for M1</u> during the CW, it has no relevance to that law and cannot be coded "factually present" under pre-*Furman* law or CW law, as the case may be. The same principle holds for an M1 predicate applied under CW law that was not in effect pre-*Furman*. Such an M1 predicate has no relevance to the coding of a pre-*Furman* case <u>in the absence of another murder predicate under pre-*Furman*</u> law.

This same principle applies when in the instant case a fact finder finds a special circumstance present or the defendant stipulates to its presence and SC found present or stipulated to in the instant case was not in effect during the CW. In that situation, the CFF for that SC applies only under 2008 law and has no relevance under CW law. For this reason it cannot be found factually present under CW law.

**Because the applicability of M1 predicates and special circumstances in M1 conviction cases depends on the date of the offense and the law in place on that date, it is crucial in such cases (a) to determine the extent to which relevant M1 predicates and SC in the instant case were applicable under**

---

[13] For this purpose, the file consists of information in the probation report, judicial opinions when available, and CA Dept. of Corrections and Rehabilitations data on the character of the homicide of conviction when the conviction information is not available in the probation report and there is no judicial opinion in the file with that information.

### III.  Information Sufficiency

all three legal regimes, and (b) if they were not, to adjust accordingly your assessment of the extent to which a CFF in the instant case can be considered applicable during earlier legal regimes.

These issues of generalizability across the three legal regimes arise with respect to the following questions:

1. The applicability of the CFF rule for M1 <u>and murder</u> factual liability when there was an M1 conviction in the instant case is answered in Q.75, Q.76, and Q.79.

2. The applicability of the CFF rule for the factual presence or absence of SCs when a fact finder found a SC present or absent in the instant case is answered in Q.60-Q.61.

3. The applicability of the CFF rule for M2 and VM factual liability when there is a murder charge and a fact finder convicts the defendant guilty of M2 or VM in the instant case is answered in Q.62.

For M2 and VM convictions, a determination of whether liability is determined by a controlling fact finding requires three pieces of information: (1) the homicide charge (s) filed, (2) the homicide crime of conviction, and (3) the identity of the decision maker who determined the grade of homicide liability.

To determine whether the presence or absence of a special circumstance (SC) is determined by a controlling fact finding requires a SC allegation in a M1 or 187 PC Murder charge and three additional pieces of information:  (1) whether the SC allegation was withdrawn by the state,[14] (2) whether it was stipulated to or admitted by the defendant,[15] and (3) if it was not withdrawn or admitted by the defendant, who and in what procedural context, determined the outcome of the allegation(s), e.g., accepted or rejected as true by a fact finder (in a bench or jury trial) or rejected by the court for insufficiency of the evidence supporting the SC.[16]

When the available procedural information is insufficient to determine whether or not M1 liability and special circumstances in the instant case are determined by a controlling finding of fact, we will seek from counsel the information needed to make that assessment.

---

[14] This is not a controlling fact finding.

[15] This is a controlling fact finding.

[16] These examples are controlling fact findings.  There is a broad spectrum in the degree to which homicide liability and special circumstances are determined by controlling fact findings.  At one extreme are cases that advance to a penalty trial following a jury finding of M1 liability and the presence of one or more special circumstances present in the case.  In these cases all of the relevant facts including the defendant's death-eligibility are determined by a controlling finding of fact and the coder's job is limited to documenting the decision making process and the basis of the jury's decisions.  Such cases call for no judgments by the coders of whether or not the case is factually M1 and whether or not a special circumstance is present in the case.

At the other extreme are cases charged with M2 or VM which result in a guilty plea by the defendant.  In such cases there are no controlling fact findings and the task for the coder is to determine if the case was factually M1 and whether one or more special circumstances was factually present.  There also are no controlling findings of fact on a SC when the case is charged with M2 or VM.  In the absence of a controlling finding of fact on the presence or absence of SC, the coder needs to determine if the information reported in the probation report is sufficient to determine whether or not the SC(s) were present in the case, under the legal sufficiency standard in note 2 *supra*.

**III. Information Sufficiency**

2. <u>Sufficiency of information to determine factual M1 liability and the presence of special circumstances that are not based on controlling findings of fact</u>

When liability and special circumstances are <u>not</u> determined by controlling findings of fact, it is necessary to assess whether the information in the file is sufficient to determine the factual grade of homicide culpability in the case, and whether SC(s) are factually present. With respect to homicide liability, the coder's information sufficiency judgments are reported in Q.34 for M2 and VM cases. With respect to special circumstances, the coder's judgments are reported in Q.31 for M1 conviction and factual M1 cases and Q.35 for M2 and VM cases. When it is ultimately determined that a case lacks sufficient information to support reliable coding on either of these issues it will be deleted from the study and replaced with a substitute case randomly selected from the same sampling strata as the deleted case.

For all these factually present questions, the standard is the "legal sufficiency" test quoted in note 2, *supra*.

A. <u>M1 Conviction Cases</u>

Q.29-Q.31. <u>If the case is a M1 conviction code Q.29-Q.31. (If the case is a M2 or VM conviction omit Q.29-Q.31 and proceed to Q.32.)</u>

29. Is there sufficient information in the probation report to apply the controlling fact-finding (CFF) on the presence or absence of special circumstances, i.e., that (a) it applies and the CFF rule determines that a SC is or is not present in the case, or (b) that there is no CFF on the issue in the case and the question is whether a SC is factually present in the case?          (circle ONE best answer)

Yes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

No[17] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..   0

If the answer to Q.29 is No, terminate coding and explain in the **INFORMATION INSUFFICIENCY** comment following your thumbnail sketch why there is insufficient information to answer this question Yes.

30. If your answer to Q29 is Yes (i.e. there is sufficient information to apply the CFF), is the SC issue determined by a CFF?     (circle ONE best answer)

Yes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

No . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   0

31. If your answer to Q. 30 is No, does the probation report have sufficient information to determine the factual presence or absence of special circumstances in the case? (circle ONE best answer)

Yes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

No . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   0

---

[17] This condition would exist when a SC is alleged and dismissed but it is unknown whether it was dismissed by the court for lack of evidence or the prosecutor in a plea bargain.

**III. Information Sufficiency**

If your answer to 31 = No terminate coding and explain in your **INFORMATION INSUFFICIENCY** comment following your thumbnail sketch exactly what is missing and why it impedes your ability to code this question = Yes.

B. M2 and VM conviction cases

Q32-Q35. If the case has a M2 or VM conviction code Q.32 – Q.35. If the case has an M1 conviction, omit Q.32-35 and proceed to the "Coder Direction" following Q.35.

32. Is there sufficient information in the probation report to apply the controlling fact-finding (CFF) on the issue of M1 factual liability, i.e., that (a) it applies and the CFF rule determines homicide liability or (b) that there is no CFF on liability in the case and the question is whether the case is factually murder or M1? (circle ONE best answer)

Yes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

No[18] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 0

If your answer to Q32 = 0 (No), in your **INFORMATION INSUFFICIENCY** comment following your thumbnail sketch indicate exactly what information is missing and why it impedes your ability to code this question and determine if the case is death eligible under the three legal regimes.

33. Is there a controlling fact finding on the grade of homicide liability? (circle ONE best answer)

Yes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

No . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 0

Not Applicable b/c there is insufficient information to apply the CFF rule, i.e., Q. 32 = 0 (No) . . 8

Unknown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

34. If your answer to Q.33 = No or Unknown, does the probation report have sufficient information to determine if the case is factually murder or M1 under the three legal regimes? (circle ONE best answer)

Yes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

No . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 0

Not Applicable b/c Q. 33 = 1 (Yes) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

If Q. 34 = No, explain in your **INFORMATION INSUFFICIENCY** comment following your thumbnail sketch exactly what is missing and why it impedes your ability to code this question =1.

35. If your answer to Q. 34 = Yes, does the probation report have sufficient information to determine the presence or absence of special circumstances in the case? (circle ONE best answer)

Yes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

No . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 0

Not Applicable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

---

[18] This condition would exist, for example, it the homicide charge is 187 PC murder and the conviction is M2 but it is unknown if the conviction is based on a jury or bench trial verdict or a plea bargain.

### III.  Information Sufficiency

If Q. 35 = No, explain in your  **INFORMATION INSUFFICIENCY** comment following your thumbnail sketch, Q.81A,  exactly what is missing and why it impedes your ability to code this question = Yes````.
(Questions 36 through 39 are reserved.)

## Part III.  Coder Entry of Identifying Information for the Instant Case[19]

**16.**   The defendant's race as reported in the probation report:
(circle ONE best answer)

Black/African American  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

White/Caucasian  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

Asian American  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

Pacific Islander  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

Latino/Hispanic  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

Native American  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

Other  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

Unknown  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

**(If there are more than three decedent victims, code the first three named in the Probation report.)**

**16A.**   Victim #1 Name

___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___
Last

___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___||___
First                                                                                          MI

**16B.**   Victim #2 Name

___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___
Last

___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___||___
First                                                                                          MI

**16C.**   Victim #3 Name

___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___
Last

___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___||___
First                                                                                          MI

---

[19] Substantive coding for the instant case commences in this Part.

**III.  Coder Entry of Identifying Information**

| | | **A**<br>Vic1 | **B**<br>Vic2 | **C**<br>Vic3 |
|---|---|:---:|:---:|:---:|
| **16D.** Victim Race (circle ONE best answer for each victim) | | | | |
| | Black/African American | 1 | 1 | 1 |
| | White/Caucasian | 2 | 2 | 2 |
| | Asian American | 3 | 3 | 3 |
| | Pacific Islander | 4 | 4 | 4 |
| | Latino/Hispanic | 5 | 5 | 5 |
| | Native American | 6 | 6 | 6 |
| | Other | 7 | 7 | 7 |
| | Unknown | 9 | 9 | 9 |

**17.** Defendant/victim relationship[20]  (circle ONE best answer for victim#1)

| | |
|---|:---:|
| Intimates | 1 |
| Other family | 2 |
| Friend/acquaintance/business relationships | 3 |
| Strangers | 4 |
| Potential antagonists in an urban youth-culture setting | 5 |
| Unknown | 9 |

**18.** Defendant's role in crime as the actual killer or an aider/abettor  (circle ONE best answer for victim#1)

| | |
|---|:---:|
| Def. was the actual killer w/o no aiders/abettors | 1 |
| Def. was the actual killer with one or more aiders/abettors | 2 |
| Def. was an aider/abettor | 3 |
| Def. was the actual killer but unknown if he had aiders/abettors | 4 |
| Unknown if def. was the actual killer or an aider/abettor | 9 |

---

[20] If the case involves multiple victims, code the one that best defines the salient features of the crime(s) resulting in the deaths(s) of the victims(s) for the purpose of identifying similarly situated cases.

**19.** Co-perpetrators in the homicide – Enter up to three with the most culpable crime of conviction, if known, i.e., M1, M2, VM.  If unknown, enter those that appear to have the highest level of criminal culpability on the basis of mental culpability, the harm caused and responsibility for it and character such as prior record.

A.  CO-PERP 1 Name

|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|
Last

|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___||___|
First                                                                                                                                   MI

Iowa Project number |___|___|___|___|___|___|

B.  CO-PERP 2  Name

|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|
Last

|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___||___|
First                                                                                                                                   MI

Iowa Project number |___|___|___|___|___|___|

C.  CO-PERP 3 Name

|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|
Last

|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___|___||___|
First                                                                                                                                   MI

Iowa Project number |___|___|___|___|___|___|

**20.**   Date of conviction as reported in the probation report:

(Enter Month, Day and Year if known. Otherwise, enter 99 for unknown Month and 99 for unknown Day. Enter 9999 for unknown year. Please enter 01-09 for months 1-9 and Days 1-9)

Month . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   |___|___|

Day  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   |___|___|

Year  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   |___|___|___|___|

## Part IV. Charges, Allegations, and Findings on Homicide Liability, Contemporaneous Offenses and the Presence or Absence of Special Circumstances in the Instant Case.

**(The purpose of this section is to document charging and sentencing outcomes in the instant case. In this section, make no judgments about the factual basis of the grade of homicide liability determined in the case or the factual presence or absence of special circumstances. Confine your coding to the charges, allegations, and findings on liability and special circumstances in the defendant's case.)**

### A. Homicide charges and convictions (Q.40 & 41)[21]

**40.** Original Homicide Charge (circle ONE best answer)

First-Degree Murder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Second-Degree Murder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

Voluntary manslaughter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

Murder, but Degree Unspecified -- PC 187 (Murder) . . . . . . . . . . . . . . . . . . . . . . .   4

Unknown. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

**41.** Homicide crime and degree for which the defendant was convicted: (circle ONE best answer)

First-Degree Murder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Second-Degree Murder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

Voluntary manslaughter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

Unknown. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

(If multiple deceased victims, code the homicide with the highest grade homicide conviction; if the conviction for each is the same, code the first homicide count.)

---

[21] If the probation report does not report the homicide charge and/or conviction, consult the "Complaint" and "Information" in the case file (for the homicide charged) and the "Report-Indeterminate Sentence" and the "Abstract of Judgment" in the case file (for the homicide conviction).

**IV. Instant Case Homicide Charge and Conviction**

**42.** Was the **homicide** charge in Q.40 reduced at any time by the prosecutor prior to conviction by the defendant's guilty plea or a bench trial or jury verdict?
(circle ONE best answer)

Prosecutor reduced charge from a first degree murder or PC187 (murder) to second degree murder . . . 1

Prosecutor reduced charge from first degree murder or PC187 (murder) to voluntary manslaughter . . . 2

Prosecutor reduced charge from second degree murder to voluntary manslaughter . . . . . . . . . . . . . . . 3

Other charge reduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Prosecutor did not reduce charge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Unknown if charge reduced . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**43.** Was the homicide charge in Q.40 reduced at any time by a court order dismissing an M1 or M2 charge made in the information, thus leaving the case to go to a bench or jury trial only on some lesser charge?
(circle ONE best answer)

Court reduced charge from first degree murder or murder with degree unspecified to voluntary manslaughter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Court reduced charge from second degree murder to voluntary manslaughter . . . . . . . . . . . . . . . . . . . 2

Other charge reduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Court reduced charge from first degree murder or murder with degree unspecified to second degree murder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Court did not reduce charge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Unknown if charge reduced . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**44.** Procedural basis for the homicide conviction: (circle ONE best answer)

Guilty plea   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Jury trial verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Bench trial judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Trial, but unknown if tried to bench or to jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Basis for conviction unknown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Contemporaneous felony charges and convictions that implicate a M1 felony murder predicate or a felony murder special circumstance (Special Circumstance foils 17A – 17M)  (Q.45A, B, C, D).**

**45A.**   Any Contemporaneous Felony Charges or Contemporaneous Felony Convictions?
(circle ONE best answer)

Yes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

No . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   0

Unknown. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

**Coder notes:**

If the answer to Q.45A is No (0) or Unknown (9), then skip Q.45B, Q.45C and Q.45D on the next page.

If the answer to Q.45A is Yes (1), then read and answer on next page below, questions Q45B, Q45C and Q45D:

Q.45B-Q45D  BELOW ARE CODED ON THE NEXT PAGE:

**45B.**   Contemporaneous Felony Charges or Allegations of crimes that are M1 predicates or implicate special circumstances that are potentially applicable in the case:

**45C.**   Contemporaneous Felony Convictions:

**45D.**   If any Q.45B = 1 and no conviction resulted code Q.45D to 66 or 67. If a conviction resulted, omit Q.45D.

   66 – No conviction because prosecutor dropped charges unilaterally or in a plea bargain.

   67 – No conviction because fact finder returned a not-guilty verdict/judgment on the charge, the court dismissed the charge, or the trial court outcome of the charge is unknown.  If the outcome is unknown, note that fact in Q. 81 in the thumbnail as a form of information insufficiency.

**Coder notes:**
Code the answers to questions Q.45B, Q.45C, and Q.45D (66 or 67) by putting check marks, as applicable, in the table below:

Rules for coding these answers:

(a) Choices 1-13 are allowed for Q.45B and Q.45C as applicable.

(b) Check box 66 or 67 if the crime was charged but did not result in a conviction.

I If the charge results in a conviction leave 66 and 67 blank.

**IV. Instant Case Contemporaneous Felonies**

| Foil Num | Contemporaneous Felony | Q.45B Charge | Q.45C Convict | Q.45D | |
|---|---|---|---|---|---|
| | | | | 66 | 67 |
| 01 | Arson (451) | | | | |
| 02 | Burglary in the first or second degree (459) | | | | |
| 03 | Carjacking (215) | | | | |
| 04 | Kidnapping (207, 209, or 209.5) | | | | |
| 05 | Lewd act with a child under the age of 14 or dependent adult (288) | | | | |
| 06 | Mayhem (203 and 205) | | | | |
| 07 | Oral copulation (288a) | | | | |
| 08 | Rape (261) | | | | |
| 09 | Rape by instrument (289) | | | | |
| 10 | Robbery (211 or 212.5) | | | | |
| 11 | Sodomy (286) | | | | |
| 12 | Torture (206) | | | | |
| 13 | Train wrecking (219) | | | | |

**IV. Instant Case Special Circumstances**

**Special circumstance (SC) allegations, findings, and sentencing outcomes.**

> **Coder note:**
> **If the homicide charge in the case is M2 or Voluntary Manslaughter  i.e. Q.40 = 2 or 3, or the homicide charge is unknown, i.e., Q.40 = 9, then omit Q.47-Q.54.**

47.     Was one or more special circumstance(s) alleged in a M1 or 187 PC (murder) information/indictment? (circle ONE best answer)

Yes, one was alleged  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1

Yes, two were alleged  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2

Yes, three were alleged . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     3

Yes, four were alleged . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     4

Yes, five were alleged . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     5

Yes, six or more were alleged . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     6

No indication of a S.C. allegation w/a M1 or 187 PC charge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     0

> **Coder note:**
> **If  Q.47 = 0 then omit Q.48-Q.54.**

48.     Was a special circumstance(s) allegation(s) deleted at any time by  the prosecutor? (circle ONE best answer)

Yes, one or more SC alleged and all deleted  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Yes, one or more SC alleged and one or more deleted but some were not deleted  . . . . . . . . . . . . . . .   2

SC allegation but unknown if one or more deleted  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

No, one or more alleged and none was deleted  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   0

49.     Were any of the allegations of SC stricken by an order of the court at any time before or during the guilt trial or after verdict? (circle ONE best answer)

Yes, one or more SC alleged and all were struck  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Yes, one or more SC alleged and one or more struck but some were not struck . . . . . . . . . . . . . . . .   2

SC allegation but unknown if one or more were struck  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

No, one or more alleged and none was struck  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   0

50.     If there was a M1 guilty-plea or a M1 conviction at trial, was a special circumstance
        found to be true or not to be true by a fact-finder (judge or jury)? (circle ONE best answer)

        Yes, one or more special circumstances found to be true/present by a fact-finder . . . . . . . . . . . . . . .   1

        Yes, one or more SC alleged but none was found to be true/present by a fact-finder, e.g. all
        were found not present or were dismissed by the court  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

        No, one or more SC alleged but all dismissed by the prosecutor, e.g. in a plea bargain . . . . . . . . . . .   3

        Not applicable because no M1 guilty plea or trial conviction by a fact-finder  . . . . . . . . . . . . . . . . .   8

        SC charged and M1 conviction or guilty plea but unknown if a fact-finder
        found a special circumstance to be true or not true . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

51.     If the defendant pled guilty to M1, did the defendant also admit or stipulate to the
        truth of one or more SC(s)? (circle ONE best answer)

        Yes, one or more special circumstances was admitted or stipulated to by the defendant  . . . . . . . . . .   1

        No, one or more SC alleged but the truth of none was admitted or stipulated to by the defendant . . . .   2

        No because SC allegation was withdrawn before plea . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

        Not applicable because no M1 plea by defendant  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

        Unknown if there was a M1 guilty plea  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

        **Coder notes:**
        **The answers for questions 52 and 53 are to be coded in the table directly following question 53.
        The table contains a row for the 22 special circumstances listed in the California Penal Code,
        Section 190.2 (a). There is also a final row in the table "99" to cover the situation in which SC are
        alleged but their identity in unknown.**

        **For your answers, there is one column for Q.52 and five columns for Q.53.**

52.     **Special Circumstance Allegation(s) in M1 Cases.**

        If one or more **Special Circumstances** was alleged (i.e. Q.47 = 1-6), code a **check mark** in the
        applicable **Q.52** column. In Q.53 code a check mark in the column that captures the outcome of each
        **Special Circumstance** that were coded as alleged in the Q.52 Column. If no special circumstances were
        alleged, omit Q. 52 and Q. 53.

53.     **Specific Special Circumstances Outcomes in M1 Cases.**

        For each **Special Circumstance coded in Q. 53**, code a check mark in one of the five Q.53 columns.

**IV. Instant Case Special Circumstances**

**You must check one of the five outcomes listed here:**
1. **The SC was found to be true by a fact finder or stipulated to by the defendant.**
2. **The SC was REJECTED as not true by a fact finder.**
3. **The SC was withdrawn by the prosecutor.**
4. **The SC was struck by the court.**
5. **The outcome of the SC charge is UNKNOWN.**

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| Foil Num | **Penal Code Section 190.2(a). California Special Circumstances.** **Questions 52 and 53** | Q.52 | Q.53 | | | | |
| | | | 1 | 2 | 3 | 4 | 5 |
| 1 | The murder was intentional and carried out for **financial gain.** | | | | | | |
| 2 | The defendant was **convicted previously of murder in the first or second** degree. For the purpose of this paragraph, an offense committed in another jurisdiction, which if committed in California would be punishable as first or second degree murder, shall be deemed murder in the first or second degree. | | | | | | |
| 3 | The defendant, in this proceeding, has been convicted of **more than one offense of murder** in the first or second degree. | | | | | | |
| 4 | The murder was committed by means of a **destructive device, bomb, or explosive** planted, hidden, or concealed in any place, area, dwelling, building, or structure, and the defendant knew, or reasonably should have known, that his or her act or acts would create a great risk of death to one or more human beings. | | | | | | |
| 5 | The murder was committed for the **purpose of avoiding or preventing a lawful arrest,** or perfecting or attempting to perfect, an escape from lawful custody. | | | | | | |
| 6 | The murder was committed by means of a **destructive device, bomb, or explosive** that the defendant mailed or delivered, attempted to mail or deliver, or caused to be mailed or delivered, and the defendant knew, or reasonably should have known, that his or her act or acts would create a great risk of death to one or more human beings. | | | | | | |
| 7 | The **victim was a peace officer,** as defined in Section 830.1, 830.2, 830.3, 830.31, *830.32, 830.33, 830.34,* 830.35, 830.36, *830.37,* 830.4, 830.5, 830.6, 830.10, 830.11, or 830.12, who, while engaged in the course of the performance of his or her duties, was intentionally killed, and the defendant knew, or reasonably should have known, that the victim was a peace officer engaged in the performance of his or her duties; or the victim was a peace officer, as defined in the above-enumerated sections, or a former peace officer under any of those sections, and was intentionally killed in retaliation for the performance of his or her official duties.  **(Italicized language effective June 6, 1990)** | | | | | | |
| 8 | The **victim was a federal law enforcement officer** or agent who, while engaged in the course of the performance of his or her duties, was intentionally killed, and the defendant knew, or reasonably should have known, that the victim was a federal law enforcement officer or agent engaged in the performance of his or her duties; or the victim was a federal law enforcement officer or agent, and was intentionally killed in retaliation for the performance of his or her official duties, | | | | | | |
| 9 | The **victim was a firefighter,** as defined in Section 245.1, who, while engaged in the course of the performance of his or her duties, was intentionally killed, and the defendant knew, or reasonably should have known, that the victim was a firefighter engaged in the performance of his or her duties. | | | | | | |

**IV. Instant Case Special Circumstances**

You must check one of the five outcomes listed here:
1. **The SC was found to be true by a fact finder or stipulated to by the defendant.**
2. **The SC was REJECTED as not true by a fact finder.**
3. **The SC was withdrawn by the prosecutor.**
4. **The SC was struck by the court.**
5. **The outcome of the SC charge is UNKNOWN.**

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| **Foil Num** | **Penal Code Section 190.2(a). California Special Circumstances. Questions 52 and 53** | **Q.52** | **Q.53** | | | | |
| | | | **1** | **2** | **3** | **4** | **5** |
| 10 | The victim was a witness to a crime who was intentionally killed **for the purpose of preventing his or her testimony** in any criminal *or juvenile* proceeding, and the killing was not committed during the commission or attempted commission of the crime to which he or she was a witness; or the victim was a witness to a crime was intentionally killed in retaliation for his or her testimony in any criminal *or juvenile* proceeding. *As used in this paragraph, "juvenile proceeding" means a proceeding brought pursuant to Section 602 or 707 of the Welfare and Institutions Code.* **(Italicized language effective June 6, 1990).** | | | | | | |
| 11 | The victim was a prosecutor or assistant prosecutor or a former prosecutor or assistant prosecutor of any local or state prosecutor's office in this or any other state, or of a federal prosecutor's office, and the murder was *intentionally* carried out in retaliation for, or to prevent the performance of, the victim's official duties **(Italicized language effective June 6, 1990).** | | | | | | |
| 12 | The victim was a judge or former judge of any court of record in the local, state, or federal system in this or any other state, and the murder was *intentionally* carried out in retaliation for, or to prevent the performance of, the victim's official duties **(Italicized language effective June 6, 1990).** | | | | | | |
| 13 | The victim was an elected or appointed official or former official of the federal government, or of any local or state government of this or any other state, and the killing was intentionally carried out in retaliation for, or to prevent the performance of, the victim's official duties. | | | | | | |
| 14 | The murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity. **[Held Unconstitutional in 1982; therefore it is not applicable during either the *Carlos* Window or in 2008.]** | | | | | | |
| 15 | The defendant intentionally killed the victim *by means of* lying in wait. **(Italicized language effective March 8, 2000. Prior to March 8, 2000 (thus, during the *Carlos* Window period), the statutory language of the lying in wait special circumstance read as follows: "The defendant intentionally killed the victim while lying in wait."** | | | | | | |
| 16 | The victim was intentionally killed because of his or her **race, color,** religion, nationality, or country of origin. | | | | | | |
| 17 | **The murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit, the following felonies:** | | | | | | |
| 17A | Robbery in violation of Section 211 or 212.5. **(Italicized language effective 1991 but additional language made no substantive change.)** | | | | | | |
| 17B | Kidnapping in violation of Section 207 or 209 *or 209.5.* **(Italicized language effective March 27, 1996.). [See Sub para. "M" below]** | | | | | | |
| 17C | Rape in violation of Section 261 | | | | | | |
| 17D | Sodomy in violation of Section 286. | | | | | | |
| 17E | The performance of a lewd or lascivious act upon the person of a **child** under the age of 14 years in violation of Section 288. | | | | | | |

## IV. Instant Case Special Circumstances

**You must check one of the five outcomes listed here:**
1. **The SC was found to be true by a fact finder or stipulated to by the defendant.**
2. **The SC was REJECTED as not true by a fact finder.**
3. **The SC was withdrawn by the prosecutor.**
4. **The SC was struck by the court.**
5. **The outcome of the SC charge is UNKNOWN.**

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| Foil Num | Penal Code Section 190.2(a). California Special Circumstances. Questions 52 and 53 | Q.52 | | | Q.53 | | |
| | | | 1 | 2 | 3 | 4 | 5 |
| 17F | Oral copulation in violation of Section 288a. | | | | | | |
| 17G | Burglary in the first or second degree in violation of Section 460. | | | | | | |
| 17H | Arson in violation of subdivision (b) of Section 451. | | | | | | |
| 17I | Train wrecking in violation of Section 219. | | | | | | |
| 17J | Mayhem in violation of Section 203 (Effective date June 6, 1990). | | | | | | |
| 17K | Rape by instrument in violation of Section 289 (Effective date June 6, 1990). | | | | | | |
| 17L | Carjacking, as defined in Section 215 (Effective date March 27, 1996). | | | | | | |
| 17M | To prove the special circumstances of kidnapping in subparagraph (B), or arson in subparagraph (H), if there is a specific intent to kill [in this case], it is only required that there be proof of the elements of those felonies. If so established, those two special circumstances are proven even if the felony of kidnapping or arson is committed primarily or solely for the purpose of facilitating the murder." (Effective date March 8, 2000). (underline and [bracket] emphasis added) | | | | | | |
| 18 | **The murder was intentional and involved the infliction of torture.  Prior to June 6, 1990, (thus, during the *Carlos* Window period) the statutory language of this special circumstance also required that:  "For the purpose of this section torture requires proof of the infliction of extreme physical pain no matter how long its duration."** | | | | | | |
| 19 | The defendant intentionally killed the victim by the **administration of poison.** | | | | | | |
| 20 | The victim was a juror in any court of record in the local, state, or federal system in this or any other state, and the murder was intentionally carried out in retaliation for, or to prevent the performance of, the victim's official duties. **(Effective date March 27, 1996).** | | | | | | |
| 21 | The murder was intentional and perpetrated by means of **discharging a firearm from a motor vehicle,** intentionally at another person or persons outside the vehicle with the intent to inflict death. For purposes of this paragraph, "motor vehicle" means any vehicle as defined in Section 415 of the Vehicle Code. **(Effective date March 27, 1996).** | | | | | | |
| 22 | The defendant intentionally killed the victim while the **defendant was an active participant in a criminal street gang,** as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang.  **(Effective date March 8, 2000).** | | | | | | |
| 99 | One or more Special circumstances were alleged but the identity of the alleged SC is unknown. | | | | | | |

**IV. Instant Case – Sentence Imposed**

54.    If a special circumstance was found by a fact finder in the guilt trial, did the
       case advance to a penalty trial? (circle ONE best answer)

       Yes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

       No . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

       Not applicable b/c no finding of a special circumstance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8

       Unknown. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9

55.  Most serious sentence imposed (circle ONE best answer)

       Death (M1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

       Life without parole (LWOP) (M1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

       25 years to life (M1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

       15 years to life (M2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

       Term of years (VM) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

       Probation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

       Other. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

       Unknown, e.g., none reported or no sentence had been imposed at the time the probation  . . . . . . .    9
       report was prepared

56.    If Q.55 = 5, what is the maximum term in years.                                             __|__

       88 = N/A b/c Q.55 not = 5

       99 = Term of years but unknown if a maximum

The purpose of Parts V, VI, and VII is to assess the factual death-eligibility of the instant case under three legal regimes; pre-*Furman* law, *Carlos* Window law and 2008 law. A M1 conviction in the instant case is relevant across all three legal regimes only if it is a controlling fact finding (CFF) and the M1 predicate in the instant case is applicable in all three legal regimes. A fact finding or guilty plea/stipulation to the presence of a SC is also a controlling fact finding and applicable under CW and 2008 law if the same SC is applicable.

## Part V. Factual Death-Eligibility Status of Cases with a M1 Conviction

**If the case resulted in a M2 or VM conviction (Q.41 = 2 or 3), omit this Part V and proceed to Part VI.**

Figure 1 at the end of this DCI presents an overview of the pathways/flow chart to nine outcomes (bolded) that determine whether or not a case is death-eligible <u>under Carlos Window and 2008 law</u>. The purpose of this section is to determine the factual death-eligibility status of cases with an M1 conviction. Part VI addresses the death-eligibility of the cases with second degree and voluntary manslaughter convictions.

All M1 convictions in the instant case, whether based on a guilty plea or a jury/court finding of M1 liability are based on a controlling finding of fact (CFF) for the time period in which murder was committed. For example a M1 conviction for a murder committed during the CW is clearly a factual M1 case under CW law. The issue is whether it is also factually <u>murder</u> under pre-*Furman* and <u>M1 under</u> 2008 law. In this regard, consult the text and list of <u>murder and</u> M1 predicates <u>in Q. 63, Q. 64, and Q. 65</u>.

Thus, if the M1 conviction in the instant case was decided under CW law, the first question would be whether the M1 predicate supporting that conviction was also <u>a murder predicate</u> under pre-*Furman* law. <u>For this study a post-*Furman* M1 conviction will be deemed to be factually murder under pre-*Furman* law unless it is clear that the factual predicate for the M1 conviction was not applicable as a murder predicate under pre-*Furman* law.</u>

The next question in this hypothetical would be whether the M1 predicate in the instant case is also applicable under 2008 law. <u>Generally </u>this is an easier question to answer because as the law has evolved over the three relevant time periods, new M1 predicates were added but none was repealed. Thus, a M1 conviction in the instant case under CW law will <u>normally</u> be factually M1 under 2008 law because the M1 predicate under CW law is <u>generally</u> applicable under 2008 law. <u>The exception to this rule that the scope of some CW M1 predicates and special circumstances have contracted over time.</u>

<u>However,</u> when the instant case involved a murder committed under 2008 law, it will be necessary to determine whether the M1 predicate supporting the conviction also existed under CW law.

**M1 Factual Liability Under Three Legal Regimes**

**M1 factual liability under pre-*Furman* law:**

57. Given the M1 predicate(s) in the instant case, under the rule stated above on the generalizability of M1 controlling findings of fact, is the case factually <u>murder</u> under pre-*Furman* law? (circle ONE best answer)

**Clearly Yes** b/c the M1 predicate supporting M1 liability in the instant case ................ 1
was also applicable <u>to murder</u> under pre-*Furman* law

**Clearly No** b/c the M1 predicate supporting M1 liability in the instant case ................ 0
was not applicable <u>to murder</u> under pre-*Furman*  law

**A close call**. ......................................................... 2

(If Q.57 = 1, code Part VII Q.75 = 1; if Q.57 = 0 code Q.75 = 0; if Q.57 = 2 code
Q.75 = 2 and explain the basis of the close call in Part I Q.85.

**M1 factual liability under CW law:**

58. Given the M1 predicate in the instant case, under the rule stated above on the generalizability of M1 controlling findings of fact, is the case factually M1 under CW law? (circle ONE best answer)

**Clearly Yes** because (a) CW law applied to the instant case, or (b) the M1 predicate supporting .... 1
M1 liability in the instant was also applicable under CW  law.

**Clearly No** because the M1 predicate supporting M1 liability in the instant case ................ 0
was not applicable under CW law.

**A close call**. ......................................................... 2

(If Q.58 = 1, code Part VII Q.76 = 1; if Q.58 = 0 code Q.76 = 0; if Q.58 = 2 code
Q.76 = 2 and explain the basis of the close call in Part 1 Q.85.

**M1 factual liability under 2008  law:**

59.  Given the M1 predicate in the instant case, under the rule stated above on the generalizability of M1 controlling findings of fact, is the case factually M1 under 2008 law? (circle ONE best answer)

**Clearly Yes** b/c (a) 2008 law applied to the instant case, or (b) the M1 predicate supporting .... 1
M1 liability in the instant case was also applicable under 2008 law.

**Clearly No** b/c the M1 predicate supporting M1 liability in the instant case ................ 0
was not applicable under 2008  law.

**A close call**. ......................................................... 2

(If Q.59 = 1, code Part VII Q.79 = 1; if Q.59 = 0 code Q.79 = 0; if Q.59 = 2 code Q.79 = 2 and explain the basis of the close call in Part I Q.85.)

**The coder's next task in the M1 conviction cases is to assess the factual presence of a special circumstance (SC) in the case.**

In that regard, the first question is whether the CFF applies to the SC issue. If the CFF applies, the case goes to Part I, Row A Box 1A (DE) or 1B (NDE) of the flow chart, depending on whether a special circumstance was found to be present or not present. (All box references refer to Figure 1 "Pathway to Death-eligibility Classifications under Carlos Window and 2008 law.")

If the CFF does not apply b/c there were no allegations and/or findings of fact on them, we assess in Row B of Figure 1 whether the facts in the case support the presence of one or more special circumstances, and determine whether the case goes to Box 2A (DE) or 2B (NDE) of the flow chart.)

60.   Was the presence or absence of all special circumstances in the case determined by a controlling fact finding? (See Q.53)
       (circle ONE best answer)

Yes, there was a controlling fact finding that **one or more SC were present in the case (i.e. Q53=1 for 1 or more rows)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Yes, there was a controlling fact finding that **there were NO SC present in the case (i.e. Q.53=2 or 4 for all SC allegations)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

No, b/c none alleged or SC withdrawn by prosecutor in a plea bargain or outcome unknown **(i.e. Q.53=3 or 5 for all SC allegations)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   0

Q. 60, foil 1 is applicable but additional SC (clearly present) were not alleged . . . . . . . . . . . . . . . . . . . . . . .3

Q. 60, foil 2 is applicable but additional SC (clearly present) were not alleged . . . . . . . . . . . . . . . . . . . . . . .4

**Coder notes:**
**If Q.60 = 1 or 2:**
> **Advance to Q.60C-Q.61.**
> **From there, advance to Part VII to complete your task.**

**If Q.60 = 0, 3, or 4 proceed to Q.60A, below:**

**The Factual Presence of a Special Circumstance (SC) If It Was Not Determined by a CFF.**

(Code this section only if Q.60 = 0, which means the presence of a special circumstance under Q.60 is not determined by a CFF, i.e., the CFF rule does not apply b/c no SC allegations and/or SC finding of fact.)

> **Coder notes:**
> **Answers for question 60A are to be coded in the table directly following. The table contains a row for the 22 special circumstances found in the California Penal Code, Section 190.2 (a). There are four columns which can be checked as noted.**

**60A.** If the facts in the probation report indicate the factual presence of a **special circumstance** (SC) under either *Carlos* Window law or 2008 law, code a **check mark** in the **Q.60A** columns C-D for each that was alleged. If none was factually present omit this 60A.

**Note that there are two choices under each of the columns named Carlos Window and 2008 Law.** For either or both that apply, check the appropriate box: **"Clearly present" or "A close call."**

(Coder Note: Flagging Differences in SCs Under CW and 2008 law. The distinctions between SCs under CW and 2008 law for this question are flagged by the effective dates of amendments to the CW SCs with the changes noted in italics. All of the CW SCs remain in effect under 2008 law, although a number of them have been modified, with expansion and contractions of liability, which are indicted below. See for example, foil 10 below.)

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| Foil Num | **Penal Code Section 190.2(a). California Special Circumstances. Question 60.A** | **Carlos Window** | | **2008 Law** | |
| | | Clearly present | A close call | Clearly present | A close call |
| 1 | The murder was intentional and carried out for **financial gain**. | | | | |
| 2 | The defendant was **convicted previously of murder in the first or second** degree. For the purpose of this paragraph, an offense committed in another jurisdiction, which if committed in California would be punishable as first or second degree murder, shall be deemed murder in the first or second degree. | | | | |
| 3 | The defendant, in this proceeding, has been convicted of **more than one offense of murder** in the first or second degree. | | | | |
| 4 | The murder was committed by means of a **destructive device, bomb, or explosive** planted, hidden, or concealed in any place, area, dwelling, building, or structure, and the defendant knew, or reasonably should have known, that his or her act or acts would create a great risk of death to one or more human beings. | | | | |
| 5 | The murder was committed for the **purpose of avoiding or preventing a lawful arrest**, or perfecting or attempting to perfect, an escape from lawful custody. | | | | |
| 6 | The murder was committed by means of a **destructive device, bomb, or explosive** that the defendant mailed or delivered, attempted to mail or deliver, or caused to be mailed or delivered, and the defendant knew, or reasonably should have known, that his or her act or acts would create a great risk of death to one or more human beings. | | | | |

**V. M1 Conviction Cases - Factual Presence of SC**

| A | B | C | D | | E | F |
|---|---|---|---|---|---|---|
| Foil Num | **Penal Code Section 190.2(a). California Special Circumstances. Question 60.A** | **Carlos Window** | | | **2008 Law** | |
| | | Clearly present | A close call | | Clearly present | A close call |
| 7 | The **victim was a peace officer**, as defined in Section 830.1, 830.2, 830.3, 830.31, *830.32, 830.33, 830.34,* 830.35, 830.36, *830.37,* 830.4, 830.5, 830.6, 830.10, 830.11, or 830.12, who, while engaged in the course of the performance of his or her duties, was intentionally killed, and the defendant knew, or reasonably should have known, that the victim was a peace officer engaged in the performance of his or her duties; or the victim was a peace officer, as defined in the above-enumerated sections, or a former peace officer under any of those sections, and was intentionally killed in retaliation for the performance of his or her official duties.  **(Italicized language effective June 6, 1990)** | | | | | |
| 8 | The **victim was a federal law enforcement officer** or agent who, while engaged in the course of the performance of his or her duties, was intentionally killed, and the defendant knew, or reasonably should have known, that the victim was a federal law enforcement officer or agent engaged in the performance of his or her duties; or the victim was a federal law enforcement officer or agent, and was intentionally killed in retaliation for the performance of his or her official duties. | | | | | |
| 9 | The **victim was a firefighter**, as defined in Section 245.1, who, while engaged in the course of the performance of his or her duties, was intentionally killed, and the defendant knew, or reasonably should have known, that the victim was a firefighter engaged in the performance of his or her duties. | | | | | |
| 10 | The **victim was a witness to a crime** who was intentionally killed **for the purpose of preventing his or her testimony** in any criminal *or juvenile* proceeding, and the killing was not committed during the commission or attempted commission of the crime to which he or she was a witness; or the victim was a witness to a crime and was intentionally killed in retaliation for his or her testimony in any criminal *or juvenile* proceeding. *As used in this paragraph, "juvenile proceeding" means a proceeding brought pursuant to Section 602 or 707 of the Welfare and Institutions Code.*  **(Italicized language effective June 6, 1990).** | | | | | |
| 11 | The **victim was a prosecutor or assistant prosecutor** or a former prosecutor or assistant prosecutor of any local or state prosecutor's office in this or any other state, or of a federal prosecutor's office, and the murder was *intentionally* carried out in retaliation for, or to prevent the performance of, the victim's official duties **(Italicized language effective June 6, 1990).** | | | | | |

**V. M1 Conviction Cases - Factual Presence of SC**

| A | B | C | D | | E | F |
|---|---|---|---|---|---|---|
| Foil Num | Penal Code Section 190.2(a). California Special Circumstances. Question 60.A | Carlos Window | | | 2008 Law | |
| | | Clearly present | A close call | | Clearly present | A close call |
| 12 | The **victim was a judge or former judge** of any court of record in the local, state, or federal system in this or any other state, and the murder was *intentionally* carried out in retaliation for, or to prevent the performance of, the victim's official duties **(Italicized language effective June 6, 1990).** | | | | | |
| 13 | The **victim was an elected or appointed official** or former official of the federal government, or of any local or state government of this or any other state, and the killing was intentionally carried out in retaliation for, or to prevent the performance of, the victim's official duties. | | | | | |
| 14 | Ommitted: former "heinous, atrocious, and cruel." | | | | | |
| 15 | The defendant intentionally killed the victim *by means of lying in wait.* (Italicized language effective March 8, 2000). Prior to March 8, 2000 (thus, during the *Carlos* Window period), the statutory language of the lying in wait special circumstance read as follows: "The defendant intentionally killed the victim while lying in wait." | | | | | |
| 16 | The victim was intentionally killed because of his or her **race,** color, religion, nationality, or country of origin. | | | | | |
| 17 | **The murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit, the following felonies:** | | | | | |
| 17A | **Robbery in violation of** <u>Section 211</u> or *212.5.* **(Italicized language effective 1991 but additional language made no substantive change.)** | | | | | |
| 17B | **Kidnapping in violation of** <u>Section 207</u> or 209 *or 209.5.* **(Italicized language effective March 27, 1996). [Also consult subparagraph "17M" below]** | | | | | |
| 17C | **Rape in violation of** <u>Section 261</u> | | | | | |
| 17D | **Sodomy in violation of** <u>Section 286.</u> | | | | | |
| 17E | The performance of a **lewd or lascivious act** upon the person of a **child** under the age of 14 years in violation of <u>Section 288.</u> | | | | | |
| 17F | **Oral copulation in violation of** <u>Section 288a.</u> | | | | | |
| 17G | **Burglary** in the first or second degree in violation of <u>Section 460.</u> | | | | | |
| 17H | **Arson in violation of subdivision (b) of** <u>Section 451</u> **(Prior to June 6, 1990, Penal Code section 190.2 referred to the arson provision contained in Section 447, but section 447 had been repealed in 1929.). [Also consult subparagraph "17M" below]** | | | | | |
| 17I | **Train wrecking in violation of** <u>Section 219.</u> | | | | | |

| A | B | C | D | | E | F |
|---|---|---|---|---|---|---|
| Foil Num | Penal Code Section 190.2(a). California Special Circumstances. Question 60.A | Carlos Window | | | 2008 Law | |
| | | Clearly present | A close call | | Clearly present | A close call |
| 17J | Mayhem in violation of Section 203 (Effective date June 6, 1990). | | | | | |
| 17K | Rape by instrument in violation of Section 289 (Effective date June 6, 1990). | | | | | |
| 17L | Carjacking, as defined in Section 215 (Effective date March 27, 1996). | | | | | |
| 17M | To prove the special circumstances of kidnapping in subparagraph (B), or arson in subparagraph (H), if there is a specific intent to kill [in this case], it is only required that there be proof of the elements of those felonies. If so established, those two special circumstances are proven even if the felony of kidnapping or arson is committed primarily or solely for the purpose of facilitating the murder." (Effective date March 8, 2000). (underline and [bracket] emphasis added) | | | | | |
| 18 | The murder was intentional and involved the **infliction of torture. Prior to June 6, 1990, (thus, during the *Carlos* Window period) the statutory language of this special circumstance also required that: "For the purpose of this section torture requires proof of the infliction of extreme physical pain no matter how long its duration.** | | | | | |
| 19 | The defendant intentionally killed the victim by the **administration of poison.** | | | | | |
| 20 | The **victim was a juror in any court** of record in the local, state, or federal system in this or any other state, and the murder was intentionally carried out in retaliation for, or to prevent the performance of, the victim's official duties. (Effective date March 27, 1996). | | | | | |
| 21 | The murder was intentional and perpetrated by means of **discharging a firearm from a motor vehicle,** intentionally at another person or persons outside the vehicle with the intent to inflict death. For purposes of this paragraph, "motor vehicle" means any vehicle as defined in Section 415 of the Vehicle Code. (Effective date March 27, 1996). | | | | | |
| 22 | The defendant intentionally killed the victim while the **defendant was an active participant in a criminal street gang,** as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang. (Effective date March 8, 2000). | | | | | |

(Special circumstances adopted after the end of the *Carlos* Window (10/13/87) are applicable only under 2008 law. If the crime in the instant case was committed after the termination of the *Carlos* window and a 2008 law special circumstance was present in the case, include that information in your answer to Q.60A.)

**Under CW law:** (Q.75-Q.81 referred to below)

**60B.** If, in Q.60A, SC 17A through 17L was coded as present, did the defendant have the intent to kill the victim(s)? (circle ONE best answer)

Yes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

No . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Not applicable b/c SC17A-17L not present . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Unknown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

> **Coder note:** If a CFF is reported in Q.60 for a case with a date of offense that was post-CW, determine if the SC was in effect October 12, 1987, the last day within the CW. If the SC was in effect on that day, the CFF in the instant case will inform your answer to Q.60C. For an instant case with the date of offense before or during the CW, a CFF on a SC in the instant case is also a CFF under 2008 law because all SCs in effect before or during the CW law were also in effect under January 1, 2008 law, although post-CW some of the special circumstances have been expanded or limited as indicated in the foils of Q. 60A.

**60C.** Is a special circumstance factually present in the case under CW law? (circle ONE best answer)

**Clearly Yes** b/c Q.60 =1 and the SC found to be present in the instant case applied under . . . .    1
CW law, or Q.60 = 0 and the facts reported in the probation report are legally sufficient to
support a determination of the factual presence of a special circumstance in the case under CW law.

**Clearly No** b/c Q.60 =2 and the SC found to be not present in the instant case applied . . . . . . .    0
under CW law, or Q.60=0 and the facts reported in the probation report are not legally sufficient
to support a determination of the factual presence of a special circumstance in the case under
CW law.

**A close call** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

(If Q.60C = 1, code in Part VII Q.77 = 1; if Q.60C = 0 code Q.77 = 0; Q.60C = 2 code Q.77 = 2 and explain the basis of the close call in Part I Q.85)

**Under 2008 law**

**61.** Is a special circumstance factually present in the case under 2008 law? (circle ONE best answer)

**Clearly Yes** b/c Q.60 =1 and the SC found to be present in the instant case applied under . . . .    1
2008 law, or Q.60 = 0 and the facts reported in the probation report are legally sufficient to support
a determination of the factual presence of a special circumstance in the case under 2008 law.

**Clearly No** b/c Q.60 =2 and the SC found to be not present in the instant case applied . . . . . . .    0
under CW law, or Q.60=0 and the facts reported in the probation report are not legally sufficient to support a
determination of the factual presence of a special circumstance in the case under 2008 law.

**A close call** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

(If Q.61 = 1, code in Part VII Q.80 = 1; if Q.61 = 0 code Q.80 = 0; Q.61 = 2 code Q.80 = 2 and explain the basis of the close call in Part I Q.85)

## Part VI. Factual Death-eligibility Status of Cases with an M2 or VM Conviction. If the instant case has a M1 conviction, omit this section and go to Part VII.

### Code this Part VI only if the case resulted in a M2 or VM conviction.

The purpose of this section is to determine the factual death-eligibility status of M2 and VM conviction cases <u>under CW and 2008 law</u> in Part II of Figure 1. The first question is whether M2 or VM liability in the case was determined by a CFF (Row A). If it was, <u>and no Q. 62 exceptions apply,</u> then the case goes to Box 3 (NDE) of the flow chart which ends the death-eligibility inquiry. If it was not, assess the factual liability of the case. If the case is factually M2 or VM, it goes to Boxes 4B and 4C where it is deemed not death-eligible which ends the inquiry. If it is factually M1 the case goes to Box 4A and the coder must next assess the case for the factual presence of SC depicted in Row C. Only when a case is factually M1 or a close call on the issue does it require a further coding of the factual presence of a special circumstance. If a special circumstance is coded as factually present, the case goes to Box 5A (DE) of the flow chart; otherwise, it goes to Box 5B (NDE). <u>However, if the case appears to be clearly factually M2 or VM, note in Q. 87 any SCs that appear to be clearly present in the case.</u>

Please note the distinction between the defendant's homicide "liability" and the defendant's "culpability level" as the terms are used herein. Liability refers to the grade of homicide (Murder or VM, pre-*Furman*, and M1, M2, or VM in CW and 2008). Unless liability was determined by a CFF, the grade of the homicide in the case is a factual question regardless of the crime of conviction. "Culpability level" refers to the most plausible factual basis for the defendant's liability as defined in Part A and Part B under Questions 63-65 below. For example, the most common culpability levels for M1 under CW and 2008 law are "willful, deliberate, and premeditated" killing (foil 1) and felony murder (foils 3A-3O). Unless the probation report or a judicial opinion states the basis for the conviction, which is rare, the coder will base his or her judgment of the defendant's level of culpability on the facts of the case and the coder's application to them of the legal sufficiency test cited in note 2.

### A. Is the M2 or VM Liability in the Case Determined by a CFF?

(The CFF rule applies on liability only if there was an M1 or 187 PC murder charge that resulted in a M2 or VM conviction by a judge or jury or an M2 charge that resulted in a VM conviction by a judge or jury.)

62. Is the defendant's M2 or VM homicide liability in the instant case determined by a controlling fact finding?

(Circle ONE best answer)

Yes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

No because the jury nullification exception in para. 1 below applies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Yes, although the CFF applies in the instant case, the CFF does not apply in all three periods because different murder or M1 predicates apply in different time periods per para 2 below . . . . . . . . 3

No . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 0

Unknown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Coder Note: If Q.62 = 1 (Yes), with two exceptions noted below, advance to Part VII and code Q.75 through Q.86 = 0.

1. The first exception arises when there is overwhelming evidence of jury nullification underlying the M2 or VM verdict or bench trial judgment in the instant case. When this occurs code Q.62 =2.

2. The second exception concerns the generalizability of the CFF in the instant case to each of the three legal regimes for which you are coding. Specifically, determine on pages 39-41 the M1 predicates that were applicable on the date of the offense. You can assume that the fact finder in the instant case found none of the M1 predicates present in the instant case if they were in effect on the date of the offense. However, if an M1 predicate <u>became effective after the date of the offense</u> and <u>it is factually present in the case</u>, code Q. 62 =3. For example, if the instant case involved a kidnapping (item 3G in table 'Q.64 & Q.65), that circumstance would have established M1 factual culpability under CW and 2008 law'). However, that M1 predicate would not have been applicable to the instant case if the date of the offense in the instant case was prior to June 6, 1990. Accordingly, it is appropriate to treat the M2 or VM conviction in the instant case as a CFF under pre-*Furman* and CW law but not under 2008 law. Moreover, depending on the strength of the evidence of the kidnapping in the probation report, it may support a coding of the factual presence of M1 under 2008 law because of the kidnapping in the instant case. When this occurs, as noted above, code Q.62 = 3.

The differences in terms of murder liability may also run in a different direction. For example, if the case instant case resulted in an M2 conviction that may be a CFF under CW and 2008 law, but if the facts would have supported a finding of common law murder under pre-*Furman* GA law, it would be coded as factually murder under pre-*Furman* law. However, if the instant case involved a CFF voluntary manslaughter conviction, that would also control for the pre-*Furman* period because the applicable VM standard is comparable in pre-*Furman* and under CW and 2008 law.

<u>B. Is the Case Otherwise Factually Common Law Murder Under pre-*Furman*, or factually M1 under CW, and 2008 law? (note that pre-*Furman* GA law had no grades of murder, i.e., M1 and M2, as exist under California CW and 2008 law).</u>

Coder notes:

Answers for questions 63, 64, and 65 are to be coded in the <u>next</u> two tables directly following. The tables contain rows for culpability levels. The first (Q. 63) table is for pre-*Furman* law, which includes common law murder and voluntary manslaughter. The second table is for CW (Q. 64) and 2008 (Q. 65) law, which embrace M1, M2, and VM. Note that there are two choices under each of the columns for each time period. Check the appropriate box: "Clearly present" or "A close call," as applicable for each column. Leave the box blank if neither is applicable.

1. If the answer to Q.62 is 0, 2, or 3, code Q.63-Q.65 for the applicable level of factual homicide culpability listed in the table below that is supported by legally sufficient facts for the three relevant periods. Code all common law <u>murder</u> and M1 culpability levels that are plausible and consistent with the facts for each period. You may code one or more of those foils a "close call" if that is appropriate.

2. If the culpability level of the case is clearly VM for Q. 63, or clearly M2 or VM for the Q.64-Q.65 time periods, code the applicable foil(s), which includes <u>foil AA for pre-*Furman* law and</u> foils 17 and 18 under

CW and 2008 law, to that effect and leave the other foils blank for that time period.[22]  If there is a close call on the presence of murder or M1 culpability vs. M2 or VM culpability in a given time period (a) code the applicable M2 or VM foils, as the case may be, a close call for that time period, and code the most applicable murder/M1 culpability level(s) as a close call.  For example, if under *Carlos* Window law, it is a close call under foil 1 (willful, deliberate, and premeditated murder) and a close call for M2 (e.g., unpremeditated murder), code both foil 1 and foil 17 as close calls for that period.

Q. 63 Table: Pre-*Furman* factual common law murder culpability level (all of the foils in this table are potential murder predicates under pre-*Furman* Georgia law):

| A | B | C | D |
|---|---|---|---|
| Foil num | **Factual common law murder culpability levels under pre-*Furman* Law.** | Q.63 Pre-Furman – GA Law | |
| | | Clearly present | A close call |
| I. Factual murder liability when the defendant is the actual killer | | | |
| A. | Express malice – deliberate intent to kill at the time the defendant made up his/her mind to shoot or strike the fatal blow without excuse, justification, or mitigation | | |
| B | Implied malice – **mens rea** – an "unlawful act" in which the defendant acted with "reckless disregard of human life." | | |
| C. | Implied malice – **manner** – deadly weapon used in a manner in which such a weapon is ordinarily used to kill | | |
| Felony murder (D through K) | | | |
| D. | Robbery | | |
| E. | Burglary | | |
| F. | Rape | | |
| G. | Assault with intent to rape | | |
| H. | Sodomy | | |
| I. | Seduction | | |
| J. | Mayhem | | |
| K. | Arson | | |
| L. | FOILS L THROUGH R ARE RESERVED FOR ADDITIONAL PROVISIONS | | |
| M. | | | |

---

[22] The VM culpability level is described for pre-*Furman* law in the coding protocol for Q. 63 and the M2 and VM culpability levels for Q. 64 and Q. 65 are described in the notes following the Q.64 and Q.65 table below.

| N. | | | |
|----|---|---|---|
| O. | | | |
| P. | | | |
| Q. | | | |
| R. | | | |
| II. Factual murder liability for non-actual killers | | | |
| S. | Principal in the second degree – actual or constructive presence at the scene of the crime | | |
| T | Aider and abettor - not present at the scene of the offense | | |
| U. | Accomplice liability in a felony murder case | | |
| V. | FOILS 11- 16 RESERVED FOR ADDITIONAL PROVISIONS | | |
| W. | | | |
| X. | | | |
| Y. | | | |
| Z. | | | |
| AA. | VM culpability level* | | |

\* For this question the culpability levels for VM is described FYI in the coding protocol for this question. If applicable check clearly present or a close call as the case may be.


## Q. 64 & Q.65.  M1 factual culpability level under CW and 2008 law.

**Code all applicable culpability levels.  Culpability levels that do not apply in the Carlos Window have been blocked off.**

| A | B | C | D | | E | F |
|---|---|---|---|---|---|---|
| Foil num | Factual M1 culpability levels under  Carlos Window and 2008 Law. | Q.64 | | | Q.65 | |
| | | Carlos Window | | | 2008 Law | |
| | | Clearly present | A close call | | Clearly present | A close call |
| I. Defendant as actual killer | | | | | | |
| 01 | Willful, deliberate, and premeditated | | | | | |
| 2A | Destructive device | | | | | |
| 2B | An explosive | | | | | |
| 2C | Knowing use of ammunition designed primarily to penetrate metal or armor (Effective date September 13, 1982). | | | | | |
| 2D | Poison | | | | | |
| 2E | Lying in wait | | | | | |
| 2F | Torture | | | | | |

## VI. M1 Factual Liability in M2 and VM Cases

| A | B | C | D | | E | F |
|---|---|---|---|---|---|---|
| Foil num | Factual M1 culpability levels under Carlos Window and 2008 Law. | Q.64 | | | Q.65 | |
| | | Carlos Window | | | 2008 Law | |
| | | Clearly present | A close call | | Clearly present | A close call |
| 2G | Discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death (Effective date October 1, 1993). | | | | | |
| 2H | A weapon of mass destruction (Effective date September 17, 2002). | | | | | |
| 31 | Arson (Penal Code Section 451) | | | | | |
| 3B | Rape (Penal Code Section 261) | | | | | |
| 3C | Carjacking (Penal Code Section 215) (Effective date October 1,1993) | | | | | |
| 3D | Robbery (Penal Code Section 211) | | | | | |
| 3E | Burglary (Penal Code Section 459) | | | | | |
| 3F | Mayhem (Penal Code Section 203) | | | | | |
| 3G | Kidnapping (Penal Code Section 207) (Effective date June 6, 1990). | | | | | |
| 3H | Train wrecking (Penal Code Section 219) (Effective date June 6, 1990) | | | | | |
| 3I | Torture (Penal Code Section 206) (Effective date January 1, 2000) | | | | | |
| 3J | Sodomy (Penal Code Section 286) (Effective date June 6, 1990) | | | | | |
| 3K | Lewd act with a child under 14 (Penal Code Section 288). | | | | | |
| 3L | Oral copulation (Penal Code Section 288a) (Effective date June 6, 1990) | | | | | |
| 3M | Penetration by foreign or unknown object (Penal Code Section 289) (Effective date June 6, 1990) | | | | | |
| 3N | Lewd act with a child under 14 or a dependent person (Penal Code Section 288). (Effective date Jan 1, 1996.) | | | | | |
| II. Liability beyond actual killers: provokers and aiders and abettors | | | | | | |
| 08 | Liability for provoking a third party (a victim, a bystander, or a police officer) to commit a homicide because the defendant or surviving co-participant provoked the third party to commit the homicide (M1, M2) | | | | | |
| 09 | The defendant (a) with knowledge of the actual killer's unlawful purpose, and (b) with the intent to facilitate or encourage commission of the homicide, (c) by act or advice aided, promoted, encouraged or instigated the commission of the homicide (M1, M2, or VM) | | | | | |

**VI. M1 Factual Liability in M2 and VM Cases**

| | | | | | | |
|---|---|---|---|---|---|---|
| 10 | Conspiracy Liability. The defendant, with specific intent, agreed with the actual killer and possibly others to commit a homicide and at least one co-conspirator committed an overt act for the purpose of accomplishing the homicide and a co-conspirator committed homicide (M1). | | | | | |
| 11 | First Degree Felony Murder Liability. The defendant intended to or did commit a Penal Code Section 189 enumerated felony (arson, rape carjacking, robbery, burglary, mayhem, kidnapping, etc.) or aided and abetted the commission of such a felony and a homicide occurred in the attempted commission or commission of the felony regardless of whether the killing was intentional, unintentional, or accidental (M1) | | | | | |
| 12 | First Degree Felony Murder Liability Based on Conspiring to Commit an Enumerated Felony. The defendant, with specific intent, agreed with the actual killer and possibly others to commit a Penal Code Section 189 enumerated felony (arson, rape carjacking, robbery, burglary, mayhem, kidnapping, etc.) and at least one co-conspirator committed an overt act for the purpose of accomplishing the felony, and a homicide occurred in the attempted commission or commission of the felony regardless of whether the killing was intentional, unintentional, or accidental (M1). | | | | | |
| 15 | Natural and Probable Consequences Liability. The defendant aided and abetted the actual killer in the commission of a non-homicidal crime for which the homicide was a natural and probable consequence (M1, M2). | | | | | |
| 16 | Natural and Probable Consequences Liability Based on Conspiracy. The defendant, with specific intent, agreed with the actual killer and possibly others to commit a non-homicidal crime for which the homicide was a natural and probable consequence and at least one co-conspirator committed an overt act for the purpose of accomplishing the felony (M1, M2) | | | | | |
| 17 | M2 culpability level* | | | | | |
| 18 | VM culpability level* | | | | | |

*The culpability levels for M2 and VM are listed below for your information. They are not to be coded here.

**(M2 and VM Culpability Levels Under *Carlos* Window (CW), and 2008 law. These definitions of M2 and VM culpability levels are presented for coder guidance in evaluating foils 17 and 18 in the preceding Tables for Q64 and Q.65. However, they are not to be coded in the Q64 and Q65 tables**

**Section A: Defendant culpability levels as the actual killer in the offense:**

1. Unpremeditated murder with express malice (M2). Defendant intended to kill without deliberation and premeditation.

2. Unpremeditated murder with implied malice murder (M2): M2 liability does not require that the defendant intended to kill. It is established where death resulted from defendant's deliberate act with knowledge that the conduct presented a danger to human life and the defendant acted with a conscious disregard for human life.

3. Felony murder (M2). M2 liability is triggered when the death occurred as the direct casual result of an attempted commission, commission, or escape from the commission or an attempted commission of a felony inherently dangerous to human life (other than those listed for M1 felony murder liability). Liability is established if defendant had specific intent to commit the felony; intent to kill is not required. Examples of inherently dangerous felonies include:

      6A = Furnishing poisonous substance.
      6B = Reckless or malicious possession of destructive device.
      6C = Willful or wanton disregard for safety of persons or property while attempting to elude
          peace officer.

**VI. M1 Factual Liability in M2 and VM Cases**

6D = Willful discharge of firearm at inhabited dwelling.
6E = Willful discharge of firearm at occupied vehicle.
6F = Selling or manufacturing illegal drugs.
6G = Kidnapping (prior to June 6, 1990).
6H = Driving under the influence of drugs or alcohol.
6I = Other_____.

4. Voluntary manslaughter. Defendant had a mens rea that would otherwise support murder liability but the malice aforethought is negated because of:

7A = Provocation. The defendant acted "upon a sudden quarrel or heat of passion" based on legally adequate provocation by the victim that arouses great fear, anger or jealousy (Penal Code 192).
(1) However, M2 liability attaches if the provocation is inadequate or if sufficient time to cool elapsed between the provocation and the killing.
7B = Imperfect self-defense. The defendant acted upon the actual but unreasonable belief in the necessity to defend self/other against imminent peril to life or great bodily injury.

**(During *Carlos* Window law VM liability under both the VM 7A and 7B prongs above required an intent to kill)**

**Section B: Defendant culpability levels as an aider/abettor in the offense:**

1 = Second-Degree Felony Murder Liability Based on a Felony Inherently Dangerous to Human Life. The defendant had the specific intent to commit, encourage, or facilitate the underlying felony, and with knowledge of the actual killer's criminal purpose under Category 6 above and by act or advice intentionally aided or encouraged the actual killer (M2). As with actual killer defendants, intent to kill is not required.

2. = Second Degree Felony Murder Liability Based on Conspiring to Commit a Felony Inherently Dangerous to Human Life. The defendant, with specific intent, agreed with the actual killer and possibly others to commit a felony inherently dangerous to human life and at least one co-conspirator committed an overt act for the purpose of accomplishing the felony, and a homicide occurred in the attempted commission or commission of the felony regardless of whether killing was intentional, unintentional, or accidental (M2)

## 6. FACTUAL Murder/M1 STATUS OF THE CASE

### Under CW law: (Q.75-Q.81)

**66.**     Is the case factually M1 under *Carlos* Window law? (circle ONE best answer)

**Clearly Yes** b/c the facts reported in the probation report are legally sufficient to . . . . . . . . . . . . . . . 1
support a determination of factual M1 status compared to M2 or VM

**Clearly No** b/c the facts reported in the probation report are not legally sufficient . . . . . . . . . . . . . . . 0
to support a determination of factual M1 status compared to M2 or VM.

**A close call** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## VI. M1 Factual Liability in M2 and VM Cases

(If Q.66 = 1, code in Part VII Q.76 = 1; if Q.66 = 0 code Q.76 = 0; if Q.66 = 2, code Q.76 = 2 and explain the basis of the close call in Part I Q.85.)

### Under pre-*Furman* law:

67.   Is the factual murder/M1 status of the case different under pre-*Furman* law? (circle ONE best answer)

Yes, it is different b/c the relevant <u>murder</u> standard under pre-*Furman* law <u>was different</u>. . . . . . . . . . 1
<u>than the M1 standard under *Carlos* Window law.</u>

No, it is the same b/c the relevant <u>murder standard</u> under pre-*Furman* law . . . . . . . . . . . . . . . . . . . . . . . . 2
is the <u>same as the M1 standard  under *Carlos* Window law.</u>

68.   Is the case factually murder under pre-*Furman* law? (circle ONE best answer)

**Clearly Yes** b/c the facts reported in the probation report are legally  . . . . . . . . . . . . . . . . . . . . . . . . 1
sufficient to support a determination of <u>factual murder status compared to VM.</u>

**Clearly No** b/c the facts reported in the probation report are not legally . . . . . . . . . . . . . . . . . . . . . . . 0
sufficient to support a <u>determination of factual murder status compared to VM.</u>

**A close call** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

(If  Q.68 = 1, code in Part VII Q.75 = 1; if Q.68 = 0 code Q.75 = 0; if Q.68 = 2, code Q.75 = 2 and explain the basis of the close call in Part 1 Q.85).

### Under 2008 law:

69.   Is the factual M1 status of the case different under 2008 law? (circle ONE best answer)

Yes, it is different b/c the relevant M1 standard is different under 2008 law . . . . . . . . . . . . . . . . . . . . . 1
than it was under *Carlos* Window law.

No, it is the same b/c the relevant M1 standard is the same under 2008 law . . . . . . . . . . . . . . . . . . . . . 2
as it was under *Carlos* Window law.

70.   Is the case factually M1 under 2008 law? (circle ONE best answer)

**Clearly Yes** b/c the facts reported in the probation report are legally . . . . . . . . . . . . . . . . . . . . . . . . . 1
sufficient to support a determination of factual M1 status compared to M2 or VM

**Clearly No** b/c the facts reported in the probation report are not legally . . . . . . . . . . . . . . . . . . . . . . . 0
sufficient to support a determination of factual M1 status compared to M2 or VM.

**A close call** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

(If Q.70 = 1, code in Part VII Q.79 = 1; if Q.70 = 0 code Q.79 = 0; if Q.70 = 2, code Q.79 = 2 and explain the basis of the close call in Part 1 Q.85.)

### 7.  For M2 or VM conviction Cases That Are Factually M1 (clearly yes or a close call) Under CW or 2008 Law, Is a Special Circumstance Factually Present?[23]

**If the instant case is not factually M1 under CW or 2008 law (i.e., neither clearly yes nor a close call), omit this Section and go to Part VII.**

(Code only if the case is classified as factually M1 under CW or 2008 law in the Section B analysis above, i.e. Q.66 = 1 (clearly yes) or 2 (a close call) or Q.70 = 1(clearly yes) or 2 (a close call).

(Special circumstances adopted after the end of the *Carlos* Window (10/13/87) are applicable only under 2008 law. If the crime in the case was committed after the termination of the *Carlos* window and a 2008 law special circumstance was present in the case, include that information in your answer to Q.73.)

**Coder notes:**
**Answers for question 71 are to be coded in the table directly following Q.71.  The table contains a row for the 22 special circumstances found in the California Penal Code, Section 190.2 (a). There are four columns which can be checked as noted.**

71.   If the facts in the probation report indicate the factual presence of a **special circumstance** under either *Carlos* Window law or 2008 law, code a **check mark** in the **Q.71** columns for each that was alleged. If none, don't check anything.

(Flagging Differences in SCs Under CW and 2008 Law.  Unlike the culpability level distinctions between the three time periods in questions 63-65 that are flagged with italics and underlining, the distinctions between SCs under CW and 2008 law for this question are flagged by the effective dates of amendments with the changes noted in italics. See, for example, foil 10 below.)

**Note that there are two choices under each of the columns named Carlos Window and 2008 Law.** For either or both that apply, check the appropriate box: **"Clearly present" or "A close call":**

| A | B | C | D | | E | F |
|---|---|---|---|---|---|---|
| Foil Num | Penal Code Section 190.2(a). California Special Circumstances. Question 71 | Carlos Window | | | 2008 Law | |
| | | Clearly present | A close call | | Clearly present | A close call |
| 1 | The murder was intentional and carried out for **financial gain**. | | | | | |
| 2 | The defendant was **convicted previously of murder in the first or second degree**. For the purpose of this paragraph, an offense committed in another jurisdiction, which if committed in California would be punishable as first or second degree murder, shall be deemed murder in the first or second degree. | | | | | |
| 3 | The defendant, in this proceeding, has been convicted of **more than one offense of murder** in the first or second degree. | | | | | |

---

[23] The law is such that if a SC is applicable under CW law, it will also be applicable under 2008 law because no CW special circumstances have been deleted, although post-CW some of the CW special circumstances have been expanded or limited as indicated in the Q. 71 foils listed below.  However, since CW a number of SC were adopted and are applicable only under 2008 law.

## VI. Special Circumstances in M2 and VM Cases

| A | B | C | D | | E | F |
|---|---|---|---|---|---|---|
| Foil Num | **Penal Code Section 190.2(a). California Special Circumstances. Question 71** | **Carlos Window** | | | **2008 Law** | |
| | | Clearly present | A close call | | Clearly present | A close call |
| 4 | The murder was committed by means of a **destructive device, bomb**, or explosive planted, hidden, or concealed in any place, area, dwelling, building, or structure, and the defendant knew, or reasonably should have known, that his or her act or acts would create a great risk of death to one or more human beings. | | | | | |
| 5 | The murder was committed for the **purpose of avoiding or preventing a lawful arrest**, or perfecting or attempting to perfect, an escape from lawful custody. | | | | | |
| 6 | The murder was committed by means of a **destructive device, bomb**, or explosive that the defendant mailed or delivered, attempted to mail or deliver, or caused to be mailed or delivered, and the defendant knew, or reasonably should have known, that his or her act or acts would create a great risk of death to one or more human beings. | | | | | |
| 7 | The **victim was a peace officer**, as defined in Section 830.1, 830.2, 830.3, 830.31, *830.32, 830.33, 830.34,* 830.35, 830.36, *830.37,* 830.4, 830.5, 830.6, 830.10, 830.11, or 830.12, who, while engaged in the course of the performance of his or her duties, was intentionally killed, and the defendant knew, or reasonably should have known, that the victim was a peace officer engaged in the performance of his or her duties; or the victim was a peace officer, as defined in the above-enumerated sections, or a former peace officer under any of those sections, and was intentionally killed in retaliation for the performance of his or her official duties.  **(Italicized language effective June 6, 1990)** | | | | | |
| 8 | The **victim was a federal law enforcement officer** or agent who, while engaged in the course of the performance of his or her duties, was intentionally killed, and the defendant knew, or reasonably should have known, that the victim was a federal law enforcement officer or agent engaged in the performance of his or her duties; or the victim was a federal law enforcement officer or agent, and was intentionally killed in retaliation for the performance of his or her official duties. | | | | | |
| 9 | The **victim was a firefighter**, as defined in Section 245.1, who, while engaged in the course of the performance of his or her duties, was intentionally killed, and the defendant knew, or reasonably should have known, that the victim was a firefighter engaged in the performance of his or her duties. | | | | | |
| 10 | The **victim was a witness to a crime** who was intentionally killed **for the purpose of preventing his or her testimony** in any criminal *or juvenile* proceeding, and the killing was not committed during the commission or attempted commission of the crime to which he or she was a witness; or the victim was a witness to a crime and was intentionally killed in retaliation for his or her testimony in any criminal *or juvenile* proceeding. *As used in this paragraph, "juvenile proceeding" means a proceeding brought pursuant to Section 602 or 707 of the Welfare and Institutions Code.* **(Italicized language effective June 6, 1990).** | | | | | |

## VI. Special Circumstances in M2 and VM Cases

| A | B | C | D | | E | F |
|---|---|---|---|---|---|---|
| Foil Num | **Penal Code Section 190.2(a). California Special Circumstances. Question 71** | **Carlos Window** | | | **2008 Law** | |
| | | Clearly present | A close call | | Clearly present | A close call |
| 11 | The **victim was a prosecutor or assistant prosecutor** or a former prosecutor or assistant prosecutor of any local or state prosecutor's office in this or any other state, or of a federal prosecutor's office, and the murder was *intentionally* carried out in retaliation for, or to prevent the performance of, the victim's official duties (Italicized language effective June 6, 1990). | | | | | |
| 12 | The **victim was a judge or former judge** of any court of record in the local, state, or federal system in this or any other state, and the murder was *intentionally* carried out in retaliation for, or to prevent the performance of, the victim's official duties (Italicized language effective June 6, 1990). | | | | | |
| 13 | The **victim was an elected or appointed official** or former official of the federal government, or of any local or state government of this or any other state, and the killing was intentionally carried out in retaliation for, or to prevent the performance of, the victim's official duties. | | | | | |
| 14 | Omitted: former "heinous, atrocious, and cruel" | | | | | |
| 15 | The defendant intentionally killed the victim *by means of* **lying in wait.** (Italicized language effective March 8, 2000). Prior to March 8, 2000 (thus, during the *Carlos* Window period), the statutory language of the lying in wait special circumstance read as follows: "The defendant intentionally killed the victim while lying in wait." | | | | | |
| 16 | The **victim was intentionally killed because** of his or her race, color, religion, nationality, or country of origin. | | | | | |
| 17 | **The murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit, the following felonies:** | | | | | |
| *17A* | **Robbery** in violation of Section 211 or *212.5.* (Italicized language effective 1991 but additional language made no substantive change.) | | | | | |
| *17B* | **Kidnapping** in violation of Section 207 or 209 *or 209.5.* (Italicized language effective March 27, 1996.  [Also consult subparagraph "17M" below] | | | | | |
| *17C* | **Rape** in violation of Section 261 | | | | | |
| *17D* | **Sodomy** in violation of Section 286. | | | | | |
| *17E* | The performance of a **lewd or lascivious act** upon the person of a **child** under the age of 14 years in violation of Section 288. | | | | | |
| *17F* | **Oral copulation** in violation of Section 288a. | | | | | |
| *17G* | **Burglary** in the first or second degree in violation of Section 460. | | | | | |
| *17H* | **Arson** in violation of subdivision (b) of Section 451 (Prior to June 6, 1990, Penal Code section 190.2 referred to the arson provision contained in Section 447, but section 447 had been repealed in 1929.). [Also consult subparagraph "17M" below.] | | | | | |
| *17I* | **Train wrecking** in violation of Section 219. | | | | | |

## VI. Special Circumstances in M2 and VM Cases

| A | B | C | D | | E | F |
|---|---|---|---|---|---|---|
| Foil Num | Penal Code Section 190.2(a). California Special Circumstances. Question 71 | Carlos Window | | | 2008 Law | |
| | | Clearly present | A close call | | Clearly present | A close call |
| *17J* | **Mayhem** in violation of <u>Section 203</u> **(Effective date June 6, 1990).** | | | | | |
| *17K* | **Rape by instrument** in violation of <u>Section 289</u> **(Effective date June 6, 1990).** | | | | | |
| *17L* | **Carjacking**, as defined in <u>Section 215</u> **(Effective date March 27, 1996).** | | | | | |
| *17M* | To prove the special circumstances of kidnapping in subparagraph (B), or arson in subparagraph (H), <u>if there is a specific intent to kill [in this case]</u>, it is only required that there be proof of the elements of those felonies. If so established, those two special circumstances are proven even if the felony of kidnapping or arson is committed primarily or solely for the purpose of facilitating the murder." **(Effective date March 8, 2000). (underline and [bracket] emphasis added)** | | | | | |
| 18 | The murder was intentional and involved the **infliction of torture. Prior to June 6, 1990, (thus, during the *Carlos Window* period) the statutory language of this special circumstance also required that: "For the purpose of this section torture requires proof of the infliction of extreme physical pain no matter how long its duration.** | | | | | |
| 19 | The defendant intentionally killed the victim by the **administration of poison.** | | | | | |
| 20 | The **victim was a juror in any court** of record in the local, state, or federal system in this or any other state, and the murder was intentionally carried out in retaliation for, or to prevent the performance of, the victim's official duties. **(Effective date March 27, 1996).** | | | | | |
| 21 | The murder was intentional and perpetrated by means of **discharging a firearm from a motor vehicle**, intentionally at another person or persons outside the vehicle with the intent to inflict death. For purposes of this paragraph, "motor vehicle" means any vehicle as defined in <u>Section 415 of the Vehicle Code</u>. **(Effective date March 27, 1996).** | | | | | |
| 22 | The defendant intentionally killed the victim while the **defendant was an active participant in a criminal street gang**, as defined in subdivision (f) of <u>Section 186.22</u>, and the murder was carried out to further the activities of the criminal street gang. **(Effective date March 8, 2000).** | | | | | |

**119**

**VI. Special Circumstances in M2 and VM Cases**

## Under CW law:

72.     Is a special circumstance factually present in the
        case under CW law? (circle ONE best answer)

        **Clearly Yes** b/c the facts reported in the probation report are legally sufficient to . . . . . . . . . . . . . . . 1
        support a determination of the factual presence of a special circumstance in the case
        under *Carlos* Window law

        **Clearly No** b/c the facts reported in the probation report are not legally sufficient to . . . . . . . . . . . . 0
        support a determination of the factual presence of a special circumstance in the case under
        *Carlos* Window law.

        **A close call** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        (If Q.72 = 1, code Part VII Q.77 = 1; if Q.72 = 0 code Q.77 = 0; if Q.72 = 2 code
        Q.77 = 2 and explain the basis of the close call in the Part I Thumbnail Sketch template, Q.85.)

## Under 2008 law:

73.     Are the statutorily defined and potentially applicable special circumstance(s) in the case different
        under 2008 law compared to CW law (whether or not the SC was charged by the prosecutor or
        rejected by the jury in the instant case)?  (circle ONE best answer)

        **Yes**, all are different b/c none of the statutorily defined and potentially applicable special
        circumstance(s) under 2008 law were statutorily defined and potentially applicable under *Carlos*
        Window law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        **No**, they are the same b/c one or more of the relevant special circumstance(s) that were statutorily
        defined and potentially applicable under 2008 law were also statutorily defined and potentially
        applicable under *Carlos* Window law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

74.     Is a special circumstance factually present in the case under 2008 law? (circle ONE best answer)

        **Clearly Yes** b/c the facts reported in the probation report are legally sufficient to . . . . . . . . . . . . . . 1
        support a determination of the factual presence of a special circumstance in the case under
        2008 law

        **Clearly No** b/c the facts reported in the probation report are not legally sufficient to support a . . . . . 0
        determination of the factual presence of a special circumstance in the case under 2008 law.

        **A close call** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        (If Q.74 = 1, code in Part VII Q.80 = 1; if  Q.74 = 0 code Q.80 = 0; Q.74 = 2 code Q.80 = 2
        and explain the basis of the close call in the Part I Thumbnail Sketch template Q.85.)

## Part VII.  Summary of Coder Classifications on Factual-Homicide Liability and Death-eligibility in Three Time Periods

### Pre-*Furman* law:

**75.**  <u>Factual murder liability and death-eligibility?</u> (circle ONE best answer)

Clearly yes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Clearly no  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  0

A close call  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

### Carlos Window (CW) law (12/12/1983 – 10/12/1987):

**76.**  Factual M1 liability under CW law? (circle ONE best answer)

Clearly yes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Clearly no . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  0

A close call  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

**77.**  Special circumstances present under CW law? (circle ONE best answer)

Clearly yes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Clearly no . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  0

A close call  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Not applicable b/c no M1 conviction or not factually M1 . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

**78.**  Death-eligibility under CW law? (circle ONE best answer)

Clearly yes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Clearly no . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  0

A close call  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

**January 1, 2008 law:**

79.    Factual M1 liability Jan. 1, 2008? (circle ONE best answer)

    Clearly yes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

    Clearly no  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    0

    A close call  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2


80.    Special circumstances present Jan. 1, 2008? (circle ONE best answer)

    Clearly yes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

    Clearly no  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    0

    A close call  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

    Not applicable b/c no M1 conviction or not factually M1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8


81.    Death-eligible Jan. 1, 2008? (circle ONE best answer)

    Clearly yes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

    Clearly no  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    0

    A close call  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

**81A-88. <u>Check all that apply in the following table:</u>**

| Thumbnail Template Questions | Check below with an "X" if the question was answered in the Thumbnail Template/File |
|---|---|
| **Q.81A.Information insufficiency.** | |
| **Q.82.  M1 liability differences under pre-Furman, CW, and 2008 law.** | |
| **Q.83.  Special circumstances differences under CW and 2008 law.** | |
| **Q.84.  Death-eligibility differences.** | |
| **Q.85.  Ambiguity.** | |
| **Q.86.  Legal Issues.** | |
| **<u>Q.87.  Special Circumstances present in a CFF M2/VM Conviction</u>** | |
| **<u>Q.88.  Other facts or circumstances</u>** | |

**89.** Date the DCI for the coding for this case was completed:

MONTH                                               |___|___|

DAY                                                    |___|___|

YEAR                                                   |___|___|___|___|

Page numbers when a Question and/or a Cross Reference is to a Page number:

| A | B |
|---|---|
| **Question (s) or Reference** | **Page(s)** |
| Para. 2.a. and 2.b. | 7 |
| Q. 53 | 25-28 |
| Q. 60 | 32 |
| Q. 60A | 33-36 |
| Q. 60B | 37 |
| Q. 60C | 37 |
| Q. 61 | 37 |
| Q. 62 | 38 |
| Part VI | 38 |
| Part VII | 51 |
| Q. 75 | 51 |
| Q. 76 | 51 |
| Q. 77 | 51 |
| Q. 78 | 51 |
| Q. 79 | 52 |
| Q. 80 | 52 |
| Q. 81 | 52 |
| Q. 81A | 53 |
| Q. 82 | 53 |
| Q. 84 | 53 |
| Q. 85 | 53 |
| Q. 87 | 53 |
| Q. 88 | 53 |

**S:\baldus-ra\Cal\DCI\DCI Current\DCI Declaration 12.2.09.doc**

FIGURE 1

PATHWAYS TO DEATH ELIGIBILITY CLASSIFICATIONS UNDER *CARLOS* WINDOW AND 2008 LAW:
CALIFORNIA HOMICIDE STUDY[1]



---

[1]DE = Death eligible; NDE = Not death eligible

Page 55

**125**